**KOLLER LAW LLC**
David M. Koller, Esquire (90119)                         *Counsel for Plaintiff*
Sarah R. Lavelle, Esquire (93383)
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
T: (215) 545-8917
F: (215) 575-0826
davidk@kollerlawfirm.com
slavelle@kollerlawfirm.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **APRIL NITKIN,** | : | |
| **49 Garlor Drive** | : | **Civil Action No.** |
| **Havertown, PA 19083** | : | |
| **Plaintiff,** | : | |
| v. | : | **COMPLAINT AND** |
| | : | **JURY DEMAND** |
| **MAIN LINE HEALTH d/b/a** | : | |
| **BRYN MAWR HOSPITAL,** | : | |
| **130 S Bryn Mawr Avenue** | : | |
| **Bryn Mawr, PA 19010** | : | |
| | : | |
| **240 North Radnor Chester Road** | : | |
| **Radnor, PA 19087** | : | |
| **Defendant.** | : | |

## CIVIL ACTION

Plaintiff, April Nitkin (hereinafter "Plaintiff"), by and through her attorney, brings this civil matter against Defendant, Main Line Health d/b/a Bryn Mawr Hospital (hereinafter, "Defendant"), alleging she was subject to unlawful violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA"), and avers and alleges as follows:

## THE PARTIES

1. Plaintiff is an adult individual domiciled in the above captioned address.

1

2. Defendant is a medical facility system with a location at 130 S Bryn Mawr Avenue, Bryn Mawr, PA 19010 and with a corporate headquarters located at 240 North Radnor Chester Road, Radnor, PA 19087.

3. At all relevant times hereto, Defendant employed the requisite number of employees under the applicable statutes.

4. At all times hereto, Defendant employed managers, supervisors, agents and employees who Plaintiff alleges had the authority to make decisions concerning Plaintiff's employment. In making said decision, these individuals engaged in the practice of treatment which forms the basis of Plaintiff allegations in the instant Complaint.

5. At all times relevant hereto, Defendant employed managers, supervisors, agents and employees who acted directly or indirectly in the interest of the employer. In so acting these individuals engaged in the pattern and practice of treatment which forms the basis of the Plaintiff's allegations in the instant Complaint.

## JURISDICTION AND VENUE

6. The Court may properly maintain personal jurisdiction over Defendant because the Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction and comply with traditional notions of fair play and substantial justice, thus satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

7. The Court may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal law.

8. The Court may also maintain supplemental jurisdiction over state law claims set forth herein

pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction that they form part of the same case or controversy.

9. Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located in this judicial district and because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff exhausted her administrative remedies under Title VII. Butterbaugh v. Chertoff, 479 F. Supp. 2d 485 (W.D. Pa. 2007).

11. Plaintiff filed a timely written Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment and retaliation against Defendant.

12. The Charge was assigned a Charge Number of 533-2020-00415 and was duly filed with the Pennsylvania Human Relations Commission ("PHRC").

13. The EEOC issued Plaintiff a Dismissal and Notice of Rights ("Right to Sue") by request and that Notice is dated July 2, 2020. Plaintiff received the notice by mail.

14. Plaintiff files the instant Complaint within ninety (90) days of her receipt of the Notice of Right to Sue letter relative the Charge.

15. Prior to the filing of this action, Plaintiff notified the EEOC of her intent to proceed with a lawsuit in federal court.

16. Plaintiff has exhausted her administrative remedies as to the allegations of this Complaint.

3

**FACTUAL SUMMARY**

**PLAINTIFF'S EMPLOYMENT HISTORY WITH DEFENDANT**

17. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

18. In January 2016, Defendant hired Plaintiff in the position of Certified Registered Nurse

   Practitioner ("CRNP") in its Palliative Care unit.

19. Plaintiff was well qualified for her position and performed well.

**PLAINTIFF'S DIRECT SUPERVISOR SUBJECTED HER TO A HOSTILE WORK
ENVIRONMENT DUE TO SEVERE AND PERVASIVE SEXUAL HARASSMENT**

20. Since the start of Plaintiff's employment, Dr. Karl Ahlswede, Medical Director and

   Plaintiff's direct supervisor, frequently made sexually inappropriate comments and jokes.

21. Dr. Ahlswede openly discussed his sexual fantasies, his desire to engage in particular sexual

   acts and his desire to engage in sexual foreplay.

