### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **APRIL NITKIN**, <br><br> Plaintiff, <br><br> *v.* <br><br> **MAIN LINE HEALTH d/b/a BRYN MAWR HOSPITAL,** <br><br> Defendant. | **CIVIL ACTION** <br><br><br> **NO. 20-4825-KSM** |

### <u>MEMORANDUM</u>

**Marston, J.**                                                                 **October 18, 2021**

Plaintiff April Nitkin has sued her former employer, Defendant Main Line Health d/b/a

Bryn Mawr Hospital ("MLH"), alleging that MLH discriminated against her after she reported

Dr. Karl Ahlswede, a doctor with whom she practiced, for fraudulent billing and for making

inappropriate comments of a sexual nature.  (Doc. No. 1.)  Nitkin—who alleges that she was

fired after discussing MLH's investigation into Ahlswede's conduct with her colleagues—seeks

relief under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human

Relations Act ("PHRA") and asserts claims for hostile work environment and retaliation.  (*Id.*)

Nitkin also brings a wrongful termination claim under Pennsylvania law.  (*Id.*)

MLH has filed a motion for summary judgment, arguing that Nitkin's hostile work

environment claim must fail because she cannot show that Ahlswede's sexually harassing

conduct was severe or pervasive, and even if it were, she cannot hold MLH liable under a theory

of *respondeat superior*; that Nitkin's retaliation claim is subject to dismissal because she has

failed to demonstrate that she suffered an adverse employment action or causation; and that

Nitkin's wrongful termination claim fails under state law because she does not identify any public policy on which the claim is based.  (Doc. Nos. 22, 25.)  Nitkin opposes the motion.  (Doc. No. 27.)

For the reasons that follow, the motion is granted in part and denied in part.

I.     **Factual Background**

Taking the facts in the light most favorable to Nitkin, the relevant facts are as follows.

A.     *Nitkin's Work at MLH*

MLH is a not-for-profit health system comprised of four acute care hospitals—Lankenau Medical Center, Bryn Mawr Hospital, Paoli Hospital, and Riddle Hospital—and Bryn Mawr Rehabilitation Hospital.  (Doc. No. 22-2 at ¶ 1; Doc. No. 23 at ¶ 1.)  MLH hired Nitkin as a Certified Registered Nurse Practitioner ("CRNP") in January 2016.  (Doc. No. 22-2 at ¶ 2; Doc. No. 23 at ¶ 2.)

Nitkin served on the palliative care team.  (Doc. No. 22-2 at ¶ 3; Doc. No. 23 at ¶ 3.)  The palliative care team works with seriously ill patients, recommending ways to alleviate and manage pain and symptoms and reducing patients' physical and emotional suffering, among other things.   (Doc. No. 22-2 at ¶¶ 4–5; Doc. No. 23 at ¶¶ 4–5.)  As a nurse practitioner on the team, Nitkin was responsible for working with the collaborating physician to reduce patient suffering, manage patient systems, and discuss goals with patients.  (Doc. No. 22-2 at ¶ 6; Doc. No. 23 at ¶ 6.)  One such physician was Dr. Karl Ahlswede, the Medical Director of the Palliative Care Team.  (Doc. No. 22-2 at ¶ 6; Doc. No. 23 at ¶ 6.)

B.     *Ahlswede Leads Weekly Team Meetings*

Every Tuesday, nurse practitioners, nurses, and physicians on the palliative care team who were assigned to work that day would attend an interdisciplinary meeting to discuss the

patient list and any pressing issues.  (Doc. No. 22-1 at ¶¶ 12–13; Doc. No. 23 at ¶¶ 12–13.)

During these meetings, Ahlswede would bring up topics unrelated to work and patient care, such

as "his substance misuse history, his beliefs on treating patients with substance misuse," his wife,

his family, and his upbringing.  (Doc. No. 22-3, Ex. B, Nitkin Dep. at 80:22–81:15

("[S]ometimes we would call it, like, his battle stories with opioid[s] and some of the things that

he had done while on opioids."); *see also id.* at 82:1–82:2 ("He would disclose a lot of personal

information."), 82:13–15.)  Ahlswede "would [also] sometimes put people on the spot" and talk

about their personal lives, such as their dating lives and/or past traumas.  (*Id.* at 81:16–21; s*ee

also id.* at 84:12–88:2 (testifying that others would join in on the discussions Ahlswede led,

including a coworker who talked about being sexually assaulted in the past), 88:13–20 ("Karl

was discussing [a coworker's] dating life and how she was going through a breakup, and he was

telling her in front of the group what she needs to do to basically find the right person and how

she should proceed with the breakup and dating.").)

Nitkin described the meetings as "look[ing] a lot like group therapy" and noted that

"[o]ften people would cry during these meetings."  (*Id.* at 81:22–24, 88:3–12; *see also id.* at

88:13–20 (testifying that a coworker cried during a meeting when Ahlswede was discussing her

dating life and breakup), 89:2–23 (testifying that that same coworker cried during a meeting

when Ahlswede publicly said he did not want her writing emails to everyone about being short-

staffed on the weekends because it undermined him), 89:24–90:20, 91:2–11 (testifying that

another coworker cried "pretty much anytime Karl would talk about the abuse that he had from

his father" and he pointed out that "she was especially sensitive to this" because of "her

relationship with her [own] father").)  Ahlswede "would sometimes cry during these meetings,"

too.  (*Id.* at 81:24–82:1.)

Nitkin testified that the interdisciplinary meetings strayed from work-related topics about 25% of the time.  (*Id.* at 91:24–92:2 ("So, the interdisciplinary meeting occurred every week. And it did not turn into that every week, but I would say one out of four would have some kind of spinoff in that direction.").)  The meetings also veered into sexually inappropriate territory about 12% of the time.  (*Id.* at 92:19–24 (Q: If one in every four of these interdisciplinary meetings departed from the topic of patient care, of those how many from your recollection became ones in which a sexual topic was discussed?  A: Probably about half of those.").)

Nitkin testified that she could not recount "each and every sexual thing" Ahlswede said during these meetings "because there were so many that I am sure some will slip through."  (*Id.* at 94:9–17; *see also id.* at 95:18–19 ("So to give you every single instance, I can't.  It was too enumerable.").)  As for specific examples, Nitkin testified that Ahlswede would talk "about women and the power that every woman has over every man because they can use sex as a weapon."  (*Id.* at 82:3–6; *see also id.* at 95:11–17 (testifying that at lunch, Ahlswede would joke, "Oh, you women, you need to get together.  You can have anything you want from your husbands or any man, because you can just withhold sex.  You should talk to Sandy [my wife]. She does that.").)  Ahlswede joked about "want[ing] more sex from his wife," who also worked for MLH.  (*Id.* at 82:7–9.)  And Ahlswede "talked about his prostatitis" and "joke[d] about how that was due to having sex with loose women."  (*Id.* at 82:10–12; *see also id.* at 95:19–23 ("A lot of jokes about his prostate when his prostate would act up.  He would make jokes about his wife Sandy being a loose woman, and that he had sex with loose women.").)

Additionally, after the holidays, Ahlswede mentioned that he had received a candle from his wife and said, "And it's my favorite, because it really sets the scene for sex.  And I believe she gave it to me to insinuate that we were going to have sex.  And that's the best gift."  (*Id.* at

4

94:17–95:6.)  Ahlswede also recounted that years before he had babysat a young girl who took

her clothes off and wanted to act like tigers.  (*Id.* at 96:2–14.)  He told the team "that he had

retold the story to someone and said, 'Oh, I had a date with a woman, and she took all her clothes

off and wanted to act like a tiger,'" and "then later on said, 'Ha, ha.  I was baby-sitting a young

girl."  (*Id.*)  Ahlswede later mentioned this story "in an atmosphere where he had someone

disclose trauma when they were a young girl."  (*Id.*)  Nitkin felt that "this was in a lot of ways

grooming and very predatory."  (*Id.*)  Finally, Nitkin recalled Ahlswede "talk[ing] about a

representative having big fake tits and how women who have big tits either show them off or

hide them."  (*Id.* at 97:20–98:12.)

Nitkin could not remember any other specific sexual comments that Ahlswede made

during the weekly team meetings or at lunch.  (*Id.* at 96:21–97:5, 98:12–15.)

### C.   *Ahlswede Makes Nitkin Feel Uncomfortable Privately*

Around July 2018, an incident occurred in private that made Nitkin feel "personally

uneasy."  (*Id.* at 98:23–101:4.)  Early one morning, Ahlswede came into Nitkin's office and

"looked terrible."  (*Id.*)  Nitkin thought to herself, "He looks really tired and almost as if he

stayed up all night and he did not look like he was feeling emotionally well."[1]  (*Id.*)  Nitkin asked

if he was okay, and with the door closed, Ahlswede told her "that he was up all night the night

before struggling with his sex addiction and masturbation, sex addition and masturbation

addiction, watching pornography all night."  (*Id.*; *see also id.* at 101:18–23.)  Ahlswede "also

said that he had been struggling . . . with that addiction for years."  (*Id.* at 100:12–14.)

Disturbed, Nitkin grew "very quiet" and "got up," "went into the bathroom," and locked

---

[1] Nitkin testified that it was "not uncommon" for Ahlswede to look emotionally unwell, and that "[h]e would sometimes shake," prompting her to "often worry that he would relapse."  (*Id.*)

the door.  (*Id.* at 100:15–101:4.)  Nitkin testified that she "had a moment where [she] thought I don't know what this man is going to do."  (*Id.*)  After five or ten minutes, Nitkin heard other people trickling into the offices, so she came out, at which point she saw Ahlswede in the hallway, talking on the phone with someone else.  (*Id.*)

On another occasion that was outside of the group setting, Ahlswede told Nitkin that a patient "would like to be alone with you.  He would probably really like that."  (*Id.* at 126:6–15; *see also id.* at 125:4–10 ("When talking about a male patient, he would say, 'Oh, well, we should send you in there.  You know all the males love to have you alone in their room.'  You know, those type of comments are those things that brought it back to this undertone of you are female and sex.").)  Nitkin interpreted this to be Ahlswede "talking about a patient who basically wants me alone because he's thinking about having sex with me."  (*Id.* at 126:2–5.)

