# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **APRIL NITKIN**, | **CIVIL ACTION** |
| Plaintiff, | |
| v. | **NO. 20-4825-KSM** |
| **MAIN LINE HEALTH d/b/a BRYN MAWR HOSPITAL,** | |
| Defendant. | |

## MEMORANDUM

**Marston, J.**                                                                                               **November 29, 2021**

On November 1, 2021, after a three-day trial, the jury returned a verdict in favor of Plaintiff April Nitkin, finding that her former employer, Defendant Main Line Health d/b/a Bryn Mawr Hospital ("MLH"), retaliated against her after she reported Dr. Karl Ahlswede, her supervising physician, for making inappropriate comments of a sexual nature, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). The jury awarded Nitkin $20,000 in backpay, $0 in emotional distress damages, $1 in compensatory damages, and $120,000 in punitive damages, for a total of $140,001.

During the trial, the Court, over MLH's objection, determined that a punitive damages jury instruction was appropriate.[1] (Doc. No. 75 at 83:20–25). The Court outlines its rationale for that ruling below.

---

[1] Before the trial, the parties submitted supplemental briefing on whether a punitive damage instruction should be given to the jury, which the Court considered in its ruling.

**II.    Discussion**

    **A.    Retaliation**

Initially, Nitkin must state a prima facie case of retaliation under Title VII and the PHRA before a punitive damages instruction is warranted.[2] To establish a prima facie case of retaliation, Nitkin must show that (1) she engaged in a protected activity; (2) she "was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity"; and (3) "there is a causal connection between the protected activity and the adverse action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006); *Holt v. Pennsylvania*, 683 F. App'x 151, 157 (3d Cir. 2017). The Court finds that Nitkin has met her burden as to each element.

        *a.    Protected Activity*

As the jury found, Nitkin "prove[d] by a preponderance of the evidence that Ms. Nitkin's report of her supervisor, Dr. Karl Ahlswede, for making inappropriate comments of a sexual nature constitutes protected activity." (Doc. No. 60 at p. 1.)

MLH concedes that Nitkin engaged in protected activity when she complained to Eric Mendez, MLH's Director of Human Resources, about Ahlswede's sexually inappropriate comments. (*See* Doc. No. 75 at 188:17–189:1 ("Protected activity is April Nitkin's March 22nd report to Eric Mendez. Ms. Nitkin reported that Dr. Ahlswede had made sexually inappropriate comments in the workplace . . . That report was intended and, in fact, did put Mainline Health on notice of potentially unlawful conduct in the workplace. So it is protected activity. We all agree on that.").)

---

[2] The same legal standards apply to Title VII and the PHRA, so the Court considers Nitkin's Title VII and PHRA claims together. *See, e.g.*, *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims." (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996))).

Because, for the reasons discussed below, we find that Nitkin has established a causal connection between her report of sexually inappropriate comments to Mendez, which MLH admits are protected, and her forced resignation, we need not consider whether any other conduct Nitkin engaged in fell within the ambit of protected activity.

> b. *Adverse Employment Action*

Under *Burlington Northern & Santa Fe Railway Co. v. White*, a plaintiff bringing a retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 68 (2006). Because Title VII "does not set forth a general civility code for the American workplace," a materially adverse action must transcend beyond "trivial harms." *Id.* The jury was instructed to this effect. (*See* Doc. No. 75 at 216:8–16 ("Concerning the second element, the term materially adverse means that Ms. Nitkin must show that the adverse employment action was serious enough that it might well have discouraged a reasonable worker from complaining about harassment.").) In rendering its verdict, the jury concluded that Nitkin "ha[d] proven by a preponderance of the evidence that Main Line Health's option that Ms. Nitkin choose between resigning effective immediately or being suspended without pay pending an investigation constitutes a materially adverse employment action." (Doc. No. 60 at p. 1.)

