IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **APRIL NITKIN**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-4825-KSM** |
| **MAIN LINE HEALTH d/b/a BRYN MAWR HOSPITAL,** | |
| Defendant. | |

## <u>MEMORANDUM</u>

**Marston, J.**                                                                 **July 7, 2022**

On November 1, 2021, after a three-day trial, the jury returned a verdict in favor of

Plaintiff April Nitkin, finding that her former employer, Defendant Main Line Health d/b/a Bryn

Mawr Hospital ("MLH"), retaliated against her, in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").  The jury awarded

Ms. Nitkin $20,000 in backpay, $1 in compensatory damages, and $120,000 in punitive

damages, for a total of $140,001.

Title VII is a fee-shifting statute, and the Court may award reasonable attorneys' fees to

Ms. Nitkin, the prevailing party in this case, as part of the costs.  *See* 42 U.S.C. § 2000e-5(k);

*Hare v. Potter*, 549 F. Supp. 2d 698, 701 (E.D. Pa. 2008).

Presently before the Court is Ms. Nitkin's fee petition, in which she requests

reimbursement for $229,086.15.  (Doc. No. 79.)  MLH has filed an opposition to Ms. Nitkin's

fee petition, arguing that Ms. Nitkin has not established that the fees she requests are reasonable

and that the Court should award no more than $84,363.25.  (Doc. No. 81.)  The Court held oral

argument on June 21, 2022.

For the reasons that follow, the fee petition is granted in part and denied in part.

**I.      Background**

On October 21, 2020, Ms. Nitkin initiated this lawsuit against MLH, alleging that MLH discriminated against her after she reported Dr. Karl Ahlswede, a doctor with whom she practiced, for fraudulent billing and for making inappropriate comments of a sexual nature. (Doc. No. 1.)  Ms. Nitkin alleged that she was forced to resign (and, in effect, was terminated) after she complained.  (*Id.*)  Ms. Nitkin sought relief under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"), asserting claims for hostile work environment and retaliation.  (*Id.*)  She also asserted a wrongful termination claim under Pennsylvania law.  (*Id.*)

Following discovery, MLH moved for summary judgment.  (Doc. No. 22.)  On October 18, 2021, the Court granted the motion in part and denied the motion in part.  *See Nitkin v. Main Line Health*, Civil Action No. 20-4825-KSM, 2021 WL 4860742 (E.D. Pa. Oct. 18, 2021).  First, we granted the motion as to Ms. Nitkin's hostile work environment claim, finding that Ms. Nitkin had failed to show that Dr. Ahlswede's conduct was sufficiently severe or pervasive.  *Id.* at *11–13.  Second, we granted the motion as to Ms. Nitkin's state law wrongful termination claim because Ms. Nitkin failed to identify a Pennsylvania law that required her to report Dr. Ahlswede's fraudulent billing practices.  *Id.* at *17–18.  Third, we granted the motion to the extent Ms. Nitkin brought a reduction in hours claim (which was not raised in her complaint), finding that she had not exhausted her administrative remedies.  *Id.* at *18–19.  However, we denied the motion as to Ms. Nitkin's retaliation claim because Ms. Nitkin raised a genuine issue of material fact as to whether there was a causal connection between her complaints about Dr.

Ahlswede's misconduct and her resignation and as to whether MLH's stated reason for firing her (violating its confidentiality policy) was pretextual.  *Id.* at *13–17.

On October 28, a jury trial commenced on Ms. Nitkin's retaliation claim.  In her case-in-chief, Ms. Nitkin testified on her own behalf and called three additional witnesses:  her husband, Brian Foley; a former co-worker, Catherine (Tess) Lombardi; and MLH's Director of Human Resources, Eric Mendez.  MLH called Dr. Barbara Wadsworth, MLH's Chief Nursing Officer.  On November 1, the jury returned a verdict in favor of Ms. Nitkin, finding that MLH had retaliated against her in violation of Title VII and the PHRA.  The jury awarded Ms. Nitkin $20,000 in backpay, $1 in compensatory damages, and $120,000 in punitive damages, for a total of $140,001.

On December 1, 2021, Ms. Nitkin filed a Petition for Attorney Fees.  (Doc. No. 79.)  Mr. David Koller was the trial attorney in this matter.  Mr. Jordan Santo and Mr. Paul Kenton also represented Ms. Nitkin.

## II.    Legal Standard

Under Title VII, a court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . as part of the costs."  42 U.S.C. § 2000e-5(k); *see also Middlebrooks v. Teva Pharma. USA, Inc.*, Civil Action No. 17-412, 2019 WL 936645, at *1 (E.D. Pa. Feb. 26, 2019) ("Congress motivates lawyers to represent employees claiming their employer discriminated or retaliated against them by allowing federal judges to award reasonable fees and costs to compensate the lawyers.").

In determining whether the fee requested is reasonable, courts use the "'lodestar' formula, which requires multiplying the number of hours reasonably expended by a reasonable hourly rate."  *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001); *see also Hensley v.*

*Eckerhart*, 461 U.S. 424, 433 (1983); *Middlebrooks*, 2019 WL 936645, at *4.  The party seeking attorney's fees bears the burden of showing that the claimed rates and number of hours are reasonable.  *See Hensley*, 461 U.S. at 433 ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."); *United Sates ex rel. Palmer v. C&D Tech., Inc.*, 897 F.3d 128, 139 (3d Cir. 2018) ("In a statutory fees case, the party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable by submitting evidence supporting the hours worked and rates claimed." (cleaned up)); *see also Clemens v. N.Y. Central Mut. Fire Ins. Co.*, 903 F.3d 396, 400 (3d Cir. 2018) ("Under the lodestar method, the party seeking attorney's fees has the burden to prove that its request is reasonable." (cleaned up)).  "The party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee."  *United States ex rel. Palmer*, 897 F.3d at 138 (cleaned up); *Middlebrooks*, 2019 WL 936645, at *4.

Courts have a "positive and affirmative function in the fee fixing process, not merely a passive one."  *Maldonado*, 256 F.3d at 184; *see also Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 362 (3d Cir. 2001) ("It is important that we reiterate our admonition in *Maldonado* that fee requests be subjected to a thorough and searching analysis . . . [I]t is necessary that the Court 'go line, by line, by line' through the billing records supporting the fee request.").  "In calculating the hours reasonably expended, a court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary."  *Maldonado*, 256 F.3d at 184. "Hours that would not generally be billed to one's own client are not properly billed to an adversary."  *Id.* (cleaned up).  And, although a court may not *sua sponte* reduce a fee award, the

court "has a great deal of discretion to adjust the fee award" once the party opposing the award lodges specific objections. *See United States ex rel. Palmer*, 897 F.3d at 139; *see also id.* at 137 (holding that the district court did not abuse its discretion in reducing the fee award even lower than what had been suggested by the opposing party because the opposing party had filed objections, which "motivated the Court's decisions," and emphasizing that "[t]he prohibition against the reduction of attorneys' fees occurs only when the amount remains 'uncontested'").

### III.    Discussion

MLH's objections fall into three different categories.  First, MLH objects to Mr. Koller and Mr. Santo's requested hourly rates.  Second, MLH objects to Mr. Koller billing for tasks that are administrative in nature.  Third, MLH argues that the fee award should be reduced by 50 percent because Ms. Nitkin only had limited success, citing the facts that she received nominal compensatory damages and the Court granted summary judgment on her wrongful termination and hostile work environment claims.  We address each category of objections in turn.

### A.    *Hourly Rates*

First, the Court considers whether Ms. Nitkin has established that the hourly rates requested by her attorneys are within the prevailing market rates in the community.  MLH challenges the $600 rate charged by Mr. Koller and the $375 rate charged by Mr. Santo and argues that the hourly rates should be reduced to $480 for Mr. Koller and $280 for Mr. Santo.[1] (Doc. No. 81.)

---

[1] Ms. Nitkin also seeks an hourly rate of $275 for A. Paul Kenton, the most junior attorney on the matter, and $185 for Elias Hoobler, a member of the firm's staff.  MLH does not dispute these hourly rates, and the Court finds that they are in line with the Community Legal Services ("CLS") fee schedule.  (*See* Doc. No. 80-2 at 3 (showing an hourly rate range of $230–$275 for attorneys with 2 to 5 years' experience and $160–$200 for paralegals).)  *See Maldonado*, 256 F.3d at 187 (stating that the CLS fee schedule has been cited approvingly by the Third Circuit).

"Generally, a reasonable hourly rate is calculated according to the prevailing market rates in the relevant community." *Maldonado*, 256 F.3d at 184 (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)).  In determining whether a requested hourly rate is reasonable, courts must "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* (cleaned up).  As the prevailing party, Ms. Nitkin bears the burden of producing "satisfactory evidence in addition to the attorney's own affidavits that the requested hourly rates . . . meet this standard." *Id.*  Typically, "the starting point in ascertaining a reasonable hourly rate is the attorney's usual billing rate, but this is not dispositive." *Id.* (cleaned up).

Ms. Nitkin relies on affidavits from five other employment lawyers in the Philadelphia area in support of the rates sought by Mr. Koller and Mr. Santo:  Traci Greenberg of Sidney L. Gold & Associates, P.C.; Rahul Munshi of Console Mattiacci; Scott Pollins of the Pollins Law Firm; Marc Weinstein of the Weinstein Firm, LLC; and Christine Burke of Karpf, Karpf & Cerutti, P.C.  (Doc. No. 19-6, Exs. 3–5; Doc. No. 80-1, Ex. 6; Doc. No. 84-1.)  Mr. Koller and Mr. Santo also submitted their own affidavits to support their rates.  (Doc. No. 79-5, Ex. 2; Doc. No. 82-1; Doc. No. 82-2.)