22. He commented about wanting to engage in sexual relations with his wife, also an employee

   of Defendant, and stated that a woman could control any man through sex.

23. In addition, Dr. Ahlswede regularly joked that his recurrent prostate infections and

   inflammation was the result of having "too much sex with promiscuous women" and that his

   wife had given him a sexually transmitted disease.

24. Dr. Ahlswede made these sexually inappropriate comments in a group setting in the presence

   of multiple female subordinates, including, but not limited to, Plaintiff.

25. Initially, Plaintiff did not complain about Dr. Ahlswede's sexual harassment because she

   feared retaliation.

**DR. AHLSWEDE'S SEXUAL HARASSMENT WAS UNBRIDLED**

26. In or around September 2018, Dr. Ahlswede entered Plaintiff's office and closed the door.

4

27. Plaintiff asked Dr. Ahlswede if he was okay because he looked extremely tired.

28. He responded by telling Plaintiff that he had been awake most of the previous night watching pornography and masturbating and that he had an obsession with them.

29. Dr. Ahlswede also commented that he has been "addicted" to pornography for years.

30. After a long period of awkward silence, Plaintiff left her own office because she was so uncomfortable with Dr. Ahlswede's comments.

31. Plaintiff did not complain about Dr. Ahlswede's comments at that time because she feared retaliation.

32. The following week, Dr. Ahlswede announced to a group of female employees including Plaintiff, on the Palliative Care team that he was having self-destructive thoughts and that he was contemplating cheating on his wife.

33. He then proceeded to ask the employees where their loyalties would lie if he did have an affair.

34. Plaintiff was very uncomfortable with Dr. Ahlswede's unrestrained sexual harassment.

**DR. AHLSWEDE RETALIATED AGAINST PLAINTIFF FOR HER DISAPPROVAL OF HIS SEXUALLY INAPPROPRIATE CONDUCT**

35. Plaintiff would turn away from Dr. Ahlswede or leave the situation when he began to make his sexually inappropriate comments.

36. Plaintiff was forced to change her employment status from full-time to part-time, and then to per diem in order to limit interactions with Dr. Ahlswede.

37. In response, Dr. Ahlswede attempted to humiliate Plaintiff in retaliation for her disapproval of and lack of engagement into his sexually inappropriate conduct.

38. Dr. Ahlswede proceeded to inform Plaintiff that "the team" did not feel that Plaintiff trusted

them because she did not share personal information with them.

39. When Plaintiff informed Dr. Ahlswede that she shared what she felt comfortable sharing, he

proceeded to call in other team members individually and ask them how Plaintiff's alleged

inability to share personal information affected them.

40. Plaintiff found this humiliating, inappropriate, unprofessional, and a further demonstration of

his retaliatory animus..

## DR. AHLSWEDE INSTRUCTED PLAINTIFF AND HER COWORKERS TO ASSIST HIM IN QUESTIONABLE BUSINESS PRACTICES WHICH MADE PLAINTIFF VERY UNCOMFORTABLE

41. On February 27, 2019, Dr. Ahlswede held a meeting with Plaintiff, Michelle Reed, Kyle

Englebart, Liz Lewis and Katie Neer, CRNPs.

42. Dr. Ahlswede requested that each of them to look at each patients' insurance and to send him

notes to co-sign for patients who had Blue Cross insurance, as CRNPs were not collecting

billing on Blue Cross patients.

43. This would mean that Dr. Ahlswede would co-sign the notes of patients who he did not treat.

44. Ms. Lewis complained that if they did as Dr. Ahlswede requested, he would be co-signing for

patients who he did not treat and often would not even be in the same building at the time.

45. However, Dr. Ahlswede ignored Ms. Lewis' complaint of this serious legal and ethical

violation and explained that it was "like going 70 in a 65" in an attempt to pressure Plaintiff

and the other CRNPs into engaging in questionable business practices which made Plaintiff

very uncomfortable.

46. He stated further that he as a "professional adult can decide what the correct documentation

is."

47. Plaintiff expressed concern in this group to Dr. Ahlswede and vehemently opposed his

proposed business practices, and warned him over what she felt would be the consequences of him engaging in such practices.

**PLAINTIFF REPORTED DR. AHLSWEDE'S SEXUAL HARASSMENT AND
BUSINESS PRACTICES TO HUMAN RESOURCES**

48. Shortly afterwards, Plaintiff reported Dr. Ahlswede's above-referenced business practices to Dr. James Gengaro, Vice President of Medical Affairs, and requested guidance on how to properly address Dr. Ahlswede's conduct.