Nitkin admits that Ahlswede never directed any sexually inappropriate comments specifically at her; for example, he never stated he wanted to have a sexual relationship with her, nor did he proposition her for a date.  (*Id.* at 155:23–156:24.)

### D.      *Nitkin Reduces Her Hours, Twice*

On December 5, 2017—about a year and a half after she started working at MLH— Nitkin requested to have her hours reduced from 40 hours to 24 hours and therefore move from full-time to part-time.  (Doc. No. 22-3, Ex. D at p. 91; *see also* Doc. No. 22-2 at ¶ 32; Doc. No. 23 at ¶ 32.)  At the time, she did not tell anyone in management or in Human Resources that one of the reasons for the switch was so that she could work less with Ahlswede.  (Nitkin Dep. at 139:18–24.)

Then, on August 8, 2018—shortly after the incident in Nitkin's office where Ahlswede said he had been up all night long struggling with his sex and masturbation addiction—Nitkin

requested to work per diem, or on an as needed basis.  (Doc. No. 22-3, Ex. D at p. 92; *see also* Doc. No. 22-1 at ¶ 34; Doc. No. 23 at ¶ 34.)  Again, Nitkin did not tell anyone in management or in Human Resources that she wanted to reduce her hours because she wanted to distance herself from Ahlswede.  (Nitkin Dep. at 139:13–17.)

### E.    Ahlswede Encourages Fraudulent Billing

On the morning of February 27, 2019, Ahlswede discussed billing practices with a group of palliative care team members, including Nitkin.  (*Id.* at 165:3–24.)  He told them that "he was really thinking about this Blue Cross issue and that he wanted to make it really clear what he was going to be asking of us."  (*Id.*)  Ahlswede explained that he wanted them to look at the insurance for the patients they were seeing, and if a patient had Blue Cross, he wanted them to send him a note to cosign so he could also bill for the visit in his own capacity as a physician. (*Id.*; *see also id.* at 170:1–9 ("A: His specific ask was that we send him the notes so he can co-sign and bill.  So he was admitting that his intent was to fraudulently bill.").)  According to Nitkin, Ahlswede "was also asking that he be sent these notes on days he was not on campus," meaning that "it would be impossible for him to see those patients."  (*Id.* at 165:3–24.)  In short, Ahlswede wanted to bill as a physician for 100 percent of any visit that involved a Blue Cross patient, even when he was not providing those patients care.  (*Id.*)

Nitkin believed Ahlswede was asking them "to do something unethical, if not illegal." (*Id.* at 170:10–23 ("[I]f we were [to put in his name to send him the note] knowing that there was no way for him to see the patient and we knew his intent was to fraudulently bill, then we were a party to that.").)

### F.    Nitkin Complains about Ahlswede's Conduct to Human Resources

After Ahlswede encouraged fraudulently billing on February 27, Nitkin felt "like this had

moved beyond [her] own experience" and that she "needed to do something." (*Id.* at 155:11–20.) As a result, a few days later, on March 2, 2019, Nitkin texted Dr. James Gengaro—Vice President of Medical Affairs at MLH and a personal friend of her husband's—to ask whom to contact to address her concerns about Ahlswede, and they spoke on March 4. (Doc. No. 22-2 at ¶ 37; Doc. No. 23 at ¶ 37; *see also* Nitkin Dep. at 172:16–173:21.)

Nitkin told Gengaro that Ahlswede had made comments of a sexual nature, including: comments about his prostate and "about wanting sex from his wife"; a comment about thinking about cheating on his wife; and the incident in her office where Ahlswede "had said that he had the addiction to masturbation and pornography." (*Id.* at 173:22–174:20.) Nitkin also informed Gengaro that Ahlswede had spoken poorly of different leaders within their organization and expressed concern about the February 27th meeting in which Ahlswede encouraged fraudulent billing. (*Id.*) Gengaro recommended that Nitkin contact Eric Mendez, Director of Human Resources. (Doc. No. 22-2 at ¶ 38; Doc. No. 23 at ¶ 38; *see also* Nitkin Dep. at 174:21–12.)

On March 22, 2019, Nitkin met with Mendez for the first time, to report Ahlswede for "fraud"; the "unhealthy cult-like atmosphere . . .that he cultivated at Bryn Mawr Hospital"; and his "inappropriate comments and behavior." (Doc. No. 22-2 at ¶ 39; Doc. No. 23 at ¶ 39; *see also* Nitkin Dep. at 183:6–16; Doc. No. 22-3, Ex I at pp. 110–11 (Mendez's notes of the meeting).) During the meeting, Nitkin read from a prepared document, in which she complained that Ahlswede: (1) created a "cult-like atmosphere" in which he "gossiped about" people and "pushed [them] out of this health system" if they were disloyal to him; (2) told Nitkin while they were alone one morning "that he was up most of the night and was really struggling with his sex addiction and masturbation" and "his struggles with this and looking at pornography";

(3) chastised her for not sharing enough personal information with the palliative care team[2];

(4) made "off color comments" like "I hope if someone goes to HR about me they get me fired";

(5) asked a group of employees "if they would stop being his friend" "if he cheated on his wife";

and (6) asked Nitkin, along with four other employees, to look at patients' insurance information

and, for Blue Cross patients, to send the notes to him to co-sign as a physician, even if he was

not seeing those patients.  (Doc. No. 22-3, Ex. E at pp. 94–96; *see also* Doc. No. 22-2 at ¶ 40;

Doc. No. 23 at ¶ 40.)

Additionally, Nitkin told Mendez about the comments Ahlswede had made about his

prostate and having sex with loose women, not getting enough sex from his wife, and how

women could control men through sex.  (Doc. No. 22-2 at ¶ 41; Doc. No. 23 at ¶ 41.)  Mendez

informed Nitkin of his next steps, which included contacting the billing department and Rick

Mankin (a higher-up within MLH), speaking with anyone in leadership who may need to know

about the issues complained of, and beginning his investigation.  (Doc. No. 22-2 at ¶ 42; Doc.

No. 23 at ¶ 42.)

A few days later, on March 26, Nitkin emailed Mendez to thank him for meeting with her

and for his discretion.  (Doc. No. 22-3, Ex. F at p. 100; *see also* Doc. No. 22-2 at ¶ 43; Doc. No.

23 at ¶ 43.)  Nitkin also provided Mendez with additional information about her billing

allegations based on a patient chart she had become aware of the day before, and she requested

that he provide her with updates.  (Doc. No. 22-3, Ex. F at p. 100; *see also* Doc. No. 22-2 at ¶ 43;

Doc. No. 23 at ¶ 43.)  On March 29, Mendez responded to Nitkin's email and asked to schedule

a follow-up meeting.  (Doc. No. 22-3, Ex. F at pp. 99–100; *see also* Doc. No. 22-2 at ¶ 44; Doc.

---

[2] Nitkin testified that "while that's not specifically sexual, I think it is harassment."  (Nitkin Dep. at 149:18–151:19.)

No. 23 at ¶ 44.)

On April 1, Mendez and Nitkin met for a second time, this time at a Starbucks offsite, per Nitkin's request.  (Doc. No. 22-3, Ex. F at pp. 98–99; *see also* Doc. No. 22-3, Ex. I at p. 112 (Mendez's meeting notes).)  During the meeting, Mendez asked Nitkin if he could confront Ahlswede with the details of her complaints.  (Nitkin Dep. at 196:3–197:24.)  Nitkin explained that there was no way for her to remain anonymous if Ahlswede was given those details and told Mendez that she would need to talk to her husband before moving forward.  (*Id.*)  Mendez also asked Nitkin if there were any witnesses and she provided him with a few names.  (*Id.*) According to Nitkin, Mendez responded, "I probably won't speak to them, but that's kind of a test that I do to make sure that someone is able to give me names."  (*Id.*)

Later that day, Nitkin spoke to her husband and then gave Mendez "the go-ahead" to move forward.  (*Id.*; *see also* Doc. No. 22-3, Ex I at p. 117.)  Because Nitkin was scheduled to work with Ahlswede alone for a few days at the Bryn Mawr campus, she had requested that Mendez wait until afterwards to proceed.  (Nitkin Dep. 197:13–24.)  According to Nitkin, Mendez had told her that "he wants to do something immediately" and if he was going to move forward, "it's either 'immediately or not at all.'"  (*Id.*; *see also* Doc. No. 22-3, Ex. I at p. 112 ('I agreed, but insisted that I hear back from her w/in the week so we could begin the investigation.").)  Ultimately, in her email, Nitkin advised Mendez, "I need to allow you to do whatever you feel is the best next step with the information I gave you.  I do not need you to wait until after any date.  It is better if I am able to just move forward and not have this looming." (Doc. No. 22-3, Ex. I at p. 117; *see also* Nitkin Dep. 200:15–18 ("I saw how that would impede on finding the total truth, and that's why I agreed to not have any details or my identity withheld.").)  Mendez responded that he would keep her "posted with regard to the timing of any

future discussions that may take place." (Doc. No. 22-3, Ex. I at p. 117.)