Here, there was sufficient evidence from which a jury could reasonably conclude that Nitkin suffered a materially adverse employment action when MLH gave her the choice of suspension without pay and likely termination or resign effective immediately.[3] In particular, a

---

[3] Based on Mendez's comments, Nitkin was also concerned that she would not receive the recommendations necessary to get credentialed at Penn if she was suspended pending MLH's investigation which would result in her likely termination. (*See* Doc. No. 67 at 103:5–15 ("[Mendez] told me that if I resigned effective immediately, he would not have to tell Penn, but that he would have to tell

reasonable jury could find that MLH wanted to exit Nitkin immediately to eliminate the problems caused by her report of Ahlswede's inappropriate sexual comments (i.e., discussion among the staff related to her allegations) and therefore forced her to move up her resignation.[4] For example, Barbara Wadsworth, MLH's Chief Nursing Officer, testified that on the afternoon of July 11 she met with four nurses on the palliative care team who worked at Bryn Mawr's campus and who were very upset after hearing Nitkin's allegations. (Doc. No. 75 at 51:13–52:24, 59:11–15; *see also id*. at 53:14–54:22 ("[S]o what they started telling me was that April [Nitkin] had told Michelle [Reed] directly what her accusations were of Karl [Ahlswede], and the team was very upset. They were angry, adamant that it was not accurate, it was false.").) Wadsworth also testified that, after that meeting, she was "concerned for the team and their ability to function as a team, and also that they were all talking about this situation, which was definitely getting in the way of taking care of patients." (*Id.* at 56:5–11.)

The next day, July 12, Wadsworth spoke to interim director of the palliative care team, Dr. Adam Tyson, and learned that members of the team at all four of MLH's campuses were aware of Nitkin's allegations. (*Id.* at 59:22–60:19.) Upon learning this, Wadsworth grew "very concerned" about the disruption these disclosures had caused; she explained that because the team members were "talking about it, trying to understand the situation, [and] drawing conclusions," "they were not focusing on the most important part, which is taking care of our patients." (*Id.* at 60:20–61:8.) Further, Wadsworth testified that she reached out to the

---

Penn if I was suspended and terminated – and/or terminated, but that if I wrote to Adam Tyson and Miss[e] Slusser before I left the campus, that he would not have to tell Penn anything and he would make sure that the credentialing that I needed to start at Penn would get completed[.]").)

[4] In June, Nitkin received a job offer from Penn Medicine (Tr. Ex. 67), and on July 9, Nitkin had informed MLH that she would be resigning, but would be staying on through September (*see* Tr. Ex. 25) to allow time for her credenitaling at Penn to be completed.

scheduling coordinator, Melissa "Misse" Slusser, to see what dates Nitkin was scheduled to work from July to September to understand possible "next steps." (*Id.* at 62:1–11.) And she admitted that she considered "exiting April at that time." (*Id.*) Along those lines, Wadsworth emailed Mendez later on July 12, "I remain in favor of exiting April." (Tr. Ex. 30.) Taken together, the jury could find from this evidence that MLH desired to exit Nitkin immediately and wanted to expedite her resignation during the July 16 meeting.

Further, there is evidence in the record of the July 16 meeting from which the jury could reasonably find that MLH forced Nitkin to resign. First, Nitkin testified that during the July 16 meeting, Mendez questioned her about her disclosure of her sexual harassment allegations and the details of MLH's investigation. (*See, e.g.*, Doc. No. 67 at 102:2–24; *see also* Tr. Ex. 53 (Mendez's handwritten notes of the July 16, 2019 meeting).) Nitkin and Mendez both testified that Nitkin readily admitted she had talked to colleagues about her allegations and the investigation. (Doc. No. 67 at 103:16–21; Doc. No. 69 at 70:1–3.) Mendez informed Nitkin that this disclosure of confidential information was a terminable offense. (Doc. No. 67 at 102:19–24; Doc. No. 69 at 70:24–71:4.) Mendez told Nitkin that she would be suspended without pay while MLH conducted an investigation. (Tr. Ex. 53 (Mendez's handwritten notes from the July 16, 2019 meeting, stating "I explained she would be suspended w/o pay as the investigation continues <u>OR</u> Since she has already resigned, she could make it effective immediately"); *see also* Doc. No. 67 at 104:10–11 ("Q: Would you be paid during the investigation? A: He never said anything about being paid, no.").) Last, the record included evidence that Nitkin was told that any action taken by MLH—suspension without pay or termination—would be reported to Penn and could result in rescission of her job offer. (*See* Doc. No. 67 at 103:5–15 ("And I asked him about my -- my job at Penn and would they have to find this out . . . [H]e told me that if I

5

resigned effective immediately, he would not have to tell Penn, but that he would have to tell Penn if I was suspended and terminated – and/or terminated, but that if I wrote to Adam Tyson and Missy [sic] Slusser before I left campus, then he would not have to tell Penn anything[.]"); *id.* at 104:25–105 ("He had told me that if I was suspended or terminated that he would report to Penn. So, in my mind, that would have prevented further employment.").)[5]

Based on the evidence in the record, a jury could reasonably find—and did find here—that MLH's conduct could dissuade a reasonable worker from complaining about sexual harassment.