Ms. Nitkin argues that the $600 hourly rate requested for Mr. Koller and the $375 hourly rate requested for Mr. Santo are reasonable for attorneys of their experience and skill level.  (*See* Doc. No. 79 at 10–11; Doc. No. 82 at 2–7.)  Mr. Koller has approximately 19 years'[2] experience practicing employment law and founded his own firm, Koller Law, in 2009.  (Doc. No. 79-5, Ex. 2 at 2–3 ¶¶ 4, 6.)  Mr. Koller almost exclusively represents employees and has handled many

---

[2] The Court calculates the number of years of experience as of 2021, when the fee petition was filed.

cases as primary lead counsel.  (*Id.* at 3 ¶ 5.)  Mr. Santo has approximately six years of

experience and served as a Judge Advocate in the United States Army for over five of those

years.  (*Id.* at 6–7 ¶¶ 4–6; Doc. No. 82-2 at ¶ 1.)  Mr. Santo has tried many cases to verdict,

including jury trials.  (Doc. No. 79-5, Ex. 2 at 7 ¶ 7.)

### 1.  **Mr. Koller**

As a preliminary matter, the Court notes that Mr. Koller stated that his firm represented

Ms. Nitkin on a contingency fee basis.  (Doc. No. 79-5, Ex. 2 at 3 ¶ 9.)  There has been no

evidence submitted that Ms. Nitkin, or any other client, agreed to pay an hourly rate of $600 for

Mr. Koller's services.  (*See generally* Doc. No. 79-5, Ex. 2 at 2–5; Doc. No. 82-1.)  *See Ray v.

AT&T Mobility Servs., LLC*, Civil Action No. 18-3303, 2022 WL 1203730, at *6 (E.D. Pa. Apr.

22, 2022) (the plaintiff "fail[ed] to present any evidence showing that any client has willingly

agreed to pay" the hourly rates sought); *Holt v. Pennsylvania*, Civil Action No. 10-5510, 2020

WL 2098103, at *14 (E.D. Pa. May 1, 2020) ("Plaintiff has not averred that Puricelli has actually

billed any paying client at an hourly rate of $750 or that anyone, including any court authorizing

an award in a fee-shifting case, has ever paid him that rate."); *Middlebrooks*, 2019 WL 936645,

at *12 ("Returning to Microeconomics 101 in setting a reasonable market price, we may look to

what a willing client would pay a willing lawyer.").

"The fee schedule established by Community Legal Services ("CLS") has been

approvingly cited by the Third Circuit as being well developed and has been found by the

Eastern District of Pennsylvania to be a fair reflection of the prevailing market rates in

Philadelphia."  *Maldonado*, 256 F.3d at 187 (cleaned up).  Under the CLS fee schedule, which

was last updated in 2018, for attorneys with 16 to 20 years of experience, like Mr. Koller, the

hourly range is $475–$530.  (Doc. No. 81-1 at 2; Doc. No. 80-2.)[3]

In determining the reasonable rate for the Philadelphia market, the Court may consider comparator affidavits describing reasonable rates for similar types of cases in this District. *Middlebrooks*, 2019 WL 936645, at *12.  Here, in almost verbatim statements, Ms. Greenberg, Mr. Munshi, and Mr. Pollins each declare that the $600 hourly rate sought by Mr. Koller is "reasonable because it lies well within the range of fees charged for work in fee shifting cases by trial counsel with similar backgrounds, abilities, and experience in this field, and is reasonable in light of the local market for lawyers of his level of experience in this field."  (Doc. No. 79-6, Ex. 3 ("Greenberg Aff.") at ¶ 6; Doc. No. 79-6, Ex. 4 ("Munshi Aff.") at ¶ 6; Doc. No. 79-6, Ex. 5 ("Pollins Aff.") at ¶ 6.)  However, the affidavits do not support this conclusory assertion.  This is because the comparator affidavits also set forth each declarants' own hourly rate, all of which are *lower* than the rate Mr. Koller seeks, undermining the declarants' assertions that Mr. Koller's $600 rate is reasonable within the local market for attorneys of his experience.  *Cf. Middlebrooks*, 2019 WL 936645, at *12 ("Our problem centers on the comparator affidavits failing to offer their hourly rates.  They conclude as to a 'range' of reasonableness but fail to offer evidence.  The primary evidence is their hourly rates.  We have no evidence of another employment lawyer charging these rates.").

---

[3] In his affidavit, Mr. Koller states that in establishing his hourly rate of $600, he relied on the CLS's 2018 schedule and adjusted the fee schedule 10 percent to reflect inflation between 2018 and 2021.  (Doc. No. 79-5, Ex. 2 at 3–4 ¶ 11; Doc. No. 79 at 12.)  However, nowhere has Mr. Koller cited any precedent stating that the Court may consider inflation when determining whether an hourly rate is reasonable, and during oral argument, he admitted that he could not point to a case supporting his position.  (*See* June 21, 2021 Rough Hr'g Tr. at 18:7–11 ("Q: Do you have a case that said I [sic] [ac]count for inflation when determining the reasonable hourly rate?  A: Not handy but just the fact that that rate, that chart is from 2018.").)  *See Harris v. Paige*, Civil Action No. 08-2126, 2013 WL 4718949, at *4 n.5 (E.D. Pa. Sept. 3, 2013) ("Attorney Humble also argues that the CLS Fee Schedule should be adjusted at the rate of 6.7% for inflation.  We, however, decline to adjust Humble's hourly rate for inflation.  He has offered no authority that this is mandated.").

Traci Greenberg—who has been practicing law for approximately 21 years and is a Senior Associate at Sidney L. Gold & Associates, an employment law and civil rights litigation firm—has an hourly rate of $450, which she avers is "reasonable in light of the local market for lawyers of [her] level of experience in this field" and because clients pay that rate for her services in employment matters.  (Greenberg Aff. at ¶¶ 2–3, 10.)  Rahul Munshi has approximately 12 years of experience and is a Partner at Console Mattiacci Law, where he practices almost exclusively employment law.  (Munshi Aff. at ¶¶ 2–4.)  Mr. Munshi's hourly rate is $480, which he declares is reasonable "in light of the local market for lawyers of [his] level of experience in this field" and because "[his] clients pay this rate for services in employment law matters."  (*Id.* at ¶ 10.)  Scott Pollins has approximately 26 years' experience and like Mr. Koller, has his own firm, Pollins Law, where he specializes in employment law.  (Pollins Aff. at ¶¶ 2–4.)  Mr. Pollins has co-counseled cases with Koller Law.  (*Id.* at ¶ 5.)  Mr. Pollins's hourly rate is $540, which he declares is reasonable as well.  (*Id.* at ¶ 10.)  In short, all three comparators charge less than Mr. Koller.  Notably, Ms. Greenberg and Mr. Pollins each have *more* years of experience than Mr. Koller but charge *less* than the hourly rate Mr. Koller seeks.[4]

Ms. Nitkin also proffers an affidavit from Christine Burke, a Partner at Karpf, Karpf &

---

[4] Ms. Nitkin asserts that Mr. Munshi and Ms. Greenberg are comparators to Mr. Santo, *not* Mr. Koller.  (Doc. No. 82 at 3 ("Defendant mistakenly attempts to use Mr. Munshi and Ms. Greenberg as comparators for Mr. Koller.  They are comparators to Mr. Santo.  Although Mr. Santo has a different title than Mr. Munshi and Ms. Greenberg, his role at Koller Law requires him to perform many of the same tasks and duties.").  But there is no evidence suggesting that Mr. Munshi and/or Ms. Greenberg perform the same duties as Mr. Santo *but not as Mr. Koller*.  The record is sparse as to what duties Mr. Munshi and Ms. Greenberg perform.  The only evidence in the record is that Mr. Munshi has "served as trial counsel in several employment law matters in federal and state courts in Pennsylvania and New Jersey" (Munshi Aff. at ¶ 4), and Ms. Greenberg represents clients in employment law before courts in this District and has been trial counsel (Greenberg Aff. at ¶¶ 4, 10).

Cerutti P.C., in support of Mr. Koller's rate.[5]  (Doc. No. 84-1 ("Burke Aff.") at ¶ 3.)  Ms. Burke

has approximately 12 years of experience and avers, "I have personally litigated against Mr.

Koller in employment matters and have lectured with him at PBI events.  He is an excellent

employment litigator, well versed in complex employment issues and presents of the same

caliber of excellent attorneys within the offices of Console Mattiacci." (*Id.* at ¶¶ 5, 22.)  She also

states that if her firm were to submit billing rates for an employment matter litigated through

verdict, the rates would be in line with Console Mattiacci and Sidney Gold's rates.[6]  (*Id.* at ¶ 18;

*see also id.* at ¶ 19.)  But Ms. Burke's comparison of Mr. Koller to attorneys at Console

Mattiacci and/or Sidney Gold actually undercuts Ms. Nitkin's position that $600 is a reasonable

rate for Mr. Koller.  As noted, Ms. Greenberg is an attorney at Sidney Gold and has more

experience than Mr. Koller yet charges an hourly rate of $450—$150 less than Mr. Koller.[7]

Likewise, Mr. Munhsi, who Mr. Koller avers should *not* be his comparator, is a Partner at

---

[5] Ms. Nitkin offers the Burke affidavit to rebut MLH's position that $480 is a reasonable rate for Mr. Koller because Ari Karpf, the founder of Karpf, Karpf & Cerutti, was awarded an hourly rate of $450 in *Winn v. Hermani Management*, Civil Action No. 18-4240, 2019 U.S. Dist. LEXIS 216248 (E.D. Pa. Dec. 17, 2019).  (*See generally* Burke Aff.; Doc. No. 84; Doc. No. 81 at 5.)  The Court is unpersuaded by MLH's contention that *Winn* supports its position that Mr. Koller's hourly rate should be $480.  *Winn* is distinguishable—in that case, default judgment was entered against the defendants because the defendants did not appear and trial was only held on damages, not liability.  *Winn*, 2019 U.S. Dist. LEXIS 216248, at *1.  (*See* Burke Aff. at ¶ 16.)  In addition, the fee petition was uncontested.  *See Winn*, 2019 U.S. Dist. LEXIS 216248, at *1 ("Counsel has filed a detailed and well-documented petition, to which there has been no response.").