49. Dr. Gengaro instructed Plaintiff to contact Eric Mendez, Director of Human Resources, to report Dr. Ahlswede's conduct.  Plaintiff followed Dr. Gengaro's instructions.

50. In or around early March 2019, Plaintiff contacted Human Resources by phone and email and requested to have a meeting regarding Dr. Ahlswede's sexual harassment and business practices.

51. After repeated attempts to meet, Plaintiff eventually met with Mr. Mendez on March 22, 2019, and complained about Dr. Ahlswede's severe and pervasive sexual harassment and business practices.

52. Plaintiff provided specific examples of Dr. Ahlswede's conduct.

53. Despite providing specific examples, Mr. Mendez was skeptical of Plaintiff's complaint.

54. Mr. Mendez stated to Plaintiff that he had known Dr. Ahlswede for 20 years and did not believe that he would engage in the conduct Plaintiff was reporting to him.

**PLAINTIFF MET WITH MR. MENDEZ AGAIN, BUT HER COMPLAINT WAS NOT
PROPERLY ADDRESSED**

55. On April 1, 2019, Plaintiff met with Mr. Mendez again, this time at a local Starbucks because for confidentiality reasons and for fear of retaliation.

56. Plaintiff provided Mr. Mendez with the names of witnesses of Dr. Ahlswede's sexual

harassment.

57. Mr. Mendez informed Plaintiff that he did not plan on contacting the witnesses, and that he just wanted to see if she actually had any witnesses.

58. Additionally, Mr. Mendez requested Plaintiff to go into the charts of patients who she had identified as being victims of Dr. Ahlswede's questionable business practices.

59. Plaintiff informed Mr. Mendez that she did not feel comfortable doing so, as this was considered a terminable offense under Defendant's policies.

60. Mr. Mendez responded that he had enough information from what Plaintiff had already provided.

61. Due to Mr. Mendez's comments and skepticism, Plaintiff worried and believed that he would not properly address her complaints.  And she turned out to be right – he did not.

**PLAINTIFF WAS AWARDED FOR HER EXEMPLARY PERFORMANCE**

62. On April 18, 2019, Plaintiff was presented with a Daisy Award to recognize her outstanding clinical care.

**PLAINTIFF MET WITH MR. MENDEZ FOR A THIRD TIME**

63. On April 25, 2019, Plaintiff met with Mr. Mendez for the third time.

64. During this meeting, Mr. Mendez informed Plaintiff that he and Barbara Wadsworth, Senior Vice President and Chief Nursing Officer, had met separately with Dr. Ahlswede and that he had admitted to his conduct.

65. Mr. Mendez told Plaintiff that as a result, Dr. Ahlswede would step down as the Director of the Palliative Care team and would have to take a 10-day leave of absence.

66. Mr. Mendez also informed Plaintiff that Dr. Ahlswede would not return with a supervisory role over her.

67. However, Mr. Mendez then proceeded to interrogate Plaintiff about why she went to Human Resources with her complaint, instead of going directly to Dr. Ahlswede or Ms. Wadsworth

68. Plaintiff felt that Mr. Mendez was blaming her for the disciplinary actions issued to Dr. Ahlswede.

69. At the conclusion of the meeting, Mr. Mendez informed Plaintiff that the Defendant investigated her allegations against M+Dr. Ahlswede regarding his business practices, and that the Defendant was unable to conclude that he engaged in any unlawful or unethical conduct.

**PLAINTIFF SUFFERED A PANIC ATTACK AT WORK AND WAS PLACED ON A MEDICAL LEAVE OF ABSENCE FOR APPROXIMATLEY ONE (1) MONTH**

70. On April 26, 2019, Plaintiff went to Defendant and was preparing for a family meeting when one of her coworkers asked her, "What happened to Karl is he ok?"

71. Plaintiff began to feel hot and dizzy, so she excused herself to get some water.

72. However, after she went up the stairwell to the office, she began to have tunnel vision and her hands and legs went numb.

73. She sat in a chair as Ms. Reed, Ms. Pelligrino and Mr. Englebart attempted to get her water and to help.

74. However, the tunnel vision became worse and she began to shake uncontrollably and cry.

75. One of Plaintiff's coworkers called Plaintiff's husband to pick her up because her symptoms were so severe that she could not drive herself home.  Plaintiff's husband picked her up from Defendant and took her home.