### G. *Mendez Meets with Ahlswede, and Ahlswede Is Removed from His Director Role*

On April 18, 2019, Mendez emailed Ahlswede to schedule a meeting. (Doc. No. 22-3, Ex. G at p. 102.) Mendez explained, "I want to share some concerns that have been brought to my attention about the department and I was hoping to get your perspective and have you weigh in, particularly on the overall management of the department." (*Id.*) Mendez also requested that Ahlswede maintain confidentiality at this time. (*Id.*)[3]

The next day, April 19, Mendez met with Ahlswede. (Doc. No. 22-2 at ¶ 50; Doc. No. 23 at ¶ 50; *see also* Doc. No. 22-3, Ex. I at pp. 124–27 (Mendez's meeting notes).) According to Mendez's notes, during the meeting, Ahlswede stated that he was frustrated with regulations that caused nurse practitioners to not be paid appropriately for their time spent with patients but was "<u>very</u> adamant" that "he <u>never</u> submitted or participated in fraudulent billing practices and <u>never</u> asked . . . his staff to do anything unethical with billing practices." (Doc. No. 22-3, Ex. I at p. 124.) After the billing discussion, Mendez shared "that there was feedback from an un-named source about a toxic environment [within] the department." (*Id.* at p. 125.) Mendez wrote that Ahlswede's "immediate reaction after learning allegations of the comments he made about porn & masturbation addiction was 'I can't believe this.'" (*Id.*) Mendez also noted that "Karl stated that he 'could have' said things like that but in a 'joking kind of way.'" (*Id.*; *see also id.* ("Karl stated that 'if he did say something like that' it was not in a malicious way").)

---

[3] This same day, April 18, Nitkin received the Daisy Award for her work on the palliative care team. (*See* Doc. No. 22-3, Ex. I at pp. 116–17.) In the morning, Nitkin emailed Mendez to see if he had met with Ahlswede yet so that she could be prepared when she saw him later that day. (*Id.* at p. 117.) Mendez responded that he and Ahlswede had not met, that Ahlswede was aware that Mendez wanted to discuss "management issues" in the department with him, that Ahlswede had no other details at that time, and that they were in the process of investigating the billing issues Nitkin had raised. (*Id.* at p. 116.)

Additionally, Mendez recorded that Ahlswede "acknowledged that he had an addiction to masturbation . . . but [stated that] he no longer has an addiction to masturbation after seeking therapy," and explained that he had "disclosed his addiction to masturbation to his entire staff as a means to teach them about the challenges of overcoming addictions." (*Id.* at pp. 125–26.) According to Mendez, Ahlswede said that "he may have made a comment to [the employee] about masturbating but that he did <u>NOT</u> make a comment about watching porn all night." (*Id.* at p. 126 ("Karl stated again that he does/did have an addiction to masturbation and 'may' have referenced something to ee [employee] about that but not about watching porn.").)

As for the other comments, Mendez noted that "Karl acknowledged that he <u>DID</u> say in a staff mtg that if anyone calls HR on him, just make sure it gets him fired" but "<u>denied</u> ever telling his staff that he was planning on having an affair [on] his wife." (*Id.* at pp. 126–27.) Based on the details given, Ahlswede figured out that Nitkin had been the complainant. (*See* Nitkin Dep. at 206:9–18; Doc. No. 22-3, Ex. I at p. 125 ("After repeating and clarifying the allegations, Karl sat nervously and stated 'I know who you're talking about'; 'It can only be one person.'").)

Afterwards, Mendez met with Dr. Barbara Wadsworth (Senior Vice President and Chief Nursing Officer) and shared details of the meeting with her. (Doc. No. 23-2, Ex. E, Mendez Dep. at 234:17–21.)

On April 23, Mendez met with Ahlswede again. (Doc. No. 22-2 at ¶ 50; Doc. No. 23 at ¶ 50; *see also* Doc. No. 22-3, Ex. I at p. 128 (Mendez's notes of the meeting).) According to Mendez, Ahlswede told him that "he is over stressed in his role and would like for [the] organization to consider allowing him to step down from [the] Director role." (Doc. No. 22-3, Ex. I at p. 128.) Mendez also noted that Ahlswede asked "who needs to know about all of this,"

and Mendez informed him that he had only discussed it with Wadsworth and Mankin.  (*Id.*)

That same day, Wadsworth also met with Ahlswede.  (Doc. No. 22-2 at ¶ 53; Doc. No. 23 at ¶ 53; *see also* Doc. No. 22-3, Ex. J at p. 144.)  Wadsworth testified that Ahlswede admitted to telling his employees about his addiction to porn.  (Doc. No. 232, Ex. B, Wadsworth Dep. at 162:16–163:10; *see also id.* at 164:16–22 ("And when [we] met in that room . . . and I said we're not going to go through all parts of the allegation, but I do understand you talked to Eric and you did acknowledge some of those accusations, although not all pieces of it, but some of it is true and he said, yes.").)

Ultimately, Mendez and Wadsworth removed Ahlswede from his role as Medical Director, provided him with information for the Employee Assistance Program, required him to take one week off of work, and assigned Dr. Adam Tyson to be the Interim Medical Director. (Doc. No. 22-2 at ¶ 54; Doc. No. 23 at ¶ 54.)

### H. *Mendez Meets with Nitkin for a Third Time*

On April 24, 2019, Mendez emailed Nitkin to schedule a meeting to give her an update on his conversations with Senior Leadership, Billing, Compliance, and Ahlswede.  (Doc. No. 22-2 at ¶ 55; Doc. No. 23 at ¶ 55.)  The next day, April 25, Mendez and Nitkin met for the third time.  (*See* Doc. No. 22-2 at ¶ 58; Doc. No. 23 at ¶ 58.)  Mendez told Nitkin that he did not use her name but that based on the details, Ahlswede knew that she was the complainant.  (Nitkin Dep. at 206:10–18.)  According to Nitkin, Mendez told her that Ahlswede "admitted to saying all of the things that I had reported him for and that he felt ashamed, he cried for three to four hours, he was very upset . . . felt like the team was family, [and] didn't understand why I wouldn't come to him."  (*Id.* at 206:18–208:22.)  In addition, Mendez informed Nitkin that Ahlswede would be removed from leadership immediately and that a temporary medical director, likely Tyson, would be assigned to take over Ahlswede's position.  (*Id.*)  Nitkin also testified that

Mendez advised her that "Karl [was] going to go away and get the help he needed" and that when he returned, "he would be moved to a different role." (*Id.*) As a result, Nitkin "was under the impression that [she] would not have to work with Ahlswede again." (*Id.*) Finally, Mendez told Nitkin that an investigation into billing had been conducted, and "they found no issues of fraudulent billing." (*Id.*) According to Nitkin, she "made a face like 'That's not possible,'" and Mendez replied, "'You should be happy that there was no fraudulent billing that we found.'" (*Id.*)

The following day, April 26, Nitkin had a panic attack and was out of work for about a month afterwards. (*Id.* at 218:5–11; *see also* Doc. No. 22-3, Ex. I ("The day after our last discussion, April started to have a panic attack.").)

From the time Nitkin first complained to Mendez in March 2019 through the investigation's conclusion in late April 2019, Nitkin had no interactions with Ahlswede where he made any inappropriate sexual comments to her, nor did MLH reduce her pay, unilaterally change her schedule, or discipline her. (Doc. No. 22-2 at ¶¶ 59–60; Doc. No. 23 at ¶¶ 59–60.)

**I.     *Nitkin Is Assigned to Work with Ahlswede and Complains to Dr. Tyson, Prompting Internal Conversations Among Tyson, Wadsworth, and Mendez***

Following her panic attack and subsequent leave, Nitkin returned to work in late May. Shortly after her return, on June 11, 2019, Nitkin was assigned to work the same shift as Ahlswede at Bryn Mawr Hospital. (Nitkin Dep. at 221:24–222:2, 228:3–9.) Nitkin attempted to switch her schedule with another nurse practitioner, but was unsuccessful. (*Id.* at 221:23–222:12 (Nitkin's coworker Ann Pellegrino was "not available to make a switch, maybe she was on vacation, [or] something.").)[4] Although Nitkin was uncomfortable working the same shift as

---

[4] At this time, Nitkin did not talk to Tyson, the new medical director, to try to have him intervene or switch her off the schedule for that shift. (*Id.* at 223:7–20.)

Ahlswede, Nitkin admits no sexually inappropriate comments were made and all conversation was directly related to patient care.  (Doc. No. 22-2 at ¶ 62; Doc. No. 23 at ¶ 62; *see also* Doc. No. 22-3, Ex. I at p. 113 ("Upon her return, she would work w/ Karl and it made her uncomfortable.  But <u>nothing</u> ever happened.  Nothing inappropriate happened.  She just felt uncomfortable, 'like I was working w/ my hands tied behind my back.'").)

A few weeks later, Nitkin saw that she had another day coming up where she was scheduled to work with Ahlswede, and she was again unable to successfully switch off that shift on her own.  (Nitkin Dep. at 222:7–20.)  Accordingly, on July 2, Nitkin asked to speak with Tyson and "told him [she] wasn't comfortable with being scheduled at Bryn Mawr while [Ahlswede] was there."  (*Id.*)  Tyson asked Nitkin why, and Nitkin "disclosed to him that [she] had made a complaint against Karl for the billing piece and the behavior piece and that Karl knew it was [her]."  (*Id.* at 223:21–224:18.)  Tyson told Nitkin that he knew someone had made allegations against Ahlswede but did not know it was her, and Tyson asked her if she was comfortable working at the Lankenau campus, given that Ahlswede's wife also worked there.  (*Id.*)  Nitkin responded that she did not think that Ahlswede's wife would be comfortable, and Tyson said, "Well, then I think for everyone, we shouldn't do you being at Bryn Mawr or Lankenau, but let me think about that."[5]  (*Id.*)

The next day, July 3, Nitkin sent an email to Mendez requesting to meet in order "to follow up on their previous conversations and discuss details since then."  (Doc. No. 22-3, Ex. O at p. 161.)  Upon returning to the office on July 10, Mendez responded to Nitkin with dates to meet.  (*Id.* at p. 160.)  Nitkin then informed Mendez that she had decided to resign in September

---

[5] Between July 2 and Nitkin's departure on July 16, Nitkin did not work with Ahlswede again, nor did she work at Lankenau with Ahlswede's wife.  (Doc. No. 22-2 at ¶ 65; Doc. No. 23 at ¶ 65; *see also* Nitkin Dep. at 228:18–24 (stating that she never worked with Ahlswede again after the June 11 shift).)

and offered to do an exit interview if Mendez or anyone in administration was interested.[6]  (*Id.*)
On July 11, Mendez expressed his regret that Nitkin was resigning and accepted her offer for a
formal exit interview.  (*Id.*)  The same day, Nitkin suggested meeting with Mendez for the exit
interview on July 19th or 22nd.  (*Id.*)  Mendez did not immediately respond to this email.