### c. *Causal Link*

Third, the Court finds that a reasonable jury could find that Nitkin established a causal connection between her complaint to Mendez and her being forced to choose between suspension without pay and an investigation or moving up her resignation.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (citation omitted). Other evidence may also support a causal link; indeed, there are "no limits" on what may be considered. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000). The Third Circuit has explained:

Although timing and ongoing antagonism have often been the basis for the causal

---

[5] Mendez testified that he did not inform Nitkin that he would need to inform Penn of a suspension or of any investigation into her disclosures of alleged confidential information. (*See* Doc. No. 69 at 98:1–6 ("Q: [D]id you tell Ms. Nitkin that you would inform Penn of a suspension? A: No. Q: Was there any discussion about whether you would inform Penn about either the investigation or the suspension? A: No.").) Although the jury had Nitkin and Mendez's diverging testimonies before it, it could (and ultimately, did) choose to credit Nitkin's version of events over Mendez's.

6

> link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference. For example, a plaintiff may establish the connection by showing that the employer gave inconsistent reasons for terminating the employee. . . . Moreover, we have been willing to explore the record in search of evidence, and our caselaw has set forth no limits on what we have been willing to consider.

*Id.*; *see also id.* at 281 ("When temporal proximity between protected activity and alleged retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." (cleaned up)); *Holt*, 683 F. App'x at 157 ("Circumstantial evidence of retaliatory animus may include a pattern of ongoing antagonism, inconsistencies in the employer's justifications, or any other evidence gleaned from the record as a whole that is sufficient to support an inference of retaliatory animus." (cleaned up)); *id.* ("[T]he jury was entitled to consider all of the facts in the record *together* in weighing whether there was a causal connection, 'particularly when we consider, as we must, that the verdict may have been based on the jurors' evaluation of each witness' credibility and demeanor.'" (citation omitted)).

Nitkin first met with Mendez on March 22, then again on April 1 and April 25. (See Tr. Exs. 49–50; Doc. No. 67 at 72:23–24.) On April 26, Nitkin experienced a panic attack and did not return to work at MLH until over a month later, on May 28. (Doc. No. 67 at 77:13–21, 81:16–18; Tr. Ex. 68 at 000125; Tr. Ex. 17.) Nitkin then resigned on July 16. The timing between Nitkin's complaints to Human Resources and her resignation on July 16 is not unduly suggestive. *See LeBoon v. Lancaster Jewish Cmm'ty Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

However, the Court cannot conclude, based on the record, that there was insufficient evidence before the jury for it to reasonably find a causal connection. Nitkin proffered evidence

7

from which the jury could infer antagonism on MLH's part. For example, Nitkin testified that she was under the impression that she would no longer have to work with Ahlswede after the investigation concluded (*see* Doc. No. 67 at 75:25–76:2), yet she was scheduled to work with Ahlswede on two occasions in June. And, after unsuccessfully attempting to reschedule her first shift with Ahlswede, Nitkin went to Tyson for assistance and answered his questions regarding why she needed to switch to a location where Ahlswede was not scheduled to work. (*Id.* at 86:16–23, 87:21–88:21.) Nitkin also testified that after Tyson granted her request to no longer work with Ahlswede, she was scheduled for fewer shifts than before. (*See id.* at 89:11–21, 90:3–9.) Further, when Nitkin submitted her resignation on July 9, informing MLH that she would be leaving at the end of September to work at Penn, Rick Mankin, President of MLH, and Wadsworth agreed that Nitkin's departure was "inevitable." (Tr. Ex. 24; Doc. No. 75 at 116:5–8.) A jury could reasonably infer from this evidence that MLH realized it had put Nitkin in an impossible position—i.e., Nitkin would have to work with Ahlswede at Bryn Mawr or specifically request to not work with Ahlswede (and therefore would have to divulge alleged confidential information in order to facilitate her scheduling changes); or experience scheduling difficulties because she was per diem and only assigned to campuses with need on the days she was available. (*See, e.g.*, Doc. No. 75 at 55:7–12 ("Q: And had Dr. Norton and Dr. Mankin been involved in conversations around scheduling? A: Rick Mankin was aware of scheduling. I don't recall if Andy Norton had direct information about the scheduling, but they know we were trying to work through the scheduling requests. Rick Mankin knew that."), 107:13–25 ("Well, it was complicated . . . [W]e wanted to allow April not to have to work with Carl [sic] . . . . [S]o as a per diem employee, we had to – we wanted to accommodate her request, but also there's a scheduling team and they do this as a team and we needed to tell them, okay, you can't schedule