[6] Interestingly, Ms. Burke does not state what her hourly rate is in her affidavit.

[7] In addition, a review of recent case law in this Circuit shows that Sidney Gold—a principal shareholder of his own employment firm, Sidney Gold, who has been practicing law since 1975—charges an hourly rate of $650.  *See, e.g.*, *Ray*, 2022 WL 1203730, at *7 (stating that Sidney Gold has an hourly rate of $650, which is consistent with the fee schedule set forth by CLS for attorneys with more than 25 years of experience and is "reliable evidence of the prevailing market rate for attorneys of similar experience"); *Giedgowd v. Cafaro Grp., LLC*, Civil Action No. 20-6184, 2021 WL 4963532, at *5 (E.D. Pa. Oct. 26, 2021) ("Attorney Gold . . . charges $650 an hour and has, in the view of many, a substantial employment rights docket in our Court as well.  Attorney Gold swears his $650 hourly rate is reasonable because it falls well within the range of fees charged for work in fee-shifting cases by trial counsel.").

Console Mattiacci with 12 years of experience and his hourly rate is $480—$120 less than Mr. Koller.

Last, Ms. Nitkin proffers an affidavit from Mr. Weinstein, a sole practitioner like Mr. Koller.  (Doc. No. 80-1, Ex. 6 ("Weinstein Aff.").)  Mr. Weinstein has more than 22 years of experience in employment law and civil rights litigation and describes several cases that he tried to a verdict.  (*Id.* at ¶¶ 3, 10–14.)  Mr. Weinstein charges an hourly rate of $625, which he states is reasonable and "what the market commands."  (*See id.* at ¶¶ 18, 20 ("It is my belief and opinion that considering the scarcity of skilled plaintiffs' attorneys who are willing to take cases of these types, and the astounding risk of loss and the unusual vigor with which these cases are defended, that $625 is a reasonable hourly rate in these cases for an attorney of my experience, skill and reputation and represents the actual market rate for an attorney of comparable skills, reputation and experience . . . This kind of hourly fee is what the market commands.").)  Mr. Weinstein declares that a $600 hourly rate for Mr. Koller is reasonable because Mr. Koller "has set himself apart in the field of employment law in the Philadelphia region" and Mr. Koller's "skills are truly extraordinary," such that "he can command some of the highest fees in the Philadelphia market for these cases."  (*See id.* at ¶¶ 22, 24, 27; *see also id.* at ¶¶ 21, 25–26.)

The Court agrees that Mr. Weinstein and Mr. Pollins are the most similar comparators to Mr. Koller, as they each founded their own firms.  Yet, each has more years of experience than Mr. Koller:  Mr. Pollins has 26 years' experience and Mr. Weinstein has more than 22 years' experience in private practice.  To that end, Mr. Pollins's and Mr. Weinstein's hourly rates, which are $540 and $625, respectively, are *consistent* with the rates set forth in the CLS's 2018 fee schedule, falling *below or within* the CLS range for attorneys with their years of experience.  (*See* Doc. No. 80-2 at 3 (showing that for attorneys with 21–25 years' experience, like Mr.

Weinstein, the range is $550–$640 and that for attorneys with more than 25 years' experience,

like Mr. Pollins, the range is $650–$700).)  By comparison, Mr. Koller's requested hourly rate of

$600[8] is higher than the CLS fee schedule range for an attorney with 19 years' experience, like

Mr. Koller, which is $475–$530.

Mr. Koller argues that it is unfair to focus on the fact that he has less years of experience

than Mr. Pollins and Mr. Weinstein; rather, the Court's analysis should be more qualitative than

quantitative and should factor in his "trial skills and performance."  (*See* Doc. No. 82 at 5–6

("Defendant's argument places too much focus on years of practice as opposed to the type of

experience.  By simply claiming that the comparators, Mr. Weinstein and Mr. Pollins, have more

years of experience than Mr. Koller and therefore their rates do not support the $600 per hour

rate, Defendant fails to give due credit to Mr. Koller's skill level and type of experience . . . This

analysis contemplates a review of the requesting attorney's skill level and proficiency instead of

just a simple view of the amount of years an attorney has practiced . . . Here, Mr. Koller's trial

skills and performance supports the reasonableness of his requested hourly rate.").)  The Court

agrees with Mr. Koller that it is proper to focus on the quality of the attorney's performance in

addition to years of experience.  However, the Court had the benefit of watching Mr. Koller at

trial.  Although Mr. Koller achieved a favorable verdict for his client and advocated zealously on

her behalf, the Court cannot find that his performance at trial was unduly exceptional or so

impressive as to merit a higher fee,[9] especially in light of the fact that the jury awarded only $1

---

[8] The Court is unpersuaded by Mr. Koller's argument that his higher rate of $600 reflects the
individualized attention his firm gives his clients since it is leanly staffed (*see* Doc. No. 82 at 5), given
that Mr. Pollins and Mr. Weinstein are also sole practitioners.

[9] Significantly, Mr. Koller did not produce any evidence as to Ms. Nitkin's compensation before resting,
such that Ms. Nitkin would have been unable to recover any damages for backpay had the Court not
exercised its discretion, over MLH's objection, and permitted Mr. Koller to reopen his case-in-chief and

in compensatory damages.

Taken together, the Court finds that $530 is an appropriate hourly rate for Mr. Koller. This rate takes into account his success obtaining a $140,001 verdict for his client as well as his overall performance during the pre-trial and trial stages of this case. This is only slightly lower than Mr. Pollins's $540 rate and accounts for their different years of experience.

## 2. **Mr. Santo**

Next, the Court considers whether Mr. Santo's requested hourly rate of $375 is appropriate.[10]  As noted above, Mr. Santo has over six years of experience. He served as Judge Advocate in the United States Army and during most of that time, was either a prosecutor or trial defense attorney. (Doc. No. 82-2 at ¶ 1.)  Mr. Santo was recognized as a senior trial attorney by the United States Army and tried six jury trials to verdict. (*Id.* at ¶¶ 2–3.)

In almost verbatim statements, Ms. Greenberg, Mr. Munshi, Mr. Pollins, and Mr. Weinstein each declare that the $375 hourly rate requested by Mr. Santo is "reasonable because it lies well within the range of fees charged for work in fee shifting cases by trial counsel and associate counsel with similar backgrounds, abilities, and experience, and is reasonable in light of the local market for lawyers of his level of experience in this field." (Greenberg Aff. at ¶ 7; Munshi Aff. at ¶ 7; Pollins Aff. at ¶ 7; Weinstein Aff. at ¶ 32.)  However, all four attorneys have significantly more years of experience than Mr. Santo and their hourly rates are much higher

---

allow that evidence to be admitted. (*See* Doc. No. 75 at 149–50.)

[10] As with his own rate, Mr. Koller states that the $375 rate for Mr. Santo accounts for inflation. (*See* Doc. No.79-5, Ex. 2 at 3–4 ¶ 11; *see also* Doc. No. 82 at 2 ("Defendant argues that the rate for Mr. Santo is unreasonable because it is outside the range of the CLS table. However, Defendant fails to account for inflation . . . Since the effective date of the CLS table was July 2018, Plaintiff adjusted the rates by ten (10) percent for inflation, according to the Bureau of Labor Statistics. As such, a rate range of $280 to $360 in July of 2018 became a range of $308 to $396 in October of 2021.").)  However, as noted *supra* n.3, Plaintiff has not cited any authority supporting the position that an hourly rate should be adjusted for inflation.

than his.  (*See* Greenberg Aff. at ¶¶ 2, 10 (showing that Ms. Greenberg has 21 years' experience and charges an hourly rate of $450); Munshi Aff. at ¶¶ 2, 10 (showing that Mr. Munshi has 12 years' experience and charges an hourly rate of $480); Pollins Aff. at ¶¶ 2, 10 (showing that Mr. Pollins has 26 years' experience and charges an hourly rate of $540); Weinstein Aff. at ¶¶ 3, 18 (showing that Mr. Weinstein has 26 years' experience and charges an hourly rate of $625).)

As noted *supra* n.3, Ms. Nitkin contends that Mr. Munshi and Ms. Greenberg are proper comparators to Mr. Santo because "his role at Koller Law requires him to perform many of the same tasks and duties" that they perform.  While all three attorneys have served as trial counsel, Mr. Santo was *not* trial counsel in this case,[11] and there is no evidence as to what other tasks and duties Mr. Munshi and Ms. Greenberg perform.  And even if there was, there is no evidence suggesting that, as a result of performing those duties, Mr. Santo has the same quality of skills and level of experience as two attorneys that respectively have double and nearly quadruple the number of years of experience as him.  The Court recognizes that Mr. Santo may very well have more trial experience than many attorneys who have been practicing for six years and that he was highly regarded by the United States Army.  However, for the reasons discussed above, the Court cannot conclude that Ms. Nitkin has met her burden of showing that $375 is a reasonable rate for someone with Mr. Santo's skill level and experience as to this case.

According to the 2018 CLS fee schedule, the hourly rate for attorneys with six to 10 years of experience, like Mr. Santo, is $280–$360.  (Doc. No. 80-2, Ex. 7 at 3.)  Mr. Santo's years of experience is on the low end of this range; accordingly, the Court finds that $300 is an appropriate rate for Mr. Santo.

\* \* \*

---

[11] As a result, the Court did not have the benefit of observing Mr. Santo's trial skills or performance.