76. Several days later, Plaintiff's symptoms had not subsided, and she was taken to the Emergency Room at Bryn Mawr Hospital for treatment.

77. Plaintiff had suffered a panic attack and was forced to take a medical leave of absence for approximately one (1) month.

78. After receiving treatment from multiple medical providers, it was concluded that Plaintiff's panic attack and persistent symptoms were caused by Defendant's conduct.

## PLAINTIFF CONTINUED TO REPORT TO DR. AHLSWEDE AND WAS RETALIATED AGAINST

79. When Plaintiff returned to work, Dr. Adam Tyson was the acting Director of the Palliative Care team.

80. However, Dr. Ahlswede continued to be an attending physician on the team and served as Plaintiff's direct supervisor, despite previous assurances that he would no longer serve in that role over her.

81. When Plaintiff was assigned to directly report to Dr. Ahlswede, he refused to communicate with her regarding patient care.

82. This was retaliatory as Dr. Ahlsweded tried to prevent Plaintiff from completing her job duties.

83. When Plaintiff requested to be scheduled on different shifts than Dr. Ahlswede, vicious rumors were spread about her.

## DEFENDANT FORCED PLAINTIFF TO RESIGN OR BE TERMINATED

84. On July 16, 2019, Plaintiff met with Mr. Mendez for a fourth time.

85. During this meeting, in an act of blatant retaliation, Mr. Mendez accused Plaintiff of discussing a confidential investigation and stated that it was grounds for immediate termination.

86. Mr. Mendez informed Plaintiff that she could either resign immediately or be terminated.

10

87. In addition, Mr. Mendez stated to Plaintiff that he would have to disclose her suspension which could jeopardize her future employment. He notified Plaintiff that if she resigned, he would not disclose it.

88. Later that day, faced with no choice of continued employment and threatened with retaliation regarding future employment, Plaintiff submitted her resignation letter. She was forced and coerced into resigning.

## DEFENDANT ANNOUNCED PLAINTIFF'S RESIGNATION BEFORE HER MEETING WITH MR. MENDEZ

89. The following day on July 17, 2019, Barbara Wadsworth, SVP of Patient Services and Chief Nursing officer, met with the entire Palliative Care System Team and stated that Plaintiff made accusations against Dr. Ahlswede, an investigation was done, and it concluded with Plaintiff's resignation.

90. She stated further that Defendant fully supports Dr. Ahlswede (who was present during this meeting) and instructed the team not to speak to Plaintiff.

91. Plaintiff also learned that multiple physicians on the Palliative Care System Team made similar statements during meetings with staff on July 16, 2019.

92. These meetings occurred even before Plaintiff had been notified by Mr. Mendez that she had to either resign or face termination.

## DEFENDANT CONTINUED TO RETALIATE AGAINST PLAINTIFF BY INTERFERING WITH HER SUBSEQUENT EMPLOYMENT EFFORT

93. Following Plaintiff's resignation, Defendant continued to retaliate against Plaintiff for her complaints against Dr. Allswede's sexual harassment and conduct towards her.

94. Defendant attempted to interfere with Plaintiff's efforts to obtain subsequent employment as Dr. Tyson refused to complete the Physician Reference for credentialing required for her

position as a CRNP.

95. Dr. Tyson refused to complete the Physician Reference by stating that he did not know Plaintiff well enough.

96. However, Plaintiff worked with Dr. Tyson long enough for him to complete the Physician Reference.

97. This was a clear attempt by Defendant to prohibit Plaintiff from obtaining subsequent employment.

## COUNT I – SEXUAL HARASSMENT – HOSTILE WORK ENVIRONMENT
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

98. Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as if the same were set forth more fully at length herein.

99. Taken together, the acts outlined above constitute a hostile work environment based on sex.

    a. Plaintiff suffered intentional discrimination because of her membership in a protected class – female.

    b. Such discrimination was severe or pervasive.

    c. Such discrimination detrimentally affected Plaintiff.

    d. Such discrimination would have detrimentally affected a reasonable woman in Plaintiff's position.

100. The unlawful employment practices outlined above were intentional.

101. Plaintiff suffered tangible employment actions as alleged herein.

102. Defendants knew or reasonably should have known of the sexual harassment.

103. Defendants failed to exercise reasonable care to prevent and promptly correct the harassing behavior.

12

104.   As a result of Defendants' conduct as aforementioned, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra.*

### COUNT II – SEXUAL HARASSMENT – HOSTILE WORK ENVIRONMENT
### PENNSYLVANIA HUMAN RELATIONS ACT

105.   Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as if the same were set forth more fully at length herein.