While Mendez and Nitkin were corresponding, Tyson informed Wadsworth that Nitkin
had shared the details of her allegations against Ahlswede.  (*See* Doc. No. 22-3, Ex. P at p. 163.)
Then, on July 12 at 4:28 p.m., Wadsworth sent an email to Mendez expressing her
disappointment that Nitkin had shared these details with Tyson and other members of the
palliative care team.  (*Id.*)  Wadsworth stated:

> Let me know if you want to connect today or Monday.  I know we will need to
> include Tom & Paul and Rick [Mankin].  I remain in favor of exiting April
> although I recognize we may want to consider paying her out as well so that we
> don't create any financial burden.  I am in my office.

(*Id.*)

Approximately one hour later, Mendez sent an email to Nitkin stating "given the current
pulse of the department, I'd like to meet with you as soon as possible."  (Doc. No. 23-2, Ex. D at
p. 66.)  Mendez asked to meet the following morning and informed Nitkin that Tyson was aware
of the meeting and had given his approval for Nitkin to come to Mendez's office.  (*Id.*)
Immediately upon sending this email to Nitkin, Mendez forwarded a copy to Wadsworth as an
"FYI."  (*Id.*)  Wadsworth then forwarded Mendez's email to Tyson as an "FYI" and stated that
"It is possible that she won't acknowledge this email and in that case we would need to direct her
to Newtown Square when she arrives to Riddle."  (*Id.* at p. 65).  Within minutes of seeing

---

[6] In June, Nitkin had received an offer letter from Penn Medicine for the position of Nurse Practitioner.
(Doc. No. 22-2 at ¶ 67; Doc. No. 23 at ¶ 67.)  On July 9, Nitkin emailed Tyson to inform him that she had
accepted another position and would be leaving MLH in September.  (Doc. No. 22-2 at ¶ 69; Doc. No. 23
at ¶ 69.)

Wadsworth's email, Tyson responded that he had an excuse (a scheduling issue) that he could use to text Nitkin and direct her to read the email.  (*Id.*)  Wadsworth agreed with this plan but reminded Tyson if Nitkin called him, he was not to talk to her and only direct her to meet with Mendez the following day.  (*Id.* at p. 64.)  Fifteen minutes later, Tyson confirmed Nitkin knew of the meeting and would be there.  (*Id.*)

### J.      The July 16 Meeting

When Nitkin and Mendez met on July 16, Mendez asked her whether she had told other employees about their meetings and the details of them.  (Doc. No. 22-2 at ¶ 77; Doc. No. 23 at ¶ 77.)  Nitkin responded, "Yes I have."  (Doc. No. 22-2 at ¶ 78; Doc. No. 23 at ¶ 78; *see also* Doc. No. 22-3, Ex. I at p. 113 (Mendez's notes of the meeting, stating "April acknowledged very openly that she disclosed the details of her discussions w/ me during investigation . . . She said she told several close peers, but didn't know how many.").)  Mendez told Nitkin "there are people that know my name and a lot of people contacting me, and there are people upset." (Nitkin Dep. at 243:18–224:6.)  Specifically, Mendez questioned whether Nitkin had disclosed his meetings with her and discussed what she had learned of his investigation.  (*Id.*)  Nitkin admitted she told people that she had reported Ahlswede and that she was worried that Mendez was not doing enough to investigate her complaint, and she asked people if anyone had tried to reach out to them as part of the investigation.  (*Id.* at 248:3–19.)  Also, Nitkin told her colleagues that when Mendez and Wadsworth interviewed Ahlswede, he had broken down and cried and that he was going away to get the help he needed.  (*Id.* at 248:20–250:2.)

After Nitkin admitted to telling others about the investigation, Mendez informed Nitkin that she had divulged confidential information, which was a terminable offense.[7]  (Doc. No. 22-2

---

[7] However, Nitkin "adamantly denied that she told anyone that her husband was so mad that he could kill Karl."  (Doc. No. 22-3, Ex. I at p. 115.)  During oral argument, defense counsel made much of the fact

at ¶¶ 78–79; Doc. No. 23 at ¶¶ 78–79.)  Nitkin asked, "Is that what's happening here?" and

Mendez responded, "No; not yet" regarding whether MLH was terminating her.  (Doc. No. 22-2

at ¶¶ 79–80; Doc. No. 23 at ¶¶ 79–80.)  Mendez explained that he would need to investigate the

conversations she had with other employees and that she would be suspended in the meantime.

(Doc. No. 22-2 at ¶¶ 81–82; Doc. No. 23 at ¶¶ 81–82.)

According to Nitkin, Mendez told her that based on what she was telling him, he would

"very likely" be terminating her after the investigation, and if she were terminated, that would

need to be reported to Penn.  (Nitkin Dep. at 243:7–244:1; *see also id.* at 247:11–248:2 ("Q:

When you had the meeting with him, at any point in time did he tell you that you would certainly

be terminated or that you were definitely being terminated?  A:  He did not use those words, but

he did say that if I told people the details, that that is cause for termination,  And when I told him

that I had, in fact, told people and I wasn't trying to hide that . . . he had said that he has to do an

investigation to find out and if that was the case . . . that would likely lead to my termination.").)

Nitkin also testified that Mendez told her that Penn would need to be notified of a suspension.

(*Id.* at 262:15–263:1.)  Nitkin understood that being terminated from her prior employment

would interfere with her credentialing with Penn and her offer letter could be rescinded as a

result.  (*Id.* at 244:2–8.)

Nitkin asked Mendez what she could do, and Mendez told her that because she had

_____

that Nitkin allegedly told her coworkers that her husband was going to kill Ahlswede and for the *first* time
argued this was a concern that MLH needed to investigate.  The Court appreciates and understands how
such a comment would cause great concern to MLH; however, the Court is not convinced that this
comment prompted the July 16 meeting or any investigation Mendez claimed he needed to undertake.
First, that concern appears nowhere in MLH's undisputed statement of facts or brief—rather, it was only
raised at oral argument after the Court questioned what confidential information Nitkin allegedly
disclosed that would subject her to termination.  (Oct. 14, 2021 Tr. at 12:8–20:7.)  Second, if that truly
was MLH's concern at the time, MLH presumably would have investigated the allegation regarding
Nitkin's husband even after Nitkin left MLH's employ—yet nothing in the record suggests that was done.

already submitted her resignation, she could email Melissa Slusser and Tyson before she left work that day to move up her resignation, effective immediately.  (*Id.* at 243:7–23; *see also* Doc. No. 22-3, Ex. I at p. 115 (Mendez's notes of the meeting, which state:  "April asked what options she has now.  I explained that I am duty-bound to follow up w/ ees [employees] in the department about the tension in the dept as a result of April disclosing information about the investigation.  I explained that she would be suspended w/o pay as the investigation continues.  OR Since she has already resigned, she could make it effective immediately.").)  And if she did that, then Mendez assured her that he would make sure that the collaborating physician form she needed for her employment at Penn would be completed.  (Nitkin Dep. at 243:7–23.)  Mendez noted in his recap of the meeting that Nitkin "said repeatedly she would prefer to resign rather than be suspended or potentially terminated."  (Doc. No. 22-3, Ex. I at p. 115.)

After the meeting, Nitkin emailed Tyson and Slusser, "I am writing this email to move up my resignation to be effective immediately."  (Doc. No. 22-3, Ex. Q at p. 165.)

### K.    *Ahlswede Recants His Prior Admissions*

Later that same day, Mendez emailed Ahlswede, "I've been involved in some discussions recently with staff from the department.  I'd like to touch base with you again to update you on some developments."  (Doc. No. 22-3, Ex. I at p. 122.)

The next day, July 17, Ahlswede responded, "I met briefly with Barbara this morning and as a result of that meeting I feel that it is important for me to categorically deny in writing that I was involved with any inappropriate workplace interaction with my accuser, who I now know is April Nitkin."  (*Id.*)  According to Wadsworth, at this point, Ahlswede was now "denying everything," thereby contradicting what he had admitted to doing previously.  (Wadsworth Dep. at 219:19–220:4.)  Wadsworth agreed that Ahlswede essentially lied one way or another (i.e., he either lied when he admitted to the conduct in April or lied on July 17 when he denied

19

everything).  (*Id.* at 220:5–24.)  And although Wadsworth admitted, "lying is a pretty significant

offense," she recalled speculating at the time that Ahlswede may have lied because his wife was

in the room.  (*Id.*)  Wadsworth agreed MLH has policies on integrity and honesty.  (*Id.* at

224:22–24.)  Moreover, Wadsworth remembered there was a conversation about Ahlswede

lying, but she did not recall how it was resolved.  (*Id.* at 223:7–23.)

### L.    *Wadsworth Outs Nitkin as Ahlswede's Accuser*

Nitkin alleges that on July 17, the day after she resigned, Wadsworth told the entire

palliative care team during a team meeting, at which Ahlswede and his wife were present, "April

Nitkin made accusations against Karl Ahlswede.  An investigation was done that concluded with

April's resignation."  (Nitkin Dep. at 269:10–24; *accord* Wadsworth Dep. at 233:11–23

(admitting that she referred to Nitkin by name during the meeting and said "there was a situation

that involved Karl and April and that it was very unfortunate and that I couldn't go into details,

but it was around inappropriate conversations with sexual content and that it had been

addressed"); *id.* at 234:20–235:7 ("Q: Did you discuss April's resignation?  A: I did tell the team,

at the time, that April had submitted her resignation . . . but I think I did say that it was effective

immediately, that she resigned").)  Two of Nitkin's former coworkers, Sandy O'Haire and

Mackenzie Houser, informed Nitkin of Wadsworth's announcement afterwards.  (Nitkin Dep. at

269:10–24; *see also id.* at 270:11–17.)