8

April at Bryn Mawr or Lankenau, but you can schedule her at Riddle or Paoli."), 110:2–5 ("Q: Would you agree that these e-mails show that Dr. Tyson had a continued struggle to manage April's schedule at this time?  A: Yes."); Tr. Exs. 22 & 23.)  Moreover, although Nitkin requested to return to a normal schedule and no longer be a per diem employee in June, which conceivably could have alleviated her scheduling issues (i.e., assigning Nitkin to a campus where Ahlswede did not work), that request was not granted.  (*See* Tr. Ex. 68 at NITKIN000129 (Nitkin's text message exchange with Slusser, the scheduling coordinator, in which she asked, "Should I be going off of the per diem schedule yet?" and Slusser responded, "Well not yet… Are you available in July now").)

In addition, a jury could find that MLH treated Nitkin, the complainant, differently from Ahlswede, illustrating antagonism on its part.  Mendez's notes and Nitkin's testimony show that Nitkin was told that while MLH investigated her disclosures of alleged confidential information, she would be suspended without pay.  (*See* Tr. Ex. 53; Doc. No. 67 at 104:10–11; *see also* Doc. No. 75 at 141:12–14 ("Q: Eric told you [Wadsworth] that he told April she was going to be suspended while they investigated; correct?  A: During an investigation, you can't work, yes.").) In contrast, Mendez testified that when MLH investigated Ahlswede's alleged sexual harassment, Ahlswede was never suspended without pay or threatened with suspension; rather, after he admitted to some of the allegations, he took paid leave.  (*See* Doc. No. 69 at 80:17–81:4*; see also* Doc. No. 75 at 99:5–11, 142:2–5 (Wadsworth's testimony that Ahlswede "was given unplanned time off.  Not a suspension").)  Similarly, although MLH insisted that it needed to investigate Nitkin's disclosures of alleged confidential information despite the fact that she had already admitted to making such disclosures (*see* Doc. No. 69 at 71:21–72:2 ("Q: You told April that you needed to suspend her and investigate the disclosures, right?  A: At the July 16th

9

meeting, when she shared with me that she had, in fact, disclosed confidential information about the discussions we had had in the preceding months during the investigation, I told her know [sic] that was something we were now going to have to investigate.")), MLH did *not* continue its investigation into Ahlswede's sexually harassing conduct after Ahlswede admitted to some of the allegations against him (*see* Doc. No. 75 at 97:10–17 ("A: He [Ahlswede] admitted to some of it. Q: You didn't need a further investigation when the alleged violator of the rule or code of conduct admits the conduct; correct? A: That's correct. Q: In fact, no further investigation was done regarding that; correct? A: That's correct."); *see also id.* at 141:22–142:1).

Further, a jury could reasonably infer that although MLH claimed its punishment of Ahlswede—stripping him of the Medical Director role, which included a $50,000 stipend (*see* Doc. No. 75 at 35:11–17)—was mandated, it was, in essence, a meaningless punishment because the record shows that Ahlswede himself had already suggested he step down from the director role because of his stress. (*See* Doc. No. 69 at 53:21–54:11 (Mendez's testimony that in his first meeting with Ahlswede, Ahlswede "suggested" that he step down from the Medical Director role due to "stress"), 54:17–24 (Q: "Isn't it true that you and Ms. Wadsworth had a meeting with Dr. Ahlswede, where you relayed to him that he could step down? A: Yes, but we weren't granting his request. . . . We took action against Dr. Ahlswede. And the action that we took was we made him give up the Director seat for the Pain and Palliative Care Division."); *see also* Doc. No. 75 at 94:16–95:2 (Wadsworth's testimony that Mendez told her that Ahlswede offered to step down from his role), 109:5–8 ("Q: But you accommodated Dr. Ahlswede with what he wanted; correct? A: No, we did not. That was our decision. He was being taken out of his position, no matter what he said.").) Although MLH argues that it punished Ahlswede, a jury could have found—and, indeed, did find—that Mendez and Wadsworth lacked credibility on this point.