In sum, the Court finds that $530 is a reasonable hourly rate for Mr. Koller and $300 is a reasonable hourly rate for Mr. Santo.  Applying these hourly rates, the totals—before any reductions—are reflected below:

| Name | Rate | Hours | Total |
|------|------|-------|-------|
| David Koller | $530 | 333.9 | $176,967.00 |
| Jordan Santo | $300 | 43.3 | $12,990.00 |
| Paul Kenton | $275 | 11.4 | $3,135.00 |
| Elias Hoobler | $185 | 19.1 | $3,533.50 |
| Total | | | $196,625.50 |

### B.    *Administrative Tasks*

Next, MLH argues that Ms. Nitkin's requested fee award wrongly charges for time her attorneys spent on administrative, and not legal, tasks.  MLH challenges 6.1 hours that Mr. Koller billed for completing tasks such as, *inter alia*, receiving ECF notifications and emails pertaining to scheduling.[12]  (*See* Doc. No. 81 at 6–13.)  As noted above, "[h]ours that would not generally be billed to one's own client are not properly billed to an adversary."  *Maldonado*, 256 F.3d at 184 (cleaned up).  Further, "[t]he fact that private lawyers may perform tasks other than

---

[12] The Court notes that in her reply, Ms. Nitkin does not cite any case law (or provide any other evidence) illustrating that the tasks identified were not considered administrative.  (*See* Doc. No. 82 at 7–14 (failing to cite a single case in support of her argument that the tasks were not administrative); *see also* June 21, 2022 Rough Hr'g Tr. at 26:25–27:4 ("Q: Do you have case law to support that those aren't administrative tasks?  Because I have to tell you they kind of read and feel like administrative tasks to me.  A: I don't have any case law on it but I can tell you as a practitioner, my position is strongly that they're not administrative tasks[.]").)

In addition, during oral argument, Mr. Koller appeared to take the position that any work he does is attorney work, since he is an attorney, and the only work that can be deemed administrative is the work his Office Manager, Colleen Tannenbaum, does.  (*See, e.g.*, June 1, 2022 Rough Hr'g Tr. at 6:22– ("The administrative task is actually what Colleen Tannenbaum does which, again, is not on the bill . . . the administrative task is what I don't do.").)  That is simply incorrect.

legal services for their clients, with their consent and approval, does not justify foisting off such expenses on an adversary under the guise of reimbursable legal fees." *Halderman ex rel. Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1995).

### 1.  Filing-related tasks and ECF receipts

MLH challenges the time Mr. Koller spent on filing-related tasks, including forwarding the Complaint to his office manager to be filed, receiving automated ECF notifications, and filing an opposition brief on his client's behalf in response to a motion in *limine*.  (*See* Doc. No. 81 at 6–13; *see also* Doc. No. 79-4 at 6, 27.)

The Court agrees with MLH that these are administrative tasks for which Mr. Koller should not be compensated.  *See Moffitt v. Tunkhannock Area Sch. Dist.*, Civil Action No. 3:13-1519, 2017 WL 319154, at *7 (M.D. Pa. Jan. 20, 2017) ("Filing documents, whether in person or electronically, requires no legal skill and is a purely clerical or administrative task."); *Roccisano v. Township of Franklin*, Civ. Action No. 11-6558 (FLW)(LHG), 2015 WL 3649149, at *9 (D.N.J. June 11, 2015) ("I find that tasks such as mailing letters, forwarding documents by email, checking a calendar, and receiving documents are purely clerical tasks which should not be billed to clients."); *L.J. ex rel. V.J. v. Audubon Bd. of Ed.*, Civil No. 06-5350 (JBS), 2009 WL 995458, at *14 (D.N.J. Apr. 13, 2009) ("Mr. Epstein filed a submission on the docket, received an automatic email confirmation of his own filing, and billed 0.1 hours of work at his desired rate of $400 per hour for having read the automatic form email. . . . As one court recently observed in the face of an attorney's effort to bill for reviewing email confirmations of ECF filing receipts, '[n]ot only would these tasks normally consume a matter of seconds, but they would ordinarily be performed by secretarial or non-legal staff, not a $275 per hour attorney.'" (citation omitted)); *see also H.W. v. N.Y.C. Dep't of Ed.*, No. 20-CV-10591 (RA), 2022 WL

16

541347, at \*4 (S.D.N.Y. Feb. 23, 2022) ("Further, several billing entries indicate that time was billed for the mere receipt and filing of electronic or paper documents and the review of ECF notifications.  Such activities, which are purely administrative in nature, are generally not compensable."); *Qureshi v. OPS 9, LLC*, Civil Action No. 14-1806 (MAH), 2020 WL 1910344, at \*4 (D.N.J. Apr. 20, 2020) ("The scrutinized tasks often fall into the category of administrative or clerical, such as sending emails that merely forwarded a document."); *Westberry v. Commonwealth Fin. Sys., Inc.*, Civil Action No. 11-4387, 2013 WL 435948, at \*7 (D.N.J. Feb. 4, 2013) (reducing attorney's time by 0.2 hours where "it appear[ed] that [she] did nothing more than look at the Answer and forward it to [another attorney at the firm to review]" and reducing attorney's time further where the attorney "received ECF notice setting initial status conference" because there is "no reason why Plaintiff should recover 0.2 hours of [the attorney's] time for simple receipt of a notice when no other action was taken").  Accordingly, the Court will reduce Mr. Koller's time by 0.3 hours for these tasks, as reflected by the Table below.

| Date | Description | Time |
|---|---|---|
| 10/1/2020 | Forwarded Complaint to Colleen Tannenbaum ("CT") to file in US District Court EDPA | 0.1 |
| | Receipt of ECF notice of Complaint filed | 0.1 |
| 10/19/2021 | Filed Plaintiff's Brief in opposition to Motion in Limine to exclude Lombardi as witness; ECF receipt of same | 0.1 |
| **Total** | | 0.3 |

### 2.  Scheduling-related emails

MLH also objects to time that Mr. Koller billed for scheduling-related communications. (*See* Doc. No. 81 at 6–13.)  The Court takes note of just a few examples that MLH flagged, which are illustrative of a wider pattern:  on February 15, 2021, Mr. Koller billed 0.2 hours for receiving an email exchange between Ms. Nitkin and his office manager regarding scheduling a

call; on April 30, 2021, Mr. Koller billed 0.2 hours for receiving two emails from his office manager in which she responded to Ms. Nitkin's inquiries regarding her deposition date; on June 4, 2021, Mr. Koller billed 0.1 hours for receiving an email from his office manager that shared "zoom phone information for the June 6th call"; and on June 10, 2021, Mr. Koller billed 0.2 hours for discussing changing the time of a deposition with his officer manager and being copied on an email in which she made that scheduling request to opposing counsel.

Courts routinely find that communications relating to scheduling are administrative in nature and reduce fees accordingly.  *See, e.g.*, *McGuire v. Neidig*, Civil Action No. 14-1531, 2017 WL 1319930, at *5 (W.D. Pa. Apr. 7, 2017) (reducing the attorney's requested fees for time he spent on "clerical or administrative tasks," which included telephone calls related to scheduling and rescheduling an "ENE" and email exchanges related to scheduling mediation); *Holzhauer v. Hayt, Hayt & Landau*, Civil Action No. 11-2336, 2012 WL 3286059, at *8–9 (D.N.J. Aug. 10, 2012) (finding certain communications to be administrative and reducing fees for those tasks, including "faxed continuance letter to court & defendant's counsel" and an email "following up on discovery responses and rescheduling deposition in this matter"); *Hayward v. Del. Valley High Sch.*, Civil Action No. 10-5383, 2011 WL 1838784, at *3–4 (E.D. Pa. May 13, 2011) (concluding that spending "0.1 hours scheduling a conference call with defendant's counsel" was "administrative work" and reducing plaintiffs' counsel's request); *see also In re Johnson & Johnson Deriv. Litig.*, 10-2033(FLW), 2013 WL 11228425, at *49 (D.N.J. June 13, 2013) (reducing time where an attorney "billed 0.2 hours on October 2, 2012, October 8, 2012, October 10, 2012, October 11, 2012 and October 16, 2012 for [the] paralegal to schedule conference calls" because it is a "non-compensable administrative task").

The Court reduces Mr. Koller's time by 3.6 hours for communications related to

scheduling, which are reflected in the Table below.

| Date | Description | Time |
|------|-------------|------|
| 2/15/2021 | Email exchange between April and Office Manager Colleen Tannenbaum of Koller Law regarding scheduling a call with April for Friday April 19th | 0.2 |
| 4/9/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to April about scheduling a phone call for next Thursday, April 15, 2021 | 0.1 |
| 4/27/2021 | Email from Office Manager Colleen Tannenbaum to April Nitkin regarding proposed dates for her deposition, telephone call with Office Manager Colleen Tannenbaum regarding same | 0.2 |
| 4/30/2021 | Discussion with Office Manager Colleen Tannenbaum regarding deposition schedule, email from Office Manager to Paul Lantis at Littler Mendelson proposing deposition schedule for April and Eric Mendez | 0.2 |
| | Email from Office Manager Colleen Tannenbaum of my office confirming April's deposition on June 7th and Eric Mendez on June 14th, the date proposed by Paul Lantis in his prior email | 0.1 |
| | Emails (2) from Colleen Tannenbaum responding to April's inquiry regarding June 7th for Plaintiff's deposition and then confirming same | 0.2 |
| 5/22/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law in response to April's inquiry about June 2nd as a date for preparation in advance of Plaintiff's deposition | 0.1 |
| 6/4/2021 | Email from Office Manager Colleen Tannenbaum sharing zoom phone information for the June 6th call | 0.1 |
| 6/10/2021 | Discussion with Office Manager Colleen Tannenbaum of Koller Law to request that we start Eric Mendez's deposition at 730 or 800 in the morning and to make that request to opposing counsel; email from Ms. Tannenbaum to Paul Lantis asking if we can start Eric Mendez's deposition on June 14th at either 730 or 8 in the morning | 0.2 |
| 6/14/2021 | Discussion with Office Manager Colleen Tannenbaum of Koller Law rescheduling deposition of Eric Mendez, and proposing July 7th as a date | 0.1 |
| | Email from Office Manager Colleen Tannenbaum of Koller Law asking if July 7th works for the rescheduling of Eric Mendez's deposition | 0.1 |
| | Discussion with Office Manager Colleen Tannenbaum of Koller Law regarding rescheduling Eric Mendez's deposition in light of email fr[o]m Paul Lantis and his availability only until noon on the proposed date | 0.1 |