106.   The foregoing conduct created a sexually hostile work environment for Plaintiff.

107.   Plaintiff suffered intentional discrimination because of her sex.

108.   Defendant subjected Plaintiff to unwelcome conduct of a sexual nature that was severe or pervasive.

109.   The discrimination detrimentally affected Plaintiff.

110.   Plaintiff suffered tangible employment actions as alleged herein.

111.   The discrimination would detrimentally affect a reasonable woman in Plaintiff's position.

112.   Defendant knew or reasonably should have known of the sexual harassment.

113.   Defendant failed to exercise reasonable care to prevent and promptly correct the harassing behavior.

114.   As a result of Defendant's conduct as aforementioned, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra.*

## COUNT III – RETALIATION
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

115.　Plaintiff incorporates all the above paragraphs as if they were set forth at length herein.

116.　Plaintiff refused sexual advances from a supervisor at Defendant.

117.　Plaintiff made internal complaints regarding the sexual harassment by her supervisor.

118.　Defendant took adverse employment actions against Plaintiff, including, but not limited to, termination.

119.　There exists a causal connection between Plaintiff's complaints of sexual harassment and the adverse employment action.

120.　Defendant constructively terminated Plaintiff's employment as a result of her complaining of sexual harassment.

121.　As a result of Defendant's unlawful retaliation, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra.*

## COUNT IV – RETALIATION
## PENNSYLVANIA HUMAN RELATIONS ACT

122.　Plaintiff incorporates all the above paragraphs as if they were set forth at length herein.

123.　Plaintiff incorporates all the above paragraphs as if they were set forth at length herein.

124.　Plaintiff refused sexual advances from a supervisor at Defendant.

125.　Plaintiff made internal complaints regarding the sexual harassment by her supervisor.

126.　Defendant took adverse employment actions against Plaintiff, including, but not limited to, termination.

127.　There exists a causal connection between Plaintiff's complaints of sexual harassment and

14

the adverse employment action.

128.   Defendant constructively terminated Plaintiff's employment as a result of her

complaining of sexual harassment.

129.   As a result of Defendant's unlawful retaliation, Plaintiff has suffered damages as set forth

herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this

Complaint, *infra.*

## COUNT V – WRONGFUL TERMINATION

130.   Plaintiff incorporates all the above paragraphs as if they were set forth at length herein.

131.   Plaintiff was an at-will employee with Defendant.

132.   Defendant terminated Plaintiff in retaliation for her reporting fraudulent insurance

practices at Defendant.

133.   This is a violation of the at-will employment doctrine in Pennsylvania.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this

Complaint, *infra.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, April Nitkin, requests that the Court grant her the following

relief against Defendant:

(a)   Damages for past and future monetary losses as a result of Defendant unlawful
discrimination;

(b)   Compensatory damages;

(c)   Punitive damages;

(d)   Emotional pain and suffering;

15

(e)     Reasonable attorneys' fees;

(f)     Recoverable costs;

(g)     Pre and post judgment interest;

(h)     An allowance to compensate for negative tax consequences;

(i)     A permanent injunction enjoining Defendant, its directors, officers, employees, agents, successors, heirs and assigns, and all persons in active concert or participation with them, from engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of Title VII and the PHRA.

(j)     Order Defendant to remove and expunge, or to cause to be removed and expunged, all negative, discriminatory, and/or defamatory memoranda and documentation from Plaintiff's record of employment, including, but not limited, the pre-textual reasons cited for her adverse actions, disciplines, and termination; and

(k)     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure.

## JURY TRIAL DEMAND

Demand is hereby made for a trial by jury as to all issues.

## CERTIFICATION

I hereby certify that to the best of my knowledge and belief the above matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, nor at the present time any other action or arbitration proceeding contemplated.

16

RESPECTFULLY SUBMITTED,

**KOLLER LAW LLC**

Date: October 1, 2020

By:   ***/s/ David M. Koller***
      David M. Koller, Esquire
      Sarah R. Lavelle, Esquire
      2043 Locust Street, Suite 1B
      Philadelphia, PA 19103
      T: (215)-545-8917
      F: (215)-575-0826
      davidk@kollerlawfirm.com
      slavelle@kollerlawfirm.com

      *Counsel for Plaintiff*

17