According to Wadsworth, she told the team "that whatever details they had heard directly

from either Karl or April, that I would ask them not to talk about them."  (Wadsworth Dep. at

234:1–3.)[8]

---

[8] There is no indication based on the record that anyone at MLH asked Ahlswede if he had shared details
of the investigation with his colleagues, or told him that there would be an investigation or that sharing
confidential information would be a terminable offense.

### M.    Nitkin Is Credentialed at Penn

About two weeks after Nitkin's resignation, on July 29, Tyson emailed Wadsworth stating that he provided Nitkin a recommendation for her credentialing at Penn Medicine based on input from two other nurse practitioners.  (Doc. No. 22-2 at ¶ 87; Doc. No. 23 at ¶ 87.) Tyson's completion of the credentialing reference was timely, and there is no evidence that he had nefarious intent when completing this process.  (Doc. No. 22-2 at ¶ 89; Doc. No. 23 at ¶ 89.)

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury.  *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the

nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

### III.    Discussion

Nitkin asserts two claims under Title VII: (1) that she was subjected to a hostile work environment on the basis of her sex; and (2) that she was retaliated against for reporting Ahlswede to Mendez. (Doc. No. 1 at pp. 12–14, Counts I & III.) Nitkin brings parallel claims under the PHRA. (*Id.* at pp. 13–15, Counts II & IV.) The same legal standards apply to Title VII and the PHRA, so the Court considers Nitkin's Title VII and PHRA claims together. *See, e.g.*, *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims." (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996))). Third, Nitkin asserts a wrongful termination claim under Pennsylvania state law. (Doc. No. 1 at p. 15, Count V.) Last, Nitkin appears to raise a claim that was not in her complaint based on her reduction in hours requests. The Court discusses each in turn below.

#### A.    *Hostile Work Environment*

To establish a hostile work environment claim, a plaintiff must show that (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *Minarsky v. Susquehanna County*, 895 F.3d 303, 310 (3d Cir. 2018); *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). To determine

whether an environment is hostile, a court considers the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168.  MLH challenges the second and fifth elements, arguing that Ahlswede's conduct was not severe or pervasive and that the *Faragher-Ellerth* defense applies, vitiating *respondeat superior* liability.  (Doc. No. 22-1 at pp. 11–22.)

      i.      <u>Severe or Pervasive</u>

Even when viewing the facts in the light most favorable to Nitkin, the Court concludes that Nitkin has not established that Ahlswede's conduct was sufficiently severe or pervasive to support a hostile work environment claim.

As an initial matter, the Court acknowledges that Nitkin testified she would be unable to recount every single time Ahlswede made sexually inappropriate comments during the weekly team meetings "because there were so many" and "[i]t was too enumerable."   (*See* Nitkin Dep. at 94:9–17, 95:18–19.)  However, courts in this Circuit have repeatedly declined to consider general, unsubstantiated allegations that the alleged conduct occurred "regularly" or "all the time."  *See, e.g.*, *Washington v. Se. Pa. Transp. Auth.*, Civil Action No. 19-4213, 2021 WL 2649146, at *25 (E.D. Pa. June 28, 2021) (considering the thirteen identifiable incidents that the plaintiff complained of but nonetheless finding the plaintiff's allegation that he was "constantly working in a hostile environment where [he was] routinely disrespected and subject to discriminatory harassment" to be "unavailing, as he has not presented any evidence to corroborate his claims of 'constant' and 'routine' harassment"); *Collins v. Kindred Hosp. E., LLC*, Civ. A. No. 14-17, 2016 WL 4264588, at *14 (W.D. Pa. Aug. 12, 2016) ("[The plaintiff's] testimony describes four specific comments.  While [the plaintiff] alleges that [her harasser]

made many other comments, she did not testify about any other specific comments . . . .
[G]eneral claims that there were a lot of incidents are insufficient where the plaintiff did not
testify about the specifics of the general claim.  This is true even where the plaintiff testified to
several specific examples and went on to testify that similar conduct occurred a lot more often,
but without additional specifics."); *Stephenson v. City of Philadelphia*, Civil Action No. 05-
1550, 2006 WL 1804570, at *11 n.2 (E.D. Pa. June 28, 2006), *aff'd*, 293 F. App'x 123 (refusing
to "credit [the plaintiff's] unsubstantiated allegations that discriminatory treatment occurred 'all
the time'" and instead considering only the nine specific instances the plaintiff had identified);
*accord Bumbarger v. New Enter. Stone & Lime Co.*, 170 F. Supp. 3d 801, 832 (W.D. Pa. 2016)
(declining to credit the plaintiff's unsubstantiated assertion that her harasser sexually
propositioned her more than 100 times and had touched her inappropriately more than 50 times
and noting that the plaintiff only identified two specific instances of touching—one where he
grabbed her and one where he squeezed her shoulder).

Accordingly, this Court focuses on the seven specific incidents that Nitkin identified in
her deposition testimony:

- Ahlswede discussing the power women have over men because they can withhold sex and that his wife, Sandy, (who also worked for MLH) did that. (Nitkin Dep. at 82:3–9, 95:11–17.)

- Ahlswede talking about his prostate and joking about how he had sex with loose women, including his wife.  (*Id.* at 82:10–12, 95:19–23.)

- Ahlswede telling the group that his favorite holiday gift was a candle because it sets the scene for sex, which is the best gift.  (*Id.* at 94:17–95:6.)

- Ahlswede told a group of employees that he had babysat a young girl who took her clothes off and wanted to act like a tiger, and when he retold the story to someone else, he said "Oh, I had a date with a woman, and she took all her clothes off and wanted to act like a tiger."  (*Id.* at 96:2–14.)

- Ahlswede commented on a third party representative's "big fake tits" and remarked that "women who have big tits either show them off or hide them."

(*Id.* at 97:20–98:12.)

- When Ahlswede and Nitkin were alone in his office one morning, he told her that he had been up all night struggling with his sex addiction and masturbation addiction and had been watching pornography all night.  (*Id.* at 98:23–101:23.)

- Ahlswede told Nitkin that a male patient would like to be alone in his room with her.  (*Id.* at 125:4–10, 126:6–15.)

The Court finds that these seven instances, which occurred over the course of the approximately three-and-a-half years that Nitkin worked at MLH, lack the frequency necessary to establish pervasiveness.  *See Hamera v. County of Berks*, 248 F. App'x 422, 425–26 (3d Cir. 2007) (affirming district court's conclusion that the plaintiff failed to show a genuine issue of material fact that the comments were severe or pervasive where his coworkers "made nine comments over a year and four months"); *Stephenson*, 2006 WL 1804570, at *11 (holding that nine specific occurrences over a 19-month period lacked the frequency necessary to support a hostile work environment claim); *Washington*, 2021 WL 2649146, at *25–26 (concluding that the plaintiff failed to show that the conduct was pervasive where there were 13 incidents over a 17-month period and only eight of those were actually directed at the plaintiff).

Undoubtedly, Ahlswede's conduct was unprofessional, distasteful, and inappropriate for the workplace, and the incidents identified by Nitkin are troubling and concerning.  Nonetheless, the Court cannot conclude that Ahlswede's sexually inappropriate comments were severe enough to support a hostile work environment claim.  Courts have found that a supervisor describing details of his or her intimate relationships or sexual activities falls short of the requisite severity. *See Grassmyer v. Shred-It USA, Inc.*, 392 F. App'x 18, 25, 30 (3d Cir. 2010) (affirming district court's grant of summary judgment to the employer on hostile work environment claim, where the plaintiffs claimed that one of the supervisors "regularly made comments about the size of his genitalia and about the intimate details of his sexual relationships, that he referred to women as

25

'bitches,' that he told them of a colleague frequenting 'titty bars' and getting 'tanked,' and that

he frequently used the word 'fuck' in the office" because "[w]hile sophomoric and no doubt

offensive, [the supervisor's] language was not . . . so severe or pervasive as to support a hostile

work environment claim"); *Jones v. Mon Valley Initiative*, 2:19-CV-00243-CRE, 2020 WL

4057646, at *5–6 (W.D. Pa. July 20, 2020) (finding that the plaintiff did not show that the

comments or touching were severe enough to establish a hostile work environment, where the

record showed that the plaintiff's female supervisor described to him a situation where she

performed oral sex on another man, called him "sexy," commented on his "soft hands," eyes, and

overall appearance, commented on his sexual relationships with other women, and would try to

give him hugs, put her hands on his shoulders, or hold his hands); *Johnson v. PSI Pizza, Inc.*,

Civil Action No. 3:11-1698, 2014 WL 1223651, at *6 (M.D. Pa. Jan. 14, 2014) (holding that the

conduct was not sufficiently severe or pervasive and granting summary judgment to employer on

hostile work environment claim where the plaintiff alleged that his supervisor "repeatedly

bragged about his own sexual encounters and made references to the plaintiff and a co-worker

being gay"); *Malin v. Orleans Parish Commc'ns Dist.*, 718 F. App'x 264, 273 (5th Cir. 2018)

("According to Malin, Hobson recounted details of her sex life at work six times . . . These

interactions—spread across a two-month period—do not provide a reasonable basis to conclude

that Malin was the victim of pervasive harassment.  Nor do they plausibly suggest that Hobson's

remarks were so severe as to alter the conditions of Malin's employment.  Hobson twice

described specific sexual acts, said she had sex during lunch, and informed Malin that she called

in sick because she was with a sexual partner . . . On these facts, it is not plausible that a

reasonable person would believe Hobson's conduct was objectively severe or pervasive."); *cf.*

*Sawka v. ADP, Inc.*, Case No. 3:13-cv-754 (VAB), 2015 WL 5708571, at *13 (D. Conn. Sept.