In that same vein, Nitkin testified she was told that violating MLH's confidentiality policy was a terminable offense and that she would be suspended without pay pending an investigation and then likely terminated. (Doc. No. 67 at 102:10–103:15; Tr. Ex. 53.) On the other hand, the record shows that Ahlswede also violated company policies but was not faced with a similar predicament. (*See* Doc. No. 75 at 125:20–127:19 (Wadsworth's testimony that after Ahlswede recanted his prior admissions, MLH understood that he had either lied then or was lying now, that lying during an investigation is a violation of MLH's code of conduct, that MLH had policies on honesty and integrity, and that Ahlswede was never formally disciplined for lying nor was he ever terminated), 96:20–97:1 ("Q: Based on your own conversation with Dr. Ahlswede and Eric Mendez's conversation with Dr. Ahlswede that Eric told you about, you had enough information to find that Dr. Ahlswede's actions were in violation of Main Line Health's code of contact; right? A: Yes."); *see also* Doc. No. 69 at 79:21–80:2 (Mendez's testimony that MLH never did "an investigation into any untruthful conduct [on Ahlswede's part]" and that Ahlswede was never disciplined for dishonesty).) Furthermore, Ahlswede was given the opportunity to address the palliative care team during a group meeting after he had been removed from his position as Medical Director in May, whereas Nitkin was not given that same opportunity when she resigned on July 16.[6] (*See* Doc. No. 75 at 147:18–148:25.)

Next, Nitkin presented evidence from which a jury could infer that there were inconsistencies in MLH's justification for forcing her to choose between suspension without pay and likely termination or resignation effective immediately. During trial, MLH maintained that

---

[6] In contrast, Nitkin was *not* permitted to say goodbye to her colleagues, nor was she allowed to retrieve her belongings. (Doc. No. 67 at 107:25–108:5.) MLH *immediately* terminated her email access. (*Id.* at 108:6–7; *see also* Tr. Ex. 39.) Further, on July 17—the day after Nitkin's departure—Wadsworth addressed the palliative care team and announced Nitkin's departure and stated there had been an "unfortunate situation" involving Ahlswede and Nitkin. (Doc. No. 75 at 70:5–71:22, 143:17–144:8, 145:2–12.)

Nitkin's disclosures of alleged confidential information to her coworkers was a terminable offense. Nitkin testified that she was not told that she needed to keep the information confidential. (*See* Doc. No. 67 at 61:18–21 ("Q: Was there any discussion at that meeting about confidentiality? A: No. Well – I had asked for confidentiality, but not that I needed to give confidentiality.").) Wadsworth and Mendez offered differing testimony as to what policy Nitkin allegedly violated by sharing her sexual harassment allegations and details of the investigation with her coworkers, and MLH did not provide evidence of either policy referenced to the jury. (*See* Doc. No. 69 at 99:14–100:5 (Mendez's testimony that the confidentiality policy is a one-page document that employees sign off on when they are first hired that says they should not disclose confidential information, such as patient information, employee information, and IT information, and that breach of confidentiality could lead to performance management, including termination); Doc. No. 75 at 120:23–121:7 (Wadsworth's testimony that if Nitkin had violated any policy, "it would be the code of conduct policy").)[7]

Taken together, even though there was a four-month gap between when Nitkin initially complained in March and her July 16 resignation, and therefore temporal proximity does not in and of itself establish causation, a jury could reasonably find based on the evidence that there was a pattern of antagonism and inconsistencies in MLH's justifications, supporting a causal link between Nitkin's protected activity and adverse employment action. *See Crosby v. State Corr. Inst. at Greensburg*, Civil Action No. 08-1506, 2011 WL 284098, at *3 (W.D. Pa. Jan. 25, 2011) (holding that there was sufficient evidence of a causal link, and explaining that "[a]lthough a nine-month gap in time between [the protected activity] and the alleged retaliatory actions may