| 6/15/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to Paul Lantis of Littler Mendelson asking if July 22nd would work to reschedule the deposition of Eric Mendez | 0.1 |
|---|---|---|
| 6/24/2021 | Email to Tanner McCarron of Littler Mendelson advising that I [Mr. Koller] will look at what he forwarded regarding the Amended Answer shortly and asking him to confirm dates for the Wadsworth deposition so we can get that scheduled | 0.1[13] |
| 7/27/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to April with information on Wadsworth deposition and asking if she is planning to attend | 0.1 |
| 8/4/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to April asking April about scheduling a call with me Monday 8/9 or Tuesday 8/10; conversation with Colleen Tannenbaum regarding same | 0.2 |
| 8/5/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to April Nitkin regarding a time for the phone call with me [Mr. Koller] | 0.1 |
| 8/10/2021 | Conversation with Office Manager Colleen Tannenbaum of Koller Law regarding moving the time of the call with April; email from Office Manager Colleen Tannenbaum about moving the call to later this afternoon | 0.2 |
| 8/24/2021 | Discussion with Office Manager Colleen Tannenbaum of Koller Law on requesting additional time for filing a response to Defendant's Motion for Summary Judgment; read email from Colleen Tannenbaum to Paul Lantis advising we will be requesting an additional two weeks of time to file a response, asking for his consent | 0.2 |
| 8/25/2021 | Email from Colleen Tannenbaum to Chambers of Judge Marston attaching letter requesting two week extension for Plaintiff to respond to Defendant's Motion for Summary Judgment[14] | 0.1 |
| 9/7/2021 | Conversation with Office Manager Colleen Tannenbaum of Koller Law about scheduling a call with April Nitkin; email from Colleen Tannenbaum regarding scheduling a call on Thursday, September 9, 2021 | 0.2 |
| 9/28/2021 | Email from Office Manager Colleen Tannenbaum to April Nitkin regarding a call with me on 9/29 | 0.1 |

[13] This particular entry shows that Mr. Koller also billed for "review[ing] attachments," for a total of 0.3 hours. (*See* Doc. No. 79-4 at 17.) The Court finds that reviewing MLH's Amended Answer is legal work, not administrative. Because it appears that 0.2 hours was spent reviewing the Amended Answer, the Court only deducts 0.1 hours for time spent on the email related to deposition dates.

[14] *See Holzhauer*, 2012 WL 3286059, at *8–9 (finding that billing entry for 0.1 hours for "fax[ing] continuance letter to court & defendant's counsel" was administrative and subtracting that time from the requested fee award).

| Date | Description | Time |
|------|-------------|------|
| 10/5/2021 | Discussion with Office Manager Colleen Tannenbaum of Koller Law regarding conflict for Pre-Trial Conference scheduled for October 18, 2021 at 10:00 a.m. and email from Colleen Tannenbaum to Judge Marston requesting that the conference be pushed back later in the day | 0.2 |
| 10/12/2021 | Discussion with Office Manager Colleen Tannenbaum of Koller Law about scheduling a call with client; email from Office Manager Colleen Tannenbaum of Koller Law to April Nitkin about a call with me [Mr. Koller] on October 13, 2021 before Thursday's Oral Argument | 0.2 |
| 10/13/2021 | Email from April Nitkin to Office Manager Colleen Tannenbaum about today's call | 0.1 |
| **Total** | | 3.6 |

### 3.  Being copied on emails that merely forward documents

MLH also objects to time entries in which Mr. Koller billed for being copied on email exchanges between his office manager, Ms. Tannenbaum, and his client, Ms. Nitkin, in which Ms. Tannenbaum merely forwarded documents to Ms. Nitkin.  The Court agrees with MLH that these are administrative in nature.  *See, e.g.*, *Roccisano*, 2015 WL 3649149, at *9 (finding that forwarding documents by email is a "purely clerical task [that] should not be billed to clients"); *Hayward*, 2011 WL 1838784, at *3–4 (reducing fee request for administrative tasks, including 0.2 hours for "receiving a notice from chambers that a pretrial conference had been continued and forwarding such notice to defendant"); *see also Qureshi*, 2020 WL 1910344, at *4 ("The scrutinized tasks often fall into the category of administrative or clerical, such as sending emails that merely forwarded a document[.]"); *Cascadia Wildlands v. Bureau of Land Mgmt.*, 987 F. Supp. 2d 1085, 1095 (D. Or. 2013) ("Notably, charging experienced attorney rates merely for scheduling, filing motions, opening emails, or forwarding documents via email is not reasonable.").  The Court subtracts 0.8 hours for these tasks.

| Date | Description | Time |
|------|-------------|------|

| 12/7/2020 | Email from Office Manager Colleen Tannenbaum to April Nitkin attaching Answer filed by Main Line Health | 0.1 |
|---|---|---|
| 3/4/2021 | Email from Office Manager Colleen Tannenbaum to April attaching Defendant's discovery responses | 0.1 |
| 4/14/2021 | Email from my law clerk to Paul Lantis at Littler Mendelson attaching the signed authorizations | 0.1[15] |
| 5/29/2021 | Email from Colleen Tannenbaum to April attaching the releases, and response from April | 0.2[16] |
| 8/10/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to April Nitkin attaching the invoice of the deposition of Eric Mendez | 0.1 |
| 8/14/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to April Nitkin attaching Defendant's Motion for Summary Judgment, and asking her to provide comments to me [Mr. Koller] by August 19, 2021 | 0.1 |
| 10/26/2021 | Email from Office Manager Colleen Tannenbaum of Koller Law to Paul Lantis of Littler Mendelson attaching that letter | 0.1 |
| **Total** | | 0.8 |

### 4.  Receipt and review of invoices of deposition transcripts

MLH also objects to entries in which Mr. Koller billed for receiving and reviewing invoices for depositions.  (*See* Doc. No. 81 at 6–13.)  The Court agrees that such tasks are administrative, not legal, and subtracts 0.3 from Mr. Koller's requested hours.  *See Pigford v. Vilsack*, 89 F. Supp. 3d 25, 33 (D.D.C. 2015) ("Cross & Kearney's billing records contain several clerical entries that include . . . receiving court reporter invoices . . . . These tasks did not require the skill and judgment of a lawyer . . . . The Court will deduct the full [amount]

---

[15] The time entry for April 14, 2021 was for 0.2 hours and stated "Reviewed signed authorizations, discussion with my law clerk regarding producing same, email from my law clerk to Paul Lantis at Littler Mendelson attaching the signed authorizations." (Doc. No. 79-4 at 10.)  The Court will only subtract 0.1 hours for the email attaching the signed authorizations and will allow the remaining 0.1 hours to stand, as discussion regarding the production of documents strikes the Court as more substantive in nature.

[16] The time entry for May 29, 2021 was for 0.3 hours and also included "Discussion with Office Manager Colleen Tannenbaum of Koller Law regarding releases for April to execute."  The Court will assume that the conversation was substantive in nature and will only reduce Mr. Koller's time by 0.2 hours for that entry.

attributable to these entries.");[17] *cf. MacCartney v. Gordon, Aylworth, & Tami, P.C.*, Case No. 3:18-cv-00568-AR, 2022 WL 1462821, at *6 (D. Or. Apr. 19, 2022), *report & recommendation adopted*, 2022 WL 1462657 (D. Or. May 9, 2022) (noting that the attorney's time included administrative tasks, such as "coordinating court reporters and paying invoices," and recommending that those entries be eliminated from his time because "clerical work [is not] compensable"); *Qureshi*, 2020 WL 1910344, at *4 (finding that "reviewing attorney invoices" "fall[s] into the category of administrative or clerical"); *Montanez v. Chicago Police Officers Fico & Simon*, 931 F. Supp. 2d 869, 881 (N.D. Ill. 2013) (disallowing time billed for administrative tasks such as "receiving deposition transcript invoices via email").

| Date | Description | Time |
|------|-------------|------|
| 6/14/2021 | Receipt and review of invoice from Veritext Court Reporting Service for $375 for cancellation of deposition of Eric Mendez | 0.1 |
| 8/9/2021 | Receipt and review of invoice of deposition of Eric Mendez (invoice of actual deposition taken) | 0.1 |
| 8/16/2021 | Receipt and review of invoice of deposition of Barbara Wadsworth (invoice for actual deposition) | 0.1 |
| **Total** | | 0.3 |

### 5.  **Miscellaneous**

Finally, the Court turns to the remaining entries to which MLH objects, including entries for Mr. Koller's receipt and review of the signed engagement letter on August 16, 2019; Mr. Koller's March 10, 2021 entry for revising a stipulation and reviewing an email his office manager drafted to send to opposing counsel; entries for emails that Mr. Koller received from

---

[17] In *Pigford*, the law firm did not dispute that the entries were clerical in nature but attempted to justify its request for reimbursement by arguing that "the law firm's small size requires a lawyer or paralegal to perform such duties." *Id.* Although the Court "recognized the constraints placed on smaller law firms," the Court still deducted the full amount attributable to those tasks because they "represent[ed] normal administrative overhead typically undertaken by clerical staff, not legal personnel." *Id.* The Court finds that the same logic applies with equal force here as the law firm in *Pigford* is analogous to Koller Law.

Ms. Nitkin on May 30, 2021 and August 10, 2021; and entries for emails between the Court and counsel regarding a flash drive for trial exhibits on October 25, 2021.