29, 2015) ("[S]everal of the comments involve [the plaintiff's] anatomy and genitals and were
directly made to him in front of other colleagues . . . Contrary to what ADP tries to suggest, the
comments involved in this case were not general sharing of sexual conquests, which would likely
not constitute a hostile work environment.  Instead, they specifically insulted and targeted [the
plaintiff.]").

Moreover, it is undisputed that Ahlswede never propositioned Nitkin for a date or sex,
never touched her, and never directed sexually inappropriate comments specifically at her.
(Nitkin Dep. at 155:23–156:24.)  *Cf. Grooms v. City of Philadelphia*, Civil Action No. 17-2696,
2018 WL 4698856, at *7 (E.D. Pa. Sept. 28, 2018) ("[T]here is record evidence that, on June 30,
2016, Plaintiff's superior, Corporal Poles, vividly described to Plaintiff sexual acts that he
wanted to perform on her. . . . [W]e find that Plaintiff could have felt threatened by these
comments because she was alone with Corporal Poles when he made those comments.  We
conclude that the evidence of these comments, the evidence that Corporal Poles made another
sexual remark to Plaintiff, and the evidence that Sergeant Dandridge asked Plaintiff on a date . . .
create a genuine issue of material fact regarding whether the environment experienced by
Plaintiff was sufficiently severe or pervasive[.]").  Ultimately, the bar for demonstrating a
genuine issue of material fact as to severity is high, and courts have found conduct more
egregious than Ahlswede's fails to sufficiently demonstrate this discrimination.  *See, e.g.*, *Saidu-
Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439–40 (E.D. Pa. 2001) (concluding that the
plaintiff "failed to demonstrate sufficiently severe or pervasive discrimination" where the record
showed that the harasser touched the plaintiff's breast and propositioned her to join him later that
evening; made several suggestive comments regarding her eyes and offered her financial
assistance if she would go out with him; removed a bottle of wine from his pants, offered her a

drink, and asked her to join him at a local hotel later for a "good time"; and patted her on her butt and breast).

Therefore, the Court grants MLH's motion for summary judgment on the hostile work environment claim.  Because Nitkin has not shown that the harassment was sufficiently severe or pervasive, we need not address whether the *Faragher-Ellerth* defense applies.

### B.     Retaliation

Nitkin claims that she was retaliated against for complaining about Ahlswede's sexually harassing behavior.  MLH contends that Nitkin's retaliation claim must be dismissed because (1) Nitkin cannot establish a prima facie case of retaliation, given that she did not suffer any adverse employment actions and, even if she did, she cannot show causation, (2) the company had non-retaliatory reasons for its actions, and (3) Nitkin cannot show that those reasons were pretextual.  (Doc. No. 22-1 at pp. 22–29.)

The *McDonnell Douglas* burden shifting framework applies to Nitkin's retaliation claim.  First, Nitkin must state a prima facie case of retaliation, after which the burden shifts to MLH to articulate legitimate, non-retaliatory reasons for its actions.  Then, the burden shifts back to Nitkin to show that the stated reasons are pretextual.  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

### i.     Prima Facie Case

To make out a prima facie case of retaliation, Nitkin must show that (1) she engaged in a protected activity; (2) she "was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity"; and (3) "there is a causal connection between the protected activity and the adverse action."  *Id.* at 340–41.  For the purposes of this motion, MLH appears to concede that Nitkin engaged in protected activity when she reported Ahlswede's inappropriate comments to Mendez.  (*See generally* Doc. No. 22-1 at pp. 22–29.)  However,

MLH argues that Nikin's case fails at the second and third prongs because she has not provided any record evidence showing that she suffered an adverse employment action and, even if she did, she cannot demonstrate a causal link between her protected activity and her resignation.  (*Id.* at pp. 23–29.)  We address each in turn below.

a.      <u>*Adverse Employment Action*</u>

First, MLH contends that Nitkin resigned and thus did not suffer an adverse employment action.  (*Id.* at pp. 23–25.)

"An adverse or tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Barnett v. N.J. Transit Corp.*, 573 F. App'x 239, 244 (3d Cir. 2014) (cleaned up).  However, the "antiretaliation provision of Title VII [also] extend[s] beyond those kinds of employment-related actions."  *Illori v. Carnegie Mellon Univ.*, 742 F. Supp. 2d 734, 558 (W.D. Pa. 2010) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).  Under *Burlington Northern & Santa Fe Railway Co. v. White*, a plaintiff bringing a retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  548 U.S. at 68.  Because Title VII "does not set forth a general civility code for the American workplace," a materially adverse action must transcend beyond "trivial harms."  *Id.*

The Court finds there is a genuine issue of material fact with respect to whether Nitkin suffered an adverse employment action when MLH gave her the choice of suspension without pay and likely termination or resignation effective immediately.

Viewing the evidence in the light most favorable to Nitkin, a reasonable jury could find that following Nitkin's submission on July 9 of her resignation effective in September, MLH decided to exit Nitkin sooner to eliminate the problems caused by Nitkin's complaint (i.e., scheduling issues and discussion among staff related to Nitkin's allegations and MLH's investigation).  During the July 16 meeting, Mendez questioned Nitkin about disclosure of her allegations and details of MLH's investigation.  Nitkin readily admitted she had told Tyson in order to facilitate her scheduling change.  Nitkin also admitted she had talked to some colleagues to address speculation and rumors circulating among team members,[9] as well as to determine the scope of Mendez's investigation.  Mendez informed Nitkin that this disclosure of confidential information was a terminable offense and Nitkin would be suspended without pay while MLH conducted an investigation.  Nitkin knew that any action taken by MLH—suspension without pay or termination—would be reported to Penn and could result in rescission of her job offer. Mendez explained the only way to avoid suspension without pay was for Nitkin to make her resignation effective immediately.

MLH relies heavily on *Hibbard v. Penn-Trafford School District*, Civ. Action No. 13-622, 2014 WL 640253, at *9 (W.D. Pa. Feb. 19, 2014), to support its contention that Nitkin did not suffer an adverse employment action, but the Court is not persuaded.  In *Hibbard*, the plaintiff alleged that "she had no recourse except to resign" from employment after a meeting she had with her supervisor, in which her supervisor said she "would probably be asked to appear before a board of directors meeting" and "revealed his desire, intent, and plan to

---

[9] According to Mendez's notes of the meeting, Nitkin felt she was being treated differently by the staff, many of whom still viewed Ahlswede as the leader of the team.  (Doc. No. 22-3, Ex. I at p. 114.)  Nitkin explained someone implied that she and Ahlswede had an affair.  (*Id.*)  Nitkin felt she had to disclose information in order to "protect her reputation personally and professionally."  (*Id.* at p. 115.)

terminate her." *Id.* at *9.  The court held that the plaintiff had not shown that she suffered an adverse employment action because she "voluntarily resigned before [the] threat of termination could be carried out." *Id.*  Unlike *Hibbard*, this is not a case where there were "mere threats." Rather, Nitkin was told that she would be immediately suspended without pay pending an investigation, unless she moved up her resignation, and that the suspension would be reported to Penn.  Nitkin testified that she felt like "he was basically telling [her] [her] career was over." (Nitkin Dep. at 244:2–3.)[10]

Viewing the evidence in the light most favorable to Nitkin, the Court concludes that Nitkin has raised a genuine issue of material fact as to whether she suffered a materially adverse action when she felt forced to resign effective immediately rather than face suspension without pay and risk her offer with Penn.

   *b.* <u>*Causal Link*</u>

Having found that Nitkin raises a genuine issue of material fact as to whether she suffered a materially adverse action, we now consider whether she has shown a causal connection between her complaining about Ahlswede's conduct and her resignation.  "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually

---

[10] However, we reject Nitkin's implication that she suffered an adverse employment action when Wadsworth told the palliative care team that she had complained about Ahlswede's conduct and the investigation concluded in her resignation.  (*See* Doc. No. 27 at p. 6.)  The case Nitkin relies on, *Vandegrift v. City of Philadelphia*, 228 F. Supp. 3d 464 (E.D. Pa. 2017), is distinguishable.  There, the City transferred the plaintiff to a new squad and during a team meeting, supervisory-level employees told the new squad that the plaintiff had made an EEO complaint and "to watch what they say around her." *Id.* at 489.  The court held that a "[a] reasonable jury could conclude [that the] City created an atmosphere where coworkers were primed to distrust [the plaintiff] by telling them she filed an EEO complaint, and this atmosphere could have dissuaded a reasonable worker from making a charge of discrimination," thereby amounting to adverse action.  *Id.* at 489–90.  But, in this case, Wadsworth did not inform employees that Nitkin had made the complaint and resigned *until after* Nitkin no longer worked for MLH. (Nitkin Dep. at 269:10–24.)  Therefore, Wadsworth's conduct at the team meeting, however ill-advised, does not support Nitkin's argument that she suffered an adverse employment action.

suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (citation omitted).  Other evidence may also support a causal link.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference.  For example, a plaintiff may establish the connection by showing that the employer gave inconsistent reasons for terminating the employee . . . Moreover, we have been willing to explore the record in search of evidence, and our caselaw has set forth no limits on what we have been willing to consider.").

First, the Court agrees with MLH that the time between Nitkin's initial complaint in March 2019 and her July 16 resignation is not unusually suggestive and does not raise an inference of a causal connection.  *See LeBoon v. Lancaster Jewish Cmm'ty Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *cf. Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (holding that the temporal proximity was unduly suggestive where the plaintiff was terminated seven days after she engaged in protected activity); *Stocker v. Green, Tweed & Co., Inc.*, Civil Action No. 18-4503, 2020 WL 4437113, at *16 (E.D. Pa. Aug. 3, 2020) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, the temporal proximity in this case [one week] is in the realm of what this Court and others have found

sufficient at the prima facie stage." (cleaned up)); *Shellenberger v. Summit Bancorp, Inc.*, 318

F.3d 183, 188–89 (3d Cir. 2003) (holding that ten days was sufficient to establish a causal link).