---

[7] Notably, although Wadsworth was very concerned about the disruption the disclosures had on the palliative care team, Wadsworth also testified that she "did not know" if she ever considered whether Ahlswede may have disclosed the allegations or details of the investigation to other coworkers. (Doc. No. 75 at 122:20–25.)

not be sufficiently suggestive of causation in and of itself, Plaintiff presented additional evidence such as, *inter alia,* a pattern of animus and antagonism and inconsistencies in the employer's articulated reasons in support of a causal link"); *see also Holt*, 683 F. App'x at 157–58 (finding that "a reasonable juror could conclude, based on 'evidence gleaned from the record as a whole,' that Johnson's hiring decision was causally related to Holt's discrimination complaint," where there was a two month gap between the complaint and adverse employment action); *Szustowicz v. City of Philadelphia*, Civil Action No. 08-cv-04745, 2016 WL 5460933, at *9 (E.D. Pa. Sept. 29, 2016) ("The jury could have found that a pattern of antagonism overcame concerns about temporal proximity. . . . This evidence of a pattern of events also answers the [defendant's] argument that the temporal link between the partner switching episode in November of 2006 and [the] investigation of [the plaintiff] in July-August, 2007 was too remote. The jury reasonably could have found a pattern of antagonism that linked the partner switching episode in November of 2006 and [the] investigation of [the plaintiff] in July-August, 2007."); *cf. Zielinski v. SPS Techs. LLC*, Civil Action No. 10-3106, 2011 WL 5902214, at *6–7 (E.D. Pa. Nov. 22, 2011) (concluding that, in light of the temporal proximity between the plaintiff's charge of discrimination, his transfer three weeks later, and his termination four months later, "the minimal investigations into his complaints of racial discrimination," and "the circumstances prompting his termination," there was sufficient evidence for a jury to find in the plaintiff's favor on his retaliation claim).

Accordingly, the Court finds that there was sufficient evidence for the jury to find a Title VII violation.

    **B.    Punitive Damages**

Punitive damages are available for claims brought pursuant to Title VII; however, they

are "limited . . . to cases in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999). "An employer may be vicariously liable for the discrimination of its employee if the employee was serving in a 'managerial capacity' and committed the wrong while 'acting in the scope of his employment.'" *Middlebrooks v. Teva Pharma. USA, LLC*, Civil Action No. 17-412, 2019 WL 438092, at *9 (E.D. Pa. Feb. 4, 2019) (cleaned up). "The focus of malice and reckless indifference to support a punitive damages award is on the actor's state of mind; the mere existence of a civil rights violation is not a guarantee of eligibility for punitive damages." *Acosta v. Fairmount Foundry, Inc.*, 391 F. Supp. 3d 395, 406–07 (E.D. Pa. 2019). "Reckless indifference and malice may be inferred from the facts." *Id.* at 407. Critically, "[t]he employer must act with malice or reckless indifference *to the plaintiff's federally protected rights*. The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535 (cleaned up). However, employers will not be held "liable for punitive damages when they engage in good faith efforts to comply with Title VII." *Id.* at 544. "Where an employer has undertaken such good faith efforts at Title VII compliance, it demonstrates that it never acted in reckless disregard of federally protected rights." *Id.*

Here, the Court finds there is sufficient evidence in the record from which a jury could reasonably find that MLH acted with malice or reckless indifference to Nitkin's federally protected rights. Mendez and Wadsworth were undoubtedly managerial agents of MLH in their roles as Director of Human Resources and Chief Nursing Officer, respectively. *See id.* at 543 ("In making th[e] determination [as to whether an employee is a managerial agent], the court

14

should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished. Suffice it to say that the examples provided . . . suggest that an employee must be 'important,' but perhaps need not be the employer's top management, officers, or directors, to be acting in a managerial capacity." (cleaned up)); *Bruso v. United States*, 239 F.3ed 848, 861 (7th Cir. 2001) (finding that the defendant airline's top management officials—specifically, the manager of cabin service at the Chicago airport, the general manager of that airport, and the company's senior litigation counsel—were managerial agents).