The Court finds that revising a stipulation was not purely administrative and therefore will not subtract any time related to that activity.  The Court also will allow Mr. Koller to recover for time spent on emails from his client.  However, the Court will reduce Mr. Koller's time for time spent receiving, reviewing, and then forwarding Ms. Nitkin's signed engagement letter to his office manager so that she could open the file.  *See, e.g.*, *Rosner v. Faloni Law Grp., LLC*, Case No. 20-cv-10279-KM-ESK, 2021 WL 933371, at *5 (D.N.J. Feb. 8, 2021), *report & recommendation adopted*, 2021 WL 931096 (D.N.J. Mar. 11, 2021) (adjusting the attorney's time from 0.3 hours to 0.0 hours because "[t]ime expended for receiving a signed retainer agreement and opening a file does not constitute legal service but is administrative in nature").  The Court will also disallow the time Mr. Koller billed for emails between counsel and the Court pertaining to when the parties would deliver an updated flash drive of trial exhibits to the Court.  These activities are administrative in nature.  The Court will subtract 0.3 hours, as reflected in the Table below.

| Date | Description | Time |
|------|-------------|------|
| 8/16/2019 | Receipt and review of signed engagement letter from client, forwarded to Office Manager, Colleen Tannenbaum to open file | 0.1 |
| 10/25/2021 | Emails between court and Counsel regarding flash drive of Exhibits | 0.2 |
| **Total** | | 0.3 |

* * *

In sum, the Court will subtract 5.3 hours from the total hours Mr. Koller billed based on the entries MLH identified.

### 6.  **Additional Reductions**

In addition, upon this Court's careful line-by-line review of Ms. Nitkin's fee petition, the Court finds it necessary to reduce Mr. Koller's time further, as the petition includes several other entries that are solely related to administrative tasks that Mr. Koller completed but which were not identified by MLH.  *Cf. Steward v. Sears, Roebuck & Co.*, Civil Action No. 02-8921, 2008 WL 1899995, at *5 (E.D. Pa. Apr. 29, 2008) ("The time entries noted by defendant total 9.6 hours.  The court finds that the time expended by Ms. Matos on simple administrative tasks was excessive.  *This court's independent review of Ms. Matos' time entries reveal another one hour of excessive time spent on administrative tasks*, for a total of 10.6 hours.  The court will make a deduction of fifty percent (50%), or 5.3 hours . . . from Ms. Matos' requested fees for excessive time spent on administrative tasks." (emphasis added).).  These entries, outlined in the Tables below, not only fall within the broader category of administrative tasks to which MLH objects , but also  fall under the smaller umbrella of "emails related to scheduling" to which MLH objects, as illustrated above.

It appears that Mr. Koller's practice is to bill 0.1 hours for each email he receives or sends related to scheduling, regardless of length.  As just one example, on October 25, 2021, Mr. Koller billed 0.1 hours for receiving a *two-sentence* email from this Court's Chambers scheduling a telephone conference for later that day and providing the dial-instructions, another 0.1 hours for receiving an email from opposing counsel that confirmed receipt of the email, and yet another 0.1 hours for sending an email to the Court confirming he also received the email.  Mr. Koller followed the same practice on June 16, 2021, June 17, 2021, July 6, 2021, October 27, 2021, and November 23, 2021.  The Court was privy to these emails, as it either sent or received them, and finds this to be an excessive amount of time spent on an administrative task.

*See Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 719 (3d Cir. 1989) (noting that a "judge may reduce requested fees with respect to matters within the judge's personal knowledge—for example, the amount of time spent by counsel at trial or in conference with the judge"); *see also Hayward*, 2011 WL 1838784, at *3 (reducing fee request for time spent on administrative tasks, including "0.2 hours [spent] receiving a notice from chambers that a pretrial conference had been continued and forwarding such notice to defendant").  Accordingly, the Court subtracts 1.8 hours from Mr. Koller's time for the entries shown in the Table below.

| Date | Description | Time |
|---|---|---|
| 6/16/2021 | Email from Chambers of Judge Marston, Civil Deputy Mark A. Rafferty, advising that Judge Marston has scheduled a phone conference for Thursday, June 27, 2021 at 4:45 PM | 0.1 |
| | Email from Paul Lantis at Littler Mendelson confirming receipt of the email from Chambers of Judge Marston scheduling the telephone status conference for June 17, 2021 | 0.1 |
| | Drafted email to Court confirming my attendance at the June 17th telephonic status conference | 0.1 |
| 6/17/2021 | Email from Grace Schmidt, Law Clerk to Judge Marston, advising that the judge is [in] the middle of a criminal trial and could not make the scheduled June 17th telephonic status conference, and stating that it will be rescheduled to June 18th at 9:00 a.m. | 0.1 |
| | Email from Paul Lantis at Littler Mendelson advising that he needed to request that the call be rescheduled for Monday the 21st for personal reasons | 0.1 |
| | Email from Grace Schmidt, Law Clerk to Judge Marston, granting Mr. Lantis' request for a continuance and rescheduling the conference call to Monday, June 21, 10:00 a.m. | 0.1 |
| | Email from Paul Lantis at Littler Mendelson thanking the Court for granting his request to reschedule the telephone conference call to Monday, June 21st at 10:00 a.m. | 0.1 |
| 7/6/2021 | Email from Grace Schmidt scheduling a telephonic conference on July 26th at 2:30 PM to discuss Defendant's motion for a protective order | 0.1 |
| | Email from Paul Lantis at Littler Mendelson confirming receipt of Ms. Schmidt's email scheduling today's telephonic call | 0.1 |
| 10/25/21 | Email from Chambers of Judge Marston advising the Court will hold a telephone conference today, October 25, 2021, at 4 PM and including dial-in instructions | 0.1 |

| | Email from Paul Lantis at Littler Mendelson confirming receipt of the Judge's email scheduling today's conference call | 0.1 |
|---|---|---|
| | Email from me confirming receipt of the Judge's email scheduling today's conference call | 0.1 |
| 10/27/21 | Email from Paul Lantis at Littler Mendelson thanking the Court for advising him of the start time tomorrow | 0.1 |
| | Email from Grace Schmidt, Law Clerk to Judge Marston, to Paul Lantis of Littler Mendelson, advising him that the Court will begin at 9:30 a.m. tomorrow morning, as discussed during the final pretrial conference | 0.1 |
| | Email from Paul Lantis of Littler Mendelson to the Court asking for the start time of trial tomorrow | 0.1 |
| 11/23/21 | Email from Grace Schmidt, Judge's Law Clerk, advising of the scheduling of a status conference for this afternoon and asking for confirmation | 0.1 |
| | Receipt and read email from Paul Lantis of Littler Mendelson confirming receipt of Ms. Schmidt's email | 0.1 |
| | Email to Grace Schmidt, Judge's Law Clerk, confirming receipt of her email scheduling the call this afternoon | 0.1 |
| **Total** | | 1.8 |

Likewise, the Court finds that the time Mr. Koller spent on scheduling calls, meet-and-confers, and other appointments with defense counsel is administrative in nature. *See, e.g.*, *Hayward*, 2011 WL 1838784, at *3 (reducing fee request for time spent on administrative tasks, including "0.1 hours [spent] scheduling a conference call with defendant's counsel"). This amounts to 2.1 hours.

| Date | Description | Time |
|---|---|---|
| 12/22/2020 | Email from Tanner McCarron asking about scheduling the Rule 26 conference being that our Joint Discovery Plan was due Tuesday December 29th, asking for times to schedule same | 0.1 |
| | Email exchange with Paul Lantis about scheduling the Rule 26 conference for tomorrow, December 23, 2020 | 0.1 |
| 12/23/2020 | Email from Tanner McCarron at Littler at 10:17 am asking if I [Mr. Koller] am available for a Rule 26 call at 130 PM today | 0.1 |
| 12/28/2020 | Email exchange with Tanner McCarron -he advised Joint discovery plan is due tomorrow so asked for time today for the Rule 16 call | 0.1 |
| | Email exchange with Paul Lantis scheduling the Rule 26 call for 4 pm today | 0.1 |

| | | |
|---|---|---|
| 6/10/2021 | Email from Paul Lantis at Littler Mendelson advising that we can start Eric Mendez's deposition at 8 am on June 14th | 0.1 |
| 6/14/2021 | Email from Paul Lantis at Littler Mendelson in response to Colleen Tannenbaum's email about July 7th for the rescheduled deposition of Eric Mendez, advising that "Unfortunately, I am not available on July 7, unless Dave can finish by noon.  If not, could you send me another day or two so I can check with Mr. Mendez as well?" | 0.1 |
| 6/15/2021 | Email from Paul Lantis at Littler Mendelson in response to Colleen Tannenbaum's email asking if July 22nd works for Eric Mendez, and he wrote "Yes, to the extent that Judge Marston permits additional time for discovery, Mr. Mendez and I are available." | 0.1 |
| 6/30/2021 | Email to Paul Lantis at Littler Mendelson telling him that Friday is fine for a meet and confer | 0.1 |
| | Email from Paul Lantis at Littler Mendelson advising he will send an invite for 10 and if that doesn't work, to please propose a new time | 0.1 |
| 7/6/2021 | Email from Paul Lantis at Littler Mendelson asking if 11 am work[s] for me [Mr. Koller] tomorrow for a conference call/meet and confer since he has guests arriving from out of town tomorrow at 1 pm | 0.1 |
| 7/7/2021 | Email to Paul Lantis at Littler Mendelson advising that I [Mr. Koller] am tied up in the morning so can talk later this afternoon or can just email him by midafternoon regarding each one so he can get back to me this evening | 0.1 |
| | Email from Paul Lantis at Littler Mendelson asking if I [Mr. Koller] can talk at 1 PM and he will resend calendar invite for then | 0.1 |
| 9/30/2021 | Email to Paul Lantis at Littler Mendelson advising him that Monday morning works better for me [Mr. Koller]  at 930 am for a call on the proposed jury instructions | 0.1 |
| | Email from Paul Lantis at Littler Mendelson that he will be on vacation Saturday to Saturday so wants the call on Friday before he leaves town | 0.1 |
| | Email to Paul Lantis at Littler Mendelson regarding having the call on Monday | 0.1 |
| | Email from Paul Lantis of Littler Mendelson about having the call Monday at 930 am and asking for proposed revisions before then | 0.1 |
| | Email to Paul Lantis at Littler Mendelson regarding confirming meeting on Monday morning at 930 am | 0.1 |
| | Email from Paul Lantis at Littler Mendelson confirming the 930 am call on Monday morning | 0.1 |
| 10/5/2021 | Email from Colleen Tannenbaum of Koller Law to Paul Lantis of Littler Mendelson asking if defense counsel is available at | 0.1 |

| | 230 PM on Monday, October 18, 2021 for final pretrial conference | |
| | Email from Paul Lantis of Littler Mendelson advising that 2:30 PM on Monday, October 18, 2021 is okay with defense counsel for the pretrial conference | 0.1 |
| **Total** | | 2.1 |