But Nitkin argues that the protected activity continued *after* her initial complaint.  After

carefully examining the record, the Court agrees with Nitkin.  Following Mendez's discussion

with Nitkin on April 25, Nitkin was under the impression she would not have to work with

Ahlswede again.  But, on June 11, Nitkin had to work with Ahlswede, and shortly thereafter,

Nitkin was again scheduled to work the same shift as Ahlswede.  Accordingly, on July 2, when

Nitkin met with Tyson to help switch her schedule because she felt uncomfortable working with

Ahlswede, she had to explain the allegations she had made against Ahlswede.  Tyson agreed it

would be best for everyone if Nitkin did not work the same shifts as Ahlswede or his wife.

Viewing the evidence in the light most favorable to Nitkin, the Court finds that Nitkin's

July 2 meeting with Tyson addressing her complaints against Ahlswede and her need to be

scheduled at campuses where Ahlswede and his wife did not work constitutes continued

protected activity.  Then, the July 16 meeting resulted in Nitkin's immediate resignation in order

to avoid being suspended without pay.  The Court finds this fourteen-day lapse an unduly

suggestive temporal proximity that creates an inference of causality.  *See Clair v. Augusta*

*Aerospace Corp.*, 592 F. Supp. 2d 812, 824 n.22 (E.D. Pa. 2009) ("When the temporal proximity

between the protected activity and the adverse action is 'unusually suggestive,' that alone can

create an inference of causality.  Here, Clair was terminated fourteen days after sending the

email to Ms. Gerrold, which satisfies this proximity requirement."); *Palish v. K & K RX Servs.,*

*Inc.*, Civil Action No. 13-cv-4092, 2014 WL 2692489, at *10 (E.D. Pa. June 13, 2014) ("Plaintiff

suffered an adverse employment action when he was terminated, and the temporal proximity

(two weeks) between his protected activity and his termination is sufficient to establish the

requisite causal link for purposes of the prima facie case."); *see also Rymas v. Princeton Healthcare Sys. Holding, Inc.*, Civil Action No. 15-8188 (BRM) (LHG), 2017 WL 4858123, at *11 (D.N.J. Oct. 27, 2017) ("The Court agrees two weeks is sufficient temporal proximity to permit a reasonable jury to find Plaintiff has raised an inference of retaliation.").  And the suggestiveness of this timing is only heightened by the fact that Wadsworth sent Mendez an email on July 12 (ten days after Nitkin met with Tyson about the ongoing scheduling issues), stating, "I *remain* in favor of exiting April." [11]

Even if the Court concluded the lapse between July 2 and July 16 was not unduly suggestive, the Court finds there is sufficient circumstantial evidence to raise a genuine dispute of material fact about whether there exists a causal connection between Nitkin's complaints and her resignation effective immediately on July 16.

    ii.  <u>Legitimate, Nonretaliatory Reason and Pretext</u>

Since Nitkin meets her burden of establishing a prima facie case of retaliation, the burden shifts to MLH to articulate a legitimate, nonretaliatory reason for its adverse employment action. MLH has done so here:  it contends that it threatened to suspend Nitkin without pay and terminate her because she divulged (or an investigation may have shown that she divulged) confidential information, a terminable offense.

The burden then shifts back to Nitkin to establish that those stated reasons were pretextual.  To show pretext, a plaintiff must submit evidence which "(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that the factfinder could reasonably conclude that each reason was a fabrication, or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse

---

[11] The Court notes that Wadsworth's July 12 email supports the reasonable inference that Mendez's agenda on July 16 was to exit Nitkin immediately.

employment action." *Young v. Pennsauken Tp. Sch. Dist.*, 47 F. App'x 160, 162 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)); *see also Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 702 (E.D. Pa. 2016) ("To establish pretext, [the plaintiff] must proffer evidence that her employer's reason for terminating her is unbelievable or implausible, or evidence that her engaging in protected activity was more likely than not the motivating cause of Defendants' decision to terminate her.").  A non-moving party can show pretext "by exposing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007) (cleaned up).

The Court finds that, at this stage, Nitkin has sufficiently poked holes in MLH's stated reason for forcing her to choose between resigning or being suspended without pay and that a reasonable juror could find them unworthy of credence.  MLH asserts that Nitkin divulged confidential information, a terminable offense.  However, Nitkin claims that she was never told she needed to keep the information confidential.[12]  (Nitkin Dep. at 247:21–22.).  And Wadsworth testified that on July 17, she told the palliative care team "that whatever details they had heard directly *from either Karl or April*, that I would ask them not to talk about them."  (Wadsworth Dep. at 234:1–3 (emphasis added).)  Despite Wadsworth's suggestion that the staff may have heard about Nitkin's allegations or MLH's investigation from either side, it does not appear that Ahlswede was ever questioned on whether he divulged confidential information, casting doubt on MLH's stated reason.

---

[12] As mentioned earlier, during oral argument MLH focused on the need to investigate the allegation that Nitkin told her coworkers that her husband was so mad that he could kill Ahlswede.  Interestingly, not once in its opening or reply briefs or statement of undisputed facts does MLH ever mention this so-called concern.

Furthermore, although MLH cites violation of its policies as a basis for its actions toward Nitkin, the record shows that Ahlswede also violated company policies but was not faced with a similar predicament.   (*See* Wadsworth Dep. at 220:5–24 (testifying that Ahlswede lied, which was a "significant offense").)  Last, Wadsworth's July 12 email, which she sent after learning that Nitkin spoke to Tyson on July 2, states, "I remain in favor of exiting April," indicating that she had been in favor of exiting Nitkin even *before* she learned that Nitkin had allegedly divulged confidential information.  A reasonable juror could therefore find weaknesses or implausibilities in MLH's stated reason.

In conclusion, the Court finds that Nitkin has raised a genuine issue of material fact as to whether MLH's reasons were pretextual, and we deny MLH's motion for summary judgment as to the retaliation claim.

### C.       *Wrongful Termination*

Nitkin alleges that MLH terminated her "in retaliation for . . . reporting fraudulent insurance practices."  (Doc. No. 1 at ¶¶ 131–33, Count V.)  MLH moves for summary judgment on Nitkin's wrongful termination claim, arguing that dismissal is appropriate because Nitkin failed to identify a Pennsylvania law that required her to report Ahlswede's fraudulent billing practices.  (Doc. No. 22-1 at pp. 30–31.)  Nitkin counters that 49 Pa. Code § 21.18 supports her wrongful termination claim.  (Doc. No. 27 at p. 24.)  Nitkin is mistaken.

Pennsylvania follows the at-will doctrine, meaning that an employer generally may terminate an employee for any reason and is not required to show cause.  *Shick v. Shirey*, 716 A.2d 1231, 1233 (Pa. 1998); *Spierling v. First Am. Home Health Servs.*, 737 A.3d 1260, 1252 (Pa. Super. Ct. 1999); *see also Brennan v. Cephalon, Inc.*, 298 F. App'x 147, 150 (3d Cir. 2008); *Lampenfeld v. Pyramid Healthcare, Inc.*, Civil Action No. 3:14-CV-0283, 2015 WL 926154, at *9 (M.D. Pa. Mar. 4, 2015).  But an exception to this doctrine applies in certain limited

36

circumstances where the discharge "violates a clearly mandated public policy." *Lampenfeld*, 2015 WL 926154, at *9 (cleaned up); *see also Spierling*, 737 A.3d at 1253.  Pennsylvania courts have not explicitly outlined the parameters of the public policy exception; however, in practice, its application has been limited to the following three situations:  where an employer (1) requires an employee to commit a crime; (2) prevents an employee from complying with a statutorily imposed duty; or (3) discharges an employee when specifically prohibited from doing so by statute.  *See Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 737–38 (E.D. Pa. 2011); *Lampenfeld*, 2015 WL 926154, at *10.  The Pennsylvania Supreme Court has cautioned against liberally construing the public policy exception.  *See, e.g.*, *Tanay*, 810 F. Supp. 2d at 738; *Lampenfeld*, 2015 WL 926154, at *10; *see also McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 314 (Pa. 2000) ("An employee will be entitled to bring a cause of action for a termination of that relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth.").

Where, as here,[13] a plaintiff claims that she had a duty to report her coworkers' or employer's misconduct, courts require the plaintiff to identify the statute that mandated the reporting.  *See, e.g.*, *Neff v. PKS Holdings, LLC*, No. 5:18-cv-1826, 2019 WL 3729568, at *12 (E.D. Pa. Aug. 8, 2019) ("Pennsylvania courts have repeatedly rejected wrongful termination claims when a private employer discharged an employee for whistleblowing unless the employee had a statutory duty to report the employer's violations of laws . . . [The plaintiff] fails to point to

---

[13] (*See* Doc. No. 27 at p. 24 (distinguishing from *Lampenfeld*, where "the plaintiff was unable to point to a regulation that mandated reporting"); *id.* ("In the present matter, Plaintiff maintains that there is a mandate of action in the same nursing regulations that *Lampenfeld* pointed to—however, the mandate is in a different section than that cited in *Lampenfeld* . . . Plaintiff would be risking disciplinary and corrective measures of unknown severity if she ignored the mandate under 49 Pa. Code § 21.18(b) and allowed Dr. Ahlswede to continue his fraudulent billing practices without objection.").)

a statute that required her to report violations of securities laws to FINRA."); *Coleman v. HCR ManorCare, Inc.*, Civil Action No. 12-6319, 2013 WL 12321992, at *3 (E.D. Pa. Aug. 20, 2013) ("Plaintiff asserts that she was terminated for reporting violations of Pennsylvania law pertaining to MA 401 forms, and for reporting unhealthy and unsafe conditions. . . The federal statutes relied upon by Plaintiff require nursing facilities to provide notice to residents of their rights, but do not directly impose any affirmative duty on Plaintiff to either ensure that MA 401 forms were being completed or report deficiencies to her employer.  The Pennsylvania Nursing Home Administrators License Act and the Pennsylvania Health Care Facilities Act require nursing facilities to adopt and enforce rules to protect the safety of their patients and appoint a full-time administrator to be responsible for the overall management of the facility.  Neither of these statutes directly imposed any affirmative duty on Plaintiff to report any unlawful, unhealthful, or unsafe conditions.  Where a statute does not impose a clear and direct duty upon the plaintiff, it cannot form the basis for a wrongful discharge claim."); *Brennan v. Cephalon*, Civil Action No. 04-3241 (NLH), 2007 WL 1382801, at *4–5 (D.N.J. May 8, 2007), *aff'd*, 298 F. App'x 147 (3d Cir. 2008) ("What these cases portray is a requirement under Pennsylvania law that in order for a plaintiff to prevail on a theory of statutory duty, he must point to a clear affirmative duty to report.  Even though [the plaintiff] was given the responsibility of conducting an internal audit by [the defendant-employer], [the plaintiff] did not have an affirmative statutory duty to report the findings from his audit directly to the FDA.  The statutes that [the plaintiff] identifies only proscribe the filing of false statements.").