Mendez and Wadsworth were both aware of MLH's Equal Employment Opportunity Policy, which includes an anti-retaliation provision. (*See* Doc. No. 69 at 88:14–18 (Mendez's testimony that the policy states that MLH does "not tolerate any form of retaliation"); Doc. No. 75 129:23–130:10 (Wadsworth's testimony that Nitkin had the right to complain, and that MLH has an anti-retaliation policy in place); *see also* Doc. No. 69 at 89:3–16 (Mendez's testimony that MLH provided training to all of its employees on the policy).) Mendez has worked at MLH for over twenty-one years and has been the Director of Human Resources for seventeen years. (Doc. No. 69 at 29:20–23.) He became a Certified Professional of Human Resources, completion of which required an "extensive amount of training," and he received training from law firms "on a host of things" "under the HR arena." (*Id.* at 90:25–91:16.) Wadsworth began working at MLH in 2012 and has been employed there for approximately nine years. (Doc. No. 75 at 29:24–30:19.) In 2019, Wadsworth was a Senior Vice President and Chief Nursing Officer. (*Id.*) Presently, Wadsworth is the Chief Operating Officer and Chief Nurse. (*Id.*)

In addition, as discussed above, a reasonable jury could find from the record that Mendez and Wadsworth acted with retaliatory animus towards Nitkin, the victim, given that they treated

her differently than Ahlswede, the alleged perpetrator (e.g., by telling Nitkin that she would be suspended without pay while MLH investigated her alleged violation of company policy but conducting no further investigation after Ahlswede admitted he made certain inappropriate sexual comments and then directing Ahlswede to take a week of paid vacation).[8] And they gave inconsistent reasons for Nitkin's termination (e.g., investigating whether Nitkin made disclosures of alleged confidential information but failing to even consider whether Ahlswede possibly made those same disclosures, citing to different policies—neither of which were shown to the jury—when questioned as to what policy Nitkin allegedly violated).[9]

Taken together, the Court finds that this evidence could lead a reasonable juror to conclude that Wadsworth and Mendez acted in the face of a perceived risk that their actions would violate federally protected law. *See Flitton v. Primary Residential Mortg., Inc.*, 238 F. App'x 410, 420 (10th Cir. 2007) ("[The Chief Executive Officer] also testified that . . . he received six weeks of training on human resources law. He admitted that he was knowledgeable

---

[8] *See supra* Section II.A.c for other instances from which a jury could find that MLH treated Nitkin differently from Ahlswede.

[9] Further, although Wadsworth and Mendez cited an alleged concern for workplace violence after hearing from another nurse practitioner that Nitkin stated that her husband, Brian Foley, was so angry that he could "kill" Ahlswede (*see, e.g.*, Doc. No. 69 at 96:1–97:1, Tr. Ex. 27), a reasonable jury could find that concern to be disingenuous, given that Foley, also an employee of MLH, was promoted *by MLH* shortly after Nitkin's resignation and within weeks of the alleged threat (*see* Doc. No. 69 at 111:7–22, 114:12–14). Further, MLH never contacted Foley concerning the threat of workplace violence he allegedly made (*see id.* at 117:17–118:6), and Mendez did not know if any investigation transpired after security was informed of the alleged threat (*see id.* at 100:10–101:5 ("Q: And you were just asked about an allegation that April's husband said that he was so angry that he could kill Karl. Do you remember that? A: I do. . . . Q: Was it, in fact, investigated? A: I did not investigate it . . . Q: Do you know if anyone at Main Line Health investigated that? A: I don't know if the Head of Security investigated it or if Barabara investigated it, because she was the one who received the firsthand account from the Employees about that."); *see also id.* at 102:23–103:11 ("Q: Do you know if he was ever interviewed about . . . the allegation that he made this threat? A: I did not speak with Brian Foley about that. Q: Okay. But, again, as Director of HR, as we sit here today, do you have any knowledge as to whether anyone did talk to him about the allegation that he said that he was so angry that he could kill Karl Ahlswede? A: I don't know if anyone from the Security Department reached out to him or not. I do not know. Q: Okay. Don't you think that if that was such a big deal that an investigation would have been undertaken that encompassed more than you just . . . asking April whether it happened or not? A: Perhaps, yes.")).