These additional deductions are appropriate under Third Circuit precedent.  As the appellate court has explained, a court may further reduce a fee award if the amount is not uncontested and if the reduction is based on factors raised by the opposing party.  *See United States ex rel. Palmer*, 897 F.3d at 137 ("The Court's determination of reasonable hourly rates and the reduction of fees for the summary judgment reply brief and travel time cannot be characterized as *sua sponte* rulings as Realtor suggests.  Clearly, C&D objected to the fees at issue given that Realtor argues the Court improperly reduced fees beyond what had been suggested by C&D in its objection—as such, the Court did not act *sua sponte*.  The prohibition against the reduction of attorneys' fees occurs only when the amount remains 'uncontested'— which is not the case here."); *Bell*, 884 F.2d at 720 ("[T]he two justifications for disallowing sua sponte fee reductions . . . mandate only that a judge not decrease a fee award based on factors *not raised at all* by the adverse party." (emphasis added)).

A court may make a reduction beyond what the opposing party requests so long as (1) the fee applicant is "given sufficient notice to present his or her contentions with respect to the reduction" ultimately made; (2) "any reduction is based on objections actually raised by the adverse party"; and (3) we provide "a concise but clear explanation of [our] reasons for the fee award."  *United States ex rel. Palmer*, 897 F.3d at 137 (quoting *Bell*, 884 F.2d at 721–23); *see also id.* at 137–38 ("Each of the District Court's reductions meets these benchmarks.  C&D filed objections to the hourly rates, travel time, and summary judgment hours, which put Relator on

notice as to those very topics.  C&D's underlying objections . . . each motivated the Court's

decisions.  And the Court permissibly relied on its knowledge of the case and the parties, in

addition to what it regarded as the inflated amount of hours billed by Relator's counsel, to reach

its conclusions.").  "In determining whether the fee request is excessive in light of particular

categorical contentions raised by the adverse party, and in setting the amount of any reduction,

the court will inevitably be required to engage in a fair amount of 'judgment calling' based upon

its experience with the case and its general experience as to how much time a case requires."

*Bell*, 884 F.2d at 721.

Here, the Court finds the fact that MLH objected to time that Mr. Koller spent on

administrative tasks, in addition to the Court's questioning at oral argument (*see, e.g.*, June 21,

2022 Rough Hr'g Tr. at 5:23–8:25), sufficient to put Ms. Nitkin on notice that this general

category of work was being objected to.  (*See* Doc. No. 81 at 6 ("Ms. Nitkin includes hours spent

on administrative tasks in her requested fees.  Ms. Nitkin's lodestar amount is unreasonable for

that additional reason.  When ruling on a motion for attorneys' fees the court must determine if

the hours expended were reasonable.  'Hours are not reasonably expended if they are excessive,

redundant, or otherwise unnecessary.  A plaintiff may not use a fee petition to recover for hours

spent on administrative tasks.'").)  We do not find it dispositive that MLH flagged 6.1 hours of

administrative work but did not flag every single entry that also constituted administrative work.

*See Bell*, 884 F.3d at 720–21 ("We believe that, in general, the party raising such challenges,

which affect an entire category . . . of work, need only specify with particularity the reason for its

challenge and the category . . . of work being challenged; it need not point to each individual

excessive entry."). And MLH's objection to the time Mr. Koller spent on administrative tasks

motivated the Court's decision to subtract the additional time that Mr. Koller spent on additional

administrative tasks that were not identified by MLH.  Virtually every single email identified in the Tables above relates to scheduling and falls within the ambit of MLH's objection that Ms. Nitkin should not be permitted to recover for administrative tasks that Mr. Koller completed.

For these reasons, the Court reduces Mr. Koller's time by 3.9 hours, in addition to the 5.3 hours that the Court calculated above based on the specific entries that MLH identified.  This amounts to a total deduction of 9.2 hours, or $4,876.00.

* * *

Based on the foregoing adjustments, the correct lodestar calculation is:

| Name | Rate | Hours | Total |
|------|------|-------|-------|
| David Koller | $530 | 324.7 | $172,091.00 |
| Jordan Santo | $300 | 43.3 | $12,990.00 |
| Paul Kenton | $275 | 11.4 | $3,135.00 |
| Elias Hoobler | $185 | 19.1 | $3,533.50 |
| Total | | | $191,749.50 |

### C.    *Level of Success*

Last, MLH argues that Ms. Nitkin's requested fee award should be reduced because of her lawsuit's limited success.  (Doc. No. 81 at 13–22.)  MLH contends that the lodestar should be adjusted downward by 20.4 hours to account for time Ms. Nitkin's attorney spent on the hostile work environment and wrongful discharge claims, as well as her emotional distress allegations.  (*Id.* at 14–18.)  MLH also argues that the lodestar should be reduced by an additional 50 percent due to limited success, which MLH asserts is illustrated by the dismissal of two of Ms. Nitkin's three claims at summary judgment, by the fact that the jury did not award

Ms. Nitkin any compensatory damages, and by the fact that the $140,001 damages award is much lower than the $850,000 figure she had requested during their last settlement discussions. (*Id.* at 18–22.)

### 1. **Standard**

"A district court can adjust a fee award upward or downward based upon the results obtained in a case." *McKenna v. City of Philadelphia*, 582 F.3d 447, 455 (3d Cir. 2009); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (explaining that the "results obtained" factor is "particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief"). Where a plaintiff has only succeeded on some, but not all, of her claims for relief, the Supreme Court has instructed courts to address the following two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Hensley*, 461 U.S. at 433.

Although there may be some lawsuits in which the plaintiff brings "distinctly different claims for relief that are based on different facts and legal theories," "[i]n other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories." *Id.* at 434–35.  In the former scenario, "counsel's work on one claim will be unrelated to his work on another claim," such that the plaintiff should not be permitted to recover fees for services rendered on an unsuccessful claim. *Id.* at 435.  However, in the latter scenario, where there is "a common core of facts" or related legal theories," the "lawsuit cannot be viewed as a series of discrete claims." *Id.*  "Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

"Where a plaintiff has obtained excellent results, his attorney should recover a full compensatory fee." *Id.* "If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436. At bottom, "the most critical factor is the degree of success obtained." *Id.*

"There is no precise rule or formula for making these determinations." *Id.* A court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37.

### 2. Analysis

At trial, Ms. Nitkin succeeded on her retaliation claim, which she brought pursuant to Title VII and the PHRA: the jury found she engaged in protected activity when she complained about Dr. Ahlswede's inappropriate comments, that she suffered an adverse employment action when she was forced to resign, and that there was a causal connection between her complaints and the adverse employment action. Before trial, the Court granted summary judgment as to Ms. Nitkin's hostile work environment claim and her state law wrongful termination claim. As to the first *Hensley* question—did Ms. Nitkin fail to prevail on claims that were unrelated to the claim on which she succeeded?—the Court finds that the answer is "yes" as to the wrongful termination claim and "no" as to the hostile work environment claim.[18]

---

[18] MLH also argues that Ms. Nitkin's emotional distress "claim" was unsuccessful and points to specific entries that it believes should be deducted as a result. (*See* Doc. No. 81 at 14 ("The Lodestar Should Be Adjusted Downward by 20.4 Hours to Account for Hours Spent on Work for the Hostile Work Environment, Wrongful Discharge, and Emotional Distress Claims."); *id.* ("[S]ome entries are tied specifically—and solely—to Ms. Nitkin's unsuccessful claims for hostile work environment, common law wrongful discharge, and emotional distress.").) However, Ms. Nitkin did not bring a standalone emotional distress *claim*. Rather, she claimed that she suffered emotional distress as a result of MLH's retaliatory conduct and the alleged hostile work environment. In other words, emotional distress only related to the damages Ms. Nitkin sought for her Title VII and PHRA claims (one of which went to the jury and one of which was dismissed at summary judgment). This is illustrated by the jury's verdict: the

<u>Wrongful Termination</u>.  The wrongful termination claim under Pennsylvania state law is unrelated to Ms. Nitkin's retaliation claim because it is based only on Ms. Nitkin's complaints that Dr. Ahlswede engaged in *fraudulent billing practices*, not Ms. Nitkin's complaints about Dr. Ahlswede's *inappropriate comments of a sexual nature*.  (*See* Doc. No. 1 at ¶¶ 131–33, Count V (alleging that MLH terminated her "in retaliation for . . . reporting fraudulent insurance practices"); Doc. No. 27 at 24 (arguing that she was required by state statute to report Dr. Ahlswede's fraudulent billing practices).)  *See Nitkin*, 2021 4860742, at *17–18.  The fraudulent billing complaints could not support a Title VII retaliation claim because they are untethered from her sex or gender discrimination claims.  *See Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (stating that Title VII's anti-retaliation provision protects "those who oppose discrimination made unlawful by Title VII"); *Davis v. City of Newark*, 417 F. App'x 201, 202–03 (3d Cir. 2011) ("Not every complaint or report entitles its author to protection from retaliation under Title VII.  Rather, only complaints about discrimination prohibited by Title VII—that is, discrimination on the basis of race, color, religion, sex, or national origin—constitute 'protected activity.'  Thus, for a complaint to amount to 'protected activity,' it must implicate an employment practice made illegal by Title VII.").  Because of the generalized nature of many of the billing entries attached as Exhibit A to Ms. Nitkin's fee petition, the Court is largely unable to discern how much time her attorneys devoted to this unrelated, unsuccessful claim.  There is only one entry that directly mentions the wrongful termination claim:  on October 4, 2021, Mr. Koller "[r]eview[ed] Defendant's proposed verdict sheet and evaluate[d] same, including

---

jury found that Ms. Niktin did not suffer emotional distress *as a result of* MLH's retaliatory conduct and, accordingly, only awarded her $1 in compensatory damages.  Because emotional distress was not an "unsuccessful *claim*" but rather part of the jury's consideration as to the damages Ms. Nitkin should receive for her successful retaliation claim, the Court finds it better suited to address the question of emotional distress in our analysis of the second *Hensley* question.

research on elements of wrongful termination claim and whether Plaintiff has to prove fraud," for which he billed 1.1 hours.  However, because the proposed verdict sheet also included Ms. Nitkin's other claims, the Court cannot find that the review related solely to the wrongful termination claim.

Hostile Work Environment.  Unlike the wrongful termination state law claim, the Court finds that the hostile work environment and retaliation claims, both of which were brought under Title VII and the PHRA, shared many of the same facts.  Ms. Nitkin claimed that she was retaliated against because she complained that Dr. Ahlswede made comments of a sexual nature that made her feel uncomfortable—the same conduct that formed much of the basis of her unsuccessful hostile work environment claim.  *Cf. Middlebrooks*, 2019 WL 936645, at *16 ("Teva argues the discrimination claims are distinct from the retaliation claims.  We disagree. The claims are sufficiently related and involve a common core of facts . . . . Even if the discrimination claims were not in the case, Mr. Middlebrooks had to develop at trial the factual context of his complaints to Teva regarding perceived age and national origin discrimination."). It is true that there were certain facts that the Court found irrelevant at trial because they related only to Ms. Nitkin's hostile work environment claim, not her retaliation claim.  However, overall, the Court finds that the claims involved many of the same facts.  Because the Court makes an overall percentage reduction, *see infra*, we do not subtract the 6.8 hours of time that Mr. Koller spent on drafting the hostile work environment section of his summary judgment brief.  *See Hensley*, 461 U.S. at 436–37 ("The district court may attempt to identify specific hours that should be eliminated, *or* it may simply reduce the award to account for the limited success." (emphasis added).)[19]

---

[19] At oral argument, Mr. Koller argued that it was double dipping to deduct the 6.8 hours he spent drafting the hostile work environment section of the summary judgment brief in addition to reducing the fee award

Next, the Court considers the second *Hensley* question—whether Ms. Nitkin achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.  MLH argues that Ms. Nitkin had limited success because two of her three claims were dismissed at the summary judgment stage and she received no damages for emotional distress.

Although Ms. Nitkin only received nominal compensatory damages, she received $20,000 in back pay and $120,000 in punitive damages.  This reflects a solid victory for Ms. Nitkin.  It is the full amount of back pay she requested, and over one-third of the statutory cap for punitive damages under Title VII, which is $300,000.  Given this success, the Court finds that MLH's proposed reduction of 50 percent is inappropriate.

That said, the Court would be remiss to not acknowledge that Ms. Nitkin spent a substantial amount of time at trial devoted to developing her alleged compensatory damages.  Yet, the jury found that she was only entitled to a nominal award of $1 and had not suffered *any* emotional distress.  Mr. Koller's closing argument illuminates that he and his client viewed Ms. Nitkin's emotional distress to be the crux of her case:

> You would then go to question number six:  As a result of Mainline Health's retaliatory conduct on July 16th, did Ms. Nitkin suffer emotional distress, mental anguish and/or loss of enjoyment of life?
>
> ***That is what this case is all about.***  The evidence clearly shows that this impacted April in many ways and still to this day.  Her life, her ability to take care of herself, her physical health, she lost her hair, her role as a mother and wife and as a daughter and a friend.
>
> It impacted her ability to trust again.  You heard her testify about that.  You

---

by a certain percentage.  (*See* June 21, 2022 Rough Hr'g Tr. at 35:7–36:9.)  In response, MLH stated that to the extent double dipping was a concern, it would prefer the Court apply an overall reduction.  (*See id*. at 47:2–13 ("[W]e will concede that it is really difficult to find what the actual time spent on the two claims [sic], and given the sort of vagueness in the record, we think that the Court should apply a reduction overall.  I don't think it's double dipping to then also take out the time that was specifically dedicated to those tasks that we can discern from the record, but if the Court is concerned about that being double dipping I think the Court [should] look at the record as a whole because the records are just too vague to actually know what time was spent on what.").)

heard [Brian Foley] testify credibly about what he witnessed with his wife. You heard Tess Lombardi who still works at Mainline Health testify about how it changed April.  It felt terrible.  It was painful to April to be victim-blamed, sabotaged, blindsided, and forced out, to have her reputation tarnished the day after.  The way Mainline Health responded to her speaking up and exercising her federally protected right was humiliating, demoralizing, shaming and caused her lots of pain and suffering still.  *We ask for a significant award to compensate April for that and for how it impacted her*.  She was genuine and authentic and her testimony reflected that.  The witnesses reflected that as well.  Emotional distress, number six. We request that you check off yes for number six, that she did suffer emotional distress, mental anguish and loss of enjoyment of life.

(Doc. No. 75 at 182–83 (emphasis added).)

The Court finds a modest reduction of 10 percent to be appropriate here.  This deduction accounts for the fact that Ms. Nitkin received only a nominal compensatory damages award,[20] that she had two of her three claims dismissed at the summary judgment stage, and that the jury verdict was significantly lower than her last settlement demand of $850,000 but also takes into consideration Ms. Nitkin's considerable success at trial as evidenced by the $140,001 damages award she received on her retaliation claim.  *See McGuffey v. Brink's*, 598 F. Supp. 2d 659, 674–

---

[20] Contrary to MLH's assertions, the Court finds it impossible to assess which billing entries were related to emotional distress.  "Text messages to and from Brian Foley" is incredibly vague—the fact that Brian Foley testified to Ms. Nitkin's emotional distress, among other things, does not provide the Court with a basis to find that those text messages related to emotional distress.  As an aside, MLH could have—and likely should have—objected to many of Mr. Koller's billing entries related to Mr. Foley on vagueness grounds.  *See, e.g.*, *Ray*, 2022 WL 1203730, at *5 ("AT&T challenges a handful of billing entries concerning internal emails, notes to file, and conferences because the attorneys have failed to state the subject matter.  I agree that the majority of these entries are too ambiguous for me to determine whether the hours were reasonably incurred."); *Giedgowd*, 2021 WL 4963532, at *4–5 (reducing fee award on vagueness grounds where billing entries related to telephone conferences or emails did not specify the subject matter of those calls/emails and were therefore ambiguous); *Middlebrooks*, 2019 WL 936645, at *8 (discounting time entries for communications that lacked reference to the subject matter those communications concerned).  But, as discussed above, the Court cannot *sua sponte* reduce the fee award on grounds that were not specifically raised by MLH.

Notably, MLH also did not object to the time that Mr. Koller spent redoing Ms. Nitkin's summary judgment response brief (*see, e.g.*, Sept. 9 and 14, 2021 entries), as the original response was stricken for failure to comply with this Court's policies or procedures (*see* Doc. No. 26).  However, again, the Court may not *sua sponte* reduce the award.

75 (E.D. Pa. 2009) ("I find that McGuffey's success was incomplete because Brink's was not found liable for age discrimination, an important component of this matter. On the other hand, the $170,000 award was itself an excellent outcome for McGuffey. Therefore, I will compensate for this limited success with a ten-percent reduction to the lodestar."); *see also Witkoski v. Int'l Bros. of Boilermakers, Iron Shipbuilders, Local Union 154*, Civil Action No. 06-874, 2010 WL 1433104, at *14–15 (W.D. Pa. Apr. 7, 2010) (reducing lodestar by 10 percent where the plaintiff prevailed on his retaliation claims but did not succeed on his underlying age discrimination claims). *Cf. Middlebrooks*, 2019 WL 936645, at *15 (reducing fee award by 4 percent where the jury found in favor of the plaintiff on his retaliation and retaliatory hostile work environment claims, but not his national origin and age discrimination claims, and awarded him compensatory damages of $200,000; back pay of $332,000; front pay of $450,000; and punitive damages of $5 million, which the court reduced to the statutory cap of $300,000, and noting that "if *Hensley* is to have meaning, we must deduct some percentage of the requested hourly fees because [the plaintiff] did not win every claim"). *Contra Roccisano*, 2015 WL 5649149, at *19 ("While Plaintiff began her case with thirteen counts against four Defendants, Plaintiff succeeded at trial on a single claim against a single Defendant, and ultimately obtained only a fraction—a mere $1000—of the damages sought pre-trial. Even the final settlement amount, $18,000, is only six percent of the Plaintiff's final settlement demand . . . . In consideration of these factors, I find that a fee reduction of 50% is appropriate."); *Dinizo v. Township of Scotch Plains*, Civil Action No. 07-05327(PGS), 2010 WL 2880171, at *2 (D.N.J. July 19, 2010) (reducing fee award by 55 percent due to the plaintiff's lack of success where the plaintiff "proved little damages" and was only awarded $1,500.00).

Therefore, the final lodestar calculation of attorneys' fees is $172,574.55.

**IV.     Conclusion**

For the foregoing reasons, the Court grants Ms. Nitkin $172,574.55 in attorneys' fees and

$5,840.15 in costs.[21]

An appropriate Order follows.

---

[21] In its response to Ms. Nitkin's fee petition, MLH did not object to the costs Ms. Nitkin requested.  (*See generally* Doc. No. 81.)  "Successful civil rights litigants are entitled to reimbursement of 'costs' connected with litigating their claim as long as the costs are reasonably and necessarily incurred." *Middlebrooks*, 2019 WL 936645, at *19 (cleaned up).  The Court finds that Ms. Nitkin's request for $5,840.15 is reasonable.