*Spierling v. First American Home Health Services, Inc.* and *Lampenfeld v. Pyramid Healthcare, Inc.* are instructive.  In *Spierling*, the plaintiff, a First American employee, claimed that she was wrongfully terminated after she reported suspected insurance fraud.  737 A.3d at

1250.  After federal investigators told First American employees to use an "800" fraud hotline to report suspected Medicare fraud, the plaintiff "reviewed 'old and discarded' files [at her employer's office] . . . and found evidence of what she believed to be past Medicare fraud."  *Id.* at 1251.  The trial court held that the public policy exception did not apply and the employer was within its rights to discharge the plaintiff as an at-will employee, and the Pennsylvania Superior Court affirmed.  *Id.* at 1254.  The court reasoned that "the statutes and caselaw cited by [the plaintiff] impose no duties and threat of penalties for failure to take the action that she did (i.e., uncovering and reporting past suspected Medicare fraud)."  *Id.* (explaining that the Pennsylvania Code sections related to nursing afforded the plaintiff no relief "since they do not mandate that she report, under threat of penalty, the sort of past alleged fraud discovered by her").  Likewise, in *Lampenfeld*, the plaintiff claimed she was wrongfully terminated after she reported inaccuracies in billing.  The court granted the employer's motion to dismiss and in doing so, noted that it could not "find anything in any of the statutes or regulations cited by Plaintiff which required her to report instances of fraudulent billing, and Plaintiff points to none.  Therefore, Plaintiff cannot base her wrongful discharge claim on her report in this regard.  2015 WL 926154, at *12.

The state statute relied upon by Nitkin, 49 Pa. Code § 21.18, prohibits registered nurses from "knowingly aid[ing], abet[ting] or assist[ing]" other individuals "to violate or circumvent a law or Board regulation."  49 Pa. Code § 21.18(b)(1).  And a registered nurse who "fails to comply" with that "prohibition . . . is subject to disciplinary and corrective measures under section 14 of the act (63 P.S. § 224)."  49 Pa. Code § 21.18(c).  Critically, nothing in these provisions required Nitkin to report Ahlswede's fraudulent billing practices.  As a result, the code does not support Nitkin's wrongful discharge claim, and the Court grants MLH's motion

39

for summary judgment on this claim.  *Cf. Diberardinis-Mason v. Super Fresh*, 94 F. Supp. 2d 626, 629–30 (E.D. Pa. 2000) (granting the employer's motion for summary judgment where the plaintiff, a Super Fresh pharmacist, alleged that other Super Fresh pharmacists were dispensing controlled substances to nonexistent senior citizens, and explaining that "the alleged sources of public policy are, in fact, general guidelines for pharmacists' conduct.  It is not at all apparent from the face of the statute that [the plaintiff] had an affirmative duty to report suspicious behavior to the authorities, and we will not take it upon ourselves to read in such a duty absent Pennsylvania case authority.  Thus, while her desire to ferret out illegal activity may be laudable, it will not form the basis of a wrongful discharge claim."); *see also Hennessy v. Santiago*, 708 A.d 1269, 1273–74 (Pa. Super. Ct. 1998) (affirming dismissal of wrongful discharge claim where the plaintiff, a counselor, was terminated after reporting an alleged rape of one of her patients to the authorities because "no authority required [the plaintiff] to act as she did"—in other words, because neither Pennsylvania law nor the counseling profession's code of ethics "impose[d] an affirmative duty upon all mental healthcare workers to investigate and report possible crimes involving their patients," the plaintiff could not state a claim for wrongful discharge); *accord Bloomfield v. Wissinoming Volunteer Tr. Aid Corps, Inc.*, Civil Action No. 15-1013, 2015 WL 4077048, at *5 (E.D. Pa. July 6, 2015) (granting motion for judgment on the pleadings where the plaintiff "allege[d] that defendants required him to falsify Medicare documentation" so that they could "obtain fraudulent payments from Medicare" because the plaintiff failed to "sufficiently allege[] any authority that would permit [the court] to apply the public policy exception").

### D.    Reduction in Hours

In her complaint, Nitkin alleges that she "was forced to change her employment status from full-time to part-time, and then to per diem in order to limit interactions with Dr. Ahlswede."  (Doc. No. 1 at ¶ 36.)  In its motion, MLH contends that Nitkin cannot recover for

her reduction in hours because her claims are untimely and she did not exhaust her administrative remedies.  (Doc. No. 22-1 at pp. 31–33.)

First, the Court notes that the complaint provides no indication that Nitkin is pursuing a standalone claim for her reduction in hours.  (*See generally* Doc. No. 1.)

Second, it is well-established that Title VII requires a claimant to file a charge with the EEOC within 300 days of the unlawful employment practice.  *Valentin v. Manpower Grp. Sols.*, 792 F. App'x 208, 210 (3d Cir. 2019) (citing 42 U.S.C. § 2000e-5(e)(1); *Mandel*, 706 F.3d at 165; *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000)).  Here, Nitkin moved from full-time to part-time on December 5, 2017 and from part-time to per diem on August 8, 2018 (*see* Doc. No. 22-3, Ex. D at pp. 91–92), but she did not file her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") until October 21, 2019 (*see* Doc. No. 22-3, Ex. S at pp. 170–71)—over 300 days after either of her reduction in hours requests.  Thus, to the extent Nitkin bases any of her claims on her reduction in hours, those claims are time-barred.  *See Angelopoulos v. HDR Eng'g, Inc.*, 2:19-CV-01578-CCW, 2021 WL 3056205, at *6 (W.D. Pa. July 20, 2021) ("It is undisputed that [the plaintiff's] hours were first reduced from 40 hours per week to 32 hours per week on September 17, 2017, and that [the plaintiff] did not file his charge with the EEOC until August 10, 2018.  Because August 10, 2018 was more than 300 days after the alleged violation on September 17, 2017, any claim based on that alleged adverse action is time-barred."); *James v. A.C. Moore Arts & Crafts Inc./Sbar's Inc.*, Civ. No. 18-063-CFC, 2019 WL 1004480, at *4 (D. Del. Mar. 1, 2019) ("To the extent Plaintiff intended to reallege or renew claims in the third charge of discrimination that she raised in the first and second charges of discrimination, the Court will grant Defendants' motion to dismiss the realleged or renewed discrete acts of reduction in work hours, retaliatory demotion/job

reassignment, and low performance evaluation job demotion as they arose more than 300 days prior to the date the third and four[th] charges of discrimination were filed.").

Third, "the parameters of [a] civil action . . . are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976); *see also McIntosh v. White Horse Vill., Inc.*, 176 F. Supp. 3d 480, 483 (E.D. Pa. 2016) (dismissing disability-related retaliation claim where the plaintiff alleged in the charge that she was demoted when she requested a religious accommodation but did not allege any facts "from which the EEOC could infer that Plaintiff was complaining of disability-based discrimination" and therefore such a claim would not "naturally grow out of [the] charge"); *Fisher v. Catholic Social Servs. of Archdiocese of Phila.*, Civil Action No. 18-CV-04653, 2019 WL 3731688, at *8 (E.D. Pa. Aug. 8, 2019) (dismissing hostile work environment claim because it "does not logically flow from, and would have required investigation of events not raised by, Plaintiff's Title VII retaliation and discrimination claims").

In her EEOC charge, Nitkin alleged that she was discriminated against on the basis of her sex and was retaliated against.  (Doc. No. 22-3, Ex. S at pp. 170–71.)  She described the "sexually inappropriate comments and jokes" Ahlswede made, such as "openly discuss[ing] his sexual fantasies, his desire to engage in particular sexual acts," and "wanting to engage in sexual relations with his wife."  (*Id.* at p. 170.)  Nitkin also recounted the incident where Ahlswede told her that he had been up most of the previous night watching pornography and masturbating, which made her feel "so uncomfortable" that she left her own office.  (*Id.*)  Nitkin described other instances of Ahlswede's sexual harassment and MLH's investigation into her complaint. (*Id.* at pp. 170–71.)  Nowhere in her charge did Nitkin mention that she reduced her hours or

switched her schedule, let alone that she did so because of Ahlswede's conduct.  (*See generally id.*)  The Court concludes that Nitkin's claim that she was discriminated against due to the reduction of her hours does not reasonably grow out of her EEOC charge, in which she claimed that she was sexually harassed and retaliated against.  *Cf. Williams v. Clegg's Nursery, LLC*, 2016 WL 3702978, at *6 (M.D. La. July 7, 2016) ("Plaintiff claims she was discriminated against due to the reduction of her hours; however, this was not set forth in her EEOC charge from August 2012. . . .  Thus, because a reduction in work hours cannot be reasonably be expected to grow out of the charge of discrimination, Plaintiff's claim is barred.").

### IV.    Conclusion

For the foregoing reasons, the Court grants MLH's motion for summary judgment as to the hostile work environment and wrongful termination claims (Counts I, II & V), but denies the motion as to the retaliation claims (Counts III & IV).

An appropriate Order follows.