about civil rights in the workplace and specifically of the civil rights of women in the workplace. This testimony, coupled with evidence of discriminatory and/or retaliatory termination, could lead a reasonable juror to conclude that Zitting acted in the face of a perceived risk that his actions would violate Title VII."); *see also Medcalf v. Trs. of Univ. of Pa.*, 71 F. App'x 924, 932–33 (3d Cir. 2003) ("A rational jury also could have found that Carolyn Femovich, who was clearly acting in a managerial capacity in the scope of her employment, acted with the requisite malice or reckless indifference to the federally protected rights of [the plaintiff]. Femovich knew that Penn had an equal opportunity employment policy that prevented Penn from taking gender into account in hiring, yet she did not grant any male candidate an interview, and several witnesses testified that she intended to put a woman in the coaching position."). Ultimately, the bulk of relevant evidence presented to the jury required the jury to make credibility determinations, and the jury could—and ultimately did—find Nitkin credible and Mendez and Wadsworth less credible. *See Zielinski*, 2011 WL 5902214, at *11 ("The Court is not persuaded by [the defendant's] contention that the evidence was insufficient as a matter of law to show malice or reckless indifference. Much of the relevant evidence regarding the intent and motivations of [the defendant's] management required the jury to make credibility determinations about the various testifying witnesses. . . . The jury apparently found [the plaintiff's] account of [the defendant's] intentions credible and the other witnesses' testimony incredible. The jury may also have relied on evidence such as, *inter alia*, [the defendant's] cursory and sometimes non-existent investigations into [the plaintiff's] complaints of racial discrimination[.]"); *see also EEOC v. Siouxland Oral Maxillofacial Surgery Assocs.*, 578 F.3d 921, 926 (11th Cir. 2009) ("[The defendant] contends that the actions of Akerson and Kost [its managerial agents] do not constitute malice or reckless indifference because neither thought that

17

they were engaging in pregnancy discrimination.  According to [the defendant], Akerson terminated [the plaintiff] because she would be unavailable when needed during [the defendant's] busy season. . . . [The defendant] offers one reasonable interpretation of the evidence presented at trial, but the jury evidently did not accept it.  If the jury believed that Akerson terminated [the plaintiff] solely because of her unavailability, then it should not have found [the defendant] liable for pregnancy discrimination against [the plaintiff].").

A reasonable jury could also find that MLH failed to demonstrate good faith compliance with the law.  Nitkin presented evidence that Wadsworth and Mendez disregarded the anti-retaliation policy and forced her to move up her resignation to push her out because Nitkin's report of Ahlswede's inappropriate sexual comments had caused disruption within the palliative care team.  A reasonable jury could conclude from this evidence—and here, the jury's verdict in Nitkin's indicates that it did conclude—that MLH did not make a good faith effort to comply with Title VII despite promulgating and providing training on its formal anti-retaliation policy. *See Bruso*, 239 F.3d at 861 ("Although [the defendant] did have a formal zero-tolerance-for-discrimination policy in place and it did educate its employees about the policy, [the plaintiff] introduced evidence at trial that [the defendant's] top management officials disregard the policy by refusing to remedy Sporer's harassment even though they knew about it. . . . If the jury accepted this evidence, which its verdict in [the plaintiff's] favor suggests it might have, then it could have concluded that [the defendant] did not make a good faith effort to comply with Title VII despite its formal antidiscrimination policy.").

At trial, the Court found that a reasonable jury could conclude that MLH had not presented evidence that it acted in good faith compliance with Title VII in its efforts to prevent retaliation for making complaints of sexual harassment.  And even if it did, a jury was entitled to

disbelieve that evidence.[10]  *See Middlebrooks*, 2019 WL 438092, at *10 ("The issue of [the defendant's] good faith defense is a question for the jury.  We allowed [the defendant] to repeatedly argue good faith.  The jury disagreed.  After hearing evidence, the jury found an award of punitive damages appropriate . . . .  [The defendant] made the good faith arguments, but the jury could have easily found its witnesses lacked credibility.").

### III. Conclusion

For these reasons, the Court instructed the jury on punitive damages.

BY THE COURT:

/s/KAREN SPENCER MARSTON
_____
KAREN SPENCER MARSTON, J.

---

[10] Here, the jury was instructed on MLH's good faith defense but evidently did not find that MLH had made a good faith attempt to comply with the law. (Doc. No. 75 at 223:14–21 ("But even if you make a finding that there has been an act of retaliation with malice or reckless disregard of Ms. Nitkin's federal rights, you cannot award punitive damages if Main Line Health proves by a preponderance of the evidence that it made a good-faith attempt to comply with the law, by adopting policies and procedures designed to prevent unlawful retaliation such as that suffered by Ms. Nitkin